# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| THOMAS MICHAEL KEENAN, | : | CASE  NO. 1:01 CV 2139 |
| | : | |
| Petitioner, | : | |
| | : | JUDGE DAVID A. KATZ |
| vs. | : | |
| | : | |
| MARGARET BAGLEY, Warden, | : | <u>MEMORANDUM  OPINION</u> |
| | : | |
| Respondent. | : | |

This matter is before the Court upon Petitioner Thomas Michael Keenan's ("Keenan" or "Petitioner") Amended Petition for Writ of Habeas Corpus.

Petitioner, acting pursuant to 28 U.S.C. § 2254, filed an Amended Petition for Writ of Habeas Corpus, challenging his conviction and sentence of death rendered by an Ohio court. (ECF No. 197.)  The Respondent, Warden Margaret Bagley ("Respondent"), filed a timely Return of Writ, and Keenan filed an Amended Traverse.  (ECF Nos. 218 and 223, respectively.)  Respondent then filed a Sur-Reply to Amended Traverse.  (ECF No. 231.)

For the following reasons, the Amended Petition for Writ of Habeas Corpus will be granted in part and denied in part.

## I.     Factual History

On October 6, 1998, a Cuyahoga County Grand Jury issued a four-count indictment against Keenan.  The indictment charged Keenan with aggravated murder (prior calculation and design) with a felony murder specification in violation of Ohio Revised Code § 2903.01(A), for the murder of Anthony Klann; aggravated murder (during the commission of a felony) with a felony murder specification in violation of Ohio Revised Code § 2903.01(B); kidnapping in violation of  Ohio Revised Code § 2905.01; and aggravated burglary in violation of Ohio Revised Code § 2911.11.  Keenan entered a plea of not guilty to all charges.

The Ohio Supreme Court set out the following factual history, as adduced by the evidence presented at trial, upon considering Keenan's direct appeal of his convictions and sentence:

> Keenan employed Anthony Klann, Edward Espinoza, and Joseph D'Ambrosio in his landscaping business. On either Thursday, September 22, or Friday, September 23, 1988, at about 7:00 p.m., Klann went to "The Saloon," a Cleveland bar, with Paul "Stoney" Lewis, his roommate and friend (and a former employee of Keenan's). Keenan, Espinoza, and D'Ambrosio went to The Saloon after work that same evening.
>
> Keenan and Lewis encountered each other at The Saloon and subsequently left the bar together. They took Keenan's truck to another bar known as Coconut Joe's, which was located in Cleveland Heights. Before going inside, Keenan gave Lewis some cocaine and marijuana, in lieu of seventy dollars Keenan owed Lewis. Later, Klann entered Coconut Joe's. Espinoza and D'Ambrosio arrived sometime after Klann.
>
> According to Lewis, Espinoza had a dispute with Klann at Coconut Joe's and shouted at him several times. One time, Lewis followed them into the men's room; he found Espinoza "hollering" and shaking his finger in Klann's face. (Espinoza admitted that he and Klann went into the men's room together, but denied having a "disagreement" with Klann.) Lewis left Coconut Joe's around midnight. Later, Espinoza was ejected from

2

the bar. Keenan, Espinoza, and D'Ambrosio left Coconut Joe's together at approximately 1:30 or 2:00 a.m. Keenan drove away, while Espinoza and D'Ambrosio walked from the bar to D'Ambrosio's apartment.

Before Espinoza and D'Ambrosio went inside the apartment, Keenan drove up in his truck. Keenan accused Lewis of stealing "dope" from his truck and asked Espinoza and D'Ambrosio to help look for Lewis. They agreed. In D'Ambrosio's apartment, Espinoza armed himself with a baseball bat, while D'Ambrosio grabbed a knife. About 2:00 or 2:30 a.m., they joined Keenan in the truck and the three of them cruised the so-called "Little Italy" area of Cleveland, looking for Lewis.

James Russell, an acquaintance of Keenan's, lived with Carolyn Rosell in an apartment in Little Italy. About 3:00 a.m., Russell and Rosell were awakened by someone banging on their door. They let Keenan, D'Ambrosio, and Espinoza into their apartment. Keenan asked where Lewis was and threatened to kill Lewis. Keenan told Russell that Lewis "had ripped him off." After about fifteen minutes, Keenan and his men left.

Keenan, still searching for Lewis, drove up Mayfield Hill, where he saw Klann walking in the opposite direction. According to Espinoza, there was a "light rain, drizzle" falling "off and on." Keenan pulled over and hailed Klann. When Klann approached, Keenan grabbed him and forced him into the truck.

Keenan, Espinoza, and D'Ambrosio repeatedly asked Klann where Lewis was, threatening "to hurt him" if he did not tell. Klann insisted that he did not know. During this interrogation, Espinoza struck Klann in the head with the baseball bat. Klann did tell the group where he and Lewis lived. Keenan drove there, and he and Espinoza knocked on what Keenan thought was Lewis's door.

Memsel Dendak and Adam Flanik lived together in the same apartment complex as Lewis and Klann. About 3:00 a.m., they were awakened by "shouting and screaming" outside. Dendak heard someone yell, "I want my dope" (or "my coke"). Flanik went out to investigate and found Espinoza pounding on someone's door. Espinoza asked **936 Flanik where "Stoney" (Lewis) lived. Espinoza then went to Lewis's door and pounded on it, saying, "Where is Stoney? I'm going to kill him."

Keenan got out of the truck and also began to pound on Lewis's door. Flanik later described Keenan's behavior as "very violent." Keenan informed Flanik that he was looking for Lewis because Lewis had stolen something.

Klann stayed in the truck. Flanik looked over and saw D'Ambrosio, who was sitting behind Klann, holding a knife to Klann's neck. Flanik thought Klann "looked intimidated by Joe, because he wasn't turning his head to see who was behind him * * *." Klann also looked to Flanik as though he had been "roughed up."

Finally, Espinoza gave up pounding on the door and proceeded to kick it until it came open. He and Keenan entered Lewis's apartment, looked around briefly, then got back in the truck and left.

Keenan drove back to Russell's residence. Espinoza went to the door and asked Russell if Lewis had been there. He told Russell to tell Lewis that Espinoza "had a contract out on him." He then returned to the truck.

Keenan then drove to Doan's Creek, where he pulled the truck over. Holding D'Ambrosio's knife, Keenan ordered Klann out of the truck. As they stood at the edge of the creek, Keenan asked Klann for the last time where Lewis was. Klann still did not know. Keenan ordered Klann to tilt his head back. Keenan then slashed Klann's throat, led him to the creek, and pushed him in. Klann got up and was "stumbling" around. Keenan said to D'Ambrosio, "Finish him." D'Ambrosio took the knife and jumped into the creek. Espinoza heard splashing and heard Klann yell, "[P]lease don't kill me."

On Saturday, September 24, a jogger found Klann's body in Doan's Creek. The next day, Dr. Elizabeth Balraj, the county coroner, performed an autopsy on the body. She found that Klann's throat had been slashed, his windpipe perforated. Klann had also been stabbed three times in the chest. Balraj was unable to estimate a time of death.

*State v. Keenan*, 81 Ohio St. 3d 133, 133-36, 689 N.E.2d 929, 935-37 (Ohio 1998).

Many additional facts have been adduced during the course of this proceeding, primarily through various expansions of the record.  Although not summarized here, those facts will be described below to the extent relevant to the Court's analysis.

I.      **Procedural History**

This case has a long and complex history.  Keenan's trial was commenced on January 23, 1989.  A jury returned a verdict of guilty on all four counts on January 31, 1989.  The penalty phase of the trial commenced on February 13, 1989.  On February 15, 1989, the jury recommended that Keenan be sentenced to death.  The trial court agreed with the jury's recommendation and sentenced Keenan to death on March 1, 1989.

Keenan filed a timely appeal of the trial court's decision to the Eighth District Court of Appeals, raising twelve assignments of error.  The court of appeals affirmed the trial court's decision on December 27, 1990.  *State v. Keenan*, No. 57565, 1990 WL 212119 (Ohio App. Dec. 27, 1990).  The Ohio Supreme Court reversed that decision, however, based upon prosecutorial misconduct, and remanded the case to the trial court for a new trial.  *State v. Keenan*, 66 Ohio St. 3d 402, 613 N.E.2d 203 (Ohio 1993).

Keenan was retried on the original indictment beginning on April 21, 1994.  He was represented by Russo Rocco and James Kersey. After the trial concluded on May 3, 1994, Keenan again was convicted on all counts on May 5, 1994.  The penalty phase of the trial commenced on May 12, 1994, and the jury sentenced him to death on May 13, 1994.  The trial court agreed with the jury's recommendation and sentenced Keenan to death that same day.  He also received consecutive sentences of 15 to 25 years for the kidnapping charge and 15 to 25 years for the aggravated burglary charge.

Keenan filed a timely appeal of the trial court's decision to the Eighth District Court of Appeals, represented by Paul Mancino, raising thirty-nine assignments of error as follows:

5

1.      Defendant was denied the right to have his own counsel as guaranteed by the Ohio and Federal constitution.

2.      Defendant was denied due process of law when the court would not permit the defendant to fully participate as co-counsel to include argument to the jury and trial preparation participation.

3.      Defendant was denied due process of law when the prosecutor was permitted to constructively amend the indictment by altering the date of the offense.

4.      Defendant was denied due process of law when the court refused to record the entire proceedings.

5.      Defendant was denied due process of law when the court permitted hearsay evidence from Det. Leo Allen.

6.      Defendant was denied due process of law when the court permitted the coroner to testify concerning possibilities that the knives in evidence could have caused the wounds on the decedent.

7.      Defendant was denied due process of law and a fair trial when the court brought to the attention of the jury the defendant was in jail.

8.      Defendant was denied a fair trial when the court required that a defense witness be shackled and handcuffed during his testimony.

9.      Defendant was prevented from presenting a full and complete defense by reason of interference from the court.

10.     Defendant was denied a fair trial when the prosecution on the argument to the jury commented on the fact that the defendant did not testify.

11.     Defendant was denied a fair trial due to improper argument by the prosecutor and the improper questioning of witnesses which placed the credibility of the prosecutor in issue and attesting to the veracity of state's witness.

12.     Defendant was denied a fair trial by reason of instances of prosecutorial misconduct during the course of the trial.

13.     Defendant was denied due process of law when the court amended the indictment so
        as to charge the defendant with the substantive offense of conspiracy.

14.     Defendant was denied due process of law when the court constructively amended the indictment to the offense and sentencing the defendant to death for conspiracy.

15.     Defendant was denied due process of law when the court improperly instructed the jury concerning the causal responsibility of the defendant.

16.     Defendant was denied due process of law when the court instructed the jury concerning the presumption arising from two or more persons having a common purpose.

17.     Defendant was denied due process of law when the court misinformed the jury concerning the criminal act and, in effect, amended the statute.

18.     Defendant was denied due process of law when the court proceeded to amend the indictment by instructing that the prosecution claimed the use of a dangerous weapon.

19.     Defendant was denied due process of law when the court constructively amended the indictment concerning the date despite the fact that the defendant had filed an alibi notice.

20.     Defendant was denied due process of law when the court informed the jury concerning the plea of a co-defendant without giving any limiting instructions concerning the effect of that plea.

21.     Defendant was denied due process of law when the court would not instruct upon any lesser included offenses.

22.     The court committed prejudicial error and denied the defendant due process of law when the jury was not required to specifically find in which manner the defendant had been found guilty.

23.     Defendant was denied due process of law when the court never informed the jury as to the effect of prior convictions concerning the evaluation of testimony of witnesses.

24.     Defendant was denied due process of law when the court modified the definition of proof beyond a reasonable doubt.

25.     Defendant was denied due process of law when the court instructed the jury upon a non-issue motive.

26.     Defendant was denied due process of law and subjected to double jeopardy when the court refused to dismiss the death penalty specification by reason of the prior reversal in this case.

27.     Defendant was denied due process of law when the court, in its comments to the jury at the sentencing phase, unconstitutionally lessened the responsibility of the jury concerning its duty concerning the death penalty.

28.     Defendant was denied due process of law when the court equated the burden of going forward with the burden of production, thus implying burden of proof.

29.     Defendant was denied due process of law when the court affirmatively misinstructed the jury concerning the nature of mitigating factors.

30.     Defendant was denied due process of law when the court proceeded to impose a sentence of death based upon non-statutory aggravating circumstances.

31.     Defendant was denied due process of law when the court gave the impression to the jury that there were aggravating circumstances that had been proven in this case when only a singular aggravating circumstance was shown to exist.

32.     Defendant was denied due process of law when the court improperly advised the jury as to mitigating factors of character.

33.     Defendant was subjected to a cruel and unusual punishment and unconstitutional multiple punishment when the court failed to merge the kidnaping and aggravated murder convictions separately when it sentenced the defendant for kidnaping which also served as a predicate for the imposition of a death sentence.

34.     Defendant was denied due process of law when the court instructed the jury concerning all of the statutory mitigating factors when evidence on all of these factors were not presented in this case.

35.     Defendant was denied his constitutional rights when the law permits an aggravating circumstance which consists of an attempt to be elevated into a circumstance that will permit the imposition of a death penalty.

36.     Defendant was subjected to cruel and unusual punishment because the underlying felonies are impermissibly enhanced so as to authorize the imposition of a death penalty when either singularly or cumulatively, such punishment is prohibited.

37.     Defendant was denied a fair tribunal because the trial court rushed to judgment to impose a death sentence and sought to have a public view of the execution.

38.     Defendant was denied due process of law and subjected to a cruel and unusual punishment because the imposition of a death sentence violates the sixth, eighth, and fourteenth amendments to the United States Constitution and sections 2, 9, 10 and 16 of article I of the Ohio Constitution.

39.     Defendant was denied the effective assistance of counsel.

(ECF No. 197, 2-4.)  The court of appeals affirmed the trial court's opinion on August 22, 1996.  *State v. Keenan*, No. 67452, 1996 WL 476437 (Ohio App. Aug. 22, 1996).

Keenan filed a timely appeal of the court of appeals' decision to the Ohio Supreme Court, employing the same attorney.  He asserted the following assignments of error:

I:          Defendant Was Denied the Right to Have Counsel of His Own Choosing as Guaranteed by the Ohio and Federal Constitutions.

II:         Defendant Was Denied Due Process of Law When the Court Would Not Permit the Defendant to Fully Participate as Co-Counsel to Include Argument to the Jury and Trial Preparation Participation.

III:        Defendant Was Denied Due Process of Law When the Prosecutor Was Permitted to Constructively Amend the Indictment by Altering the Date of the Offense.

IV:        Defendant Was Denied Due Process of Law When the Court Refused to Record the Entire Proceedings.

V:         Defendant Was Denied Due Process of Law and a Fair Trial When the Court Permitted Det. Leo Allen to Relate Hearsay Evidence.

VI:        Defendant Was Denied Due Process of Law When the Court Permitted the Coroner to Testify as to Possibilities the Knives Offered into Evidence Could Have Caused the Wounds on the Decedent.

VII:       Defendant Was Denied Due Process of Law and a Fair Trial When the Court Brought to the Attention of the Jury That the Defendant Was in Jail.

VIII:      Defendant Was Denied a Fair Trial When the Court Required That a Defense Witness Be Shackled and Handcuffed While Testifying Which Bias Was Reinforced by the Court Toward Defendant When Former Testimony of the Witness Was Read to the Jury.

9

IX:                Defendant Was Prevented from Presenting a Full and Complete Defense by Reason of Interference from the Court.

X:                Defendant Was Denied a Fair Trial When the Prosecution, in its Argument to the Jury, Commented on the Fact That the Defendant Did Not Testify.

XI:                Defendant Was Denied a Fair Trial Due to Improper Argument by the Prosecutor and the Improper Questions of Witnesses Which Placed the Credibility of the Prosecutor in Issue and the Prosecutor Attesting to the Veracity of State's Witness.

XII:                Defendant Was Denied a Fair Trial by Reason of Instances of Prosecutorial Misconduct During the Course of the Trial.

XIII:                Defendant Was Denied Due Process of Law When the Court Amended the Indictment So as to Charge the Defendant with the Substantive Offense of Conspiracy.

XIV:                Defendant Was Denied Due Process of Law When the Court Constructively Amended the Indictment to the Offense of a Conspiracy, Which Is a Substantive Offense, and Sentencing the Defendant to Death for Conspiracy.

XV:                Defendant Was Denied Due Process of Law When the Court Improperly Instructed the Jury Concerning the Causal Responsibility of the Defendant.

XVI:                Defendant Was Denied Due Process of Law When the Court Instructed the Jury Concerning the Presumption Arising from Two or More Persons Having a Common Purpose.

XVII:                Defendant Was Denied Due Process of Law When the Court Misinformed the Jury Concerning the Criminal Act And, in Effect, Amended the Statute.

XVIII:                Defendant Was Denied Due Process of Law When the Court Proceeded to Amend the Indictment by Instructing That the Prosecution Claimed the Use of a Dangerous Weapon.

XIX:                Defendant Was Denied Due Process of Law When the Court Constructively Amended the Indictment Concerning the Date Despite the Fact That the Defendant Had Filed an Alibi Notice.

XX:                Defendant Was Denied the Effective Assistance of Counsel.

XXI:        Defendant Was Denied Due Process of Law When the Court Informed the Jury Concerning the Plea of a Co-defendant Without Giving Any Limiting Instructions Concerning the Effect of That Plea.

XXII:       Defendant Was Denied Due Process of Law When the Court Would Not Instruct upon Any Lesser Included Offenses.

XXIII:      The Court Committed Prejudicial Error and Denied the Defendant Due Process of Law When the Jury Was Not Required to Specifically Find in Which Manner the Defendant Had Been Found Guilty.

XXIV:       Defendant Was Denied Due Process of Law When the Court Never Informed the Jury as to the Effect of Prior Convictions Concerning the Evaluation of Testimony of Witnesses.

XXV:        Defendant Was Denied Due Process of Law When the Court Modified the Definition of Reasonable Doubt.

XXVI:       Defendant Was Denied Due Process When the Court Instructed the Jury upon a Non-Issue Motive.

XXVII:      Defendant Was Denied Due Process of Law and Subjected to Double Jeopardy When the Court Refused to Dismiss the Death Penalty Specification by Reason of the Prior Reversal in this Case.

XXVIII:     Defendant Was Denied Due Process of Law When the Court, in its Comments to the Jury at the Sentencing Phase, Unconstitutionally Lessened the Responsibility of the Jury Concerning its Duty Concerning the Death Penalty.

XXIX:       Defendant Was Denied Due Process of Law When the Court Equated the Burden of Going Forward with the Burden of Production, Thus Implying a Burden of Proof.

XXX:        Defendant Was Denied Due Process of Law When the Court Affirmatively Misinstructed the Jury Concerning the Nature of Mitigating Factors.

XXXI:       Defendant Was Denied Due Process of Law When the Court Proceeded to Impose a Sentence of Death Based upon Nonstatutory Aggravating Circumstances.

XXXII:        Defendant Was Denied Due Process of Law When the Court Gave the Impression to the Jury That There Were Aggravating Circumstances That Had Been Proven in this Case When Only a Singular Aggravating Circumstance Was Shown to Exist.

XXXIII:       Defendant Was Denied Due Process of Law When the Court Improperly Advised the Jury as to Mitigating Factors of Character.

XXXIV:       Defendant Was Subjected to Cruel and Unusual Punishment and Unconstitutional Multiple Punishment When the Court Failed to Merge the Kidnaping and Aggravated Murder Convictions When it Separately Sentenced the Defendant for Kidnaping Which Also Served as a Predicate for the Imposition of a Death Sentence.

XXXV:       Defendant Was Denied Due Process of Law When the Court Instructed the Jury Concerning All of the Statutory Mitigating Factors When Evidence on All of These Factors Was Not Presented in this Case.

XXXVI:       Defendant Was Denied His Constitutional Rights When the Law Permits an Aggravating Circumstance Which Consists of an Attempt to Be Elevated into a Circumstance That Will Permit the Imposition of a Death Penalty.

XXXVII:      Defendant Was Subjected to Cruel and Unusual Punishment Because the Underlying Felonies Are Impermissibly Enhanced So as to Authorize the Imposition of a Death Penalty When Either Singularly or Cumulatively, Such Punishment Is Prohibited.

XXXVIII:     Defendant Was Denied a Fair Tribunal Because the Trial Court Rushed to Judgment to Impose a Death Sentence and Sought to Have a Public View of the Execution.

XXXIX:      Defendant Was Denied Due Process of Law and Subjected to a Cruel and Unusual Punishment Because the Imposition of a Death Sentence Violates the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 2,9,10 and 16 of Article I of the Ohio Constitution.

(ECF No. 197, 5-7.)  The Ohio Supreme Court affirmed that decision.  *State v. Keenan*, 81 Ohio St. 3d 133, 689 N.E.2d 929 (Ohio 1998).  Concluding his direct appeals, Keenan filed a Petition for Writ of Certiorari to the United States Supreme Court, again represented by Paul Mancino.  The Court denied the Petition on October 5, 1998.  *Keenan v. Ohio*, 525

U.S. 860 (1998).  The Supreme Court also denied Keenan's Petition for Rehearing on

November 30, 1998.  *Keenan v. Ohio*, 525 U.S. 1035 (1998).

Keenan filed a Petition for Post-Conviction Relief And/Or Motion For New Trial

on March 26, 1999.  He raised the following grounds for relief:

1.      Ineffective assistance of counsel for failure to file a motion to suppress.

2.      Ineffective assistance of counsel for failure to use prior statements of witnesses
        from first trial and D'Ambrosio's trial.

3.      Defendant was denied due process when exculpatory evidence was withheld.

(ECF No. 197, 8.)  The Cuyahoga County  Court of Common Pleas denied the Petition on

August 10, 1999.  (App. To Return of Writ, Post-Conviction, vol. 4, 160-74.)  Keenan filed

a timely appeal of the trial court's decision to the Cuyahoga County Court of Appeals,

which affirmed the judgment on February 1, 2001.  *State v. Keenan*, No. 77480, 2001 WL

91129 (Ohio App. Feb. 1, 2001).  The Ohio Supreme Court declined to review the court of

appeals' decision.  *State v. Keenan*, 92 Ohio St. 3d 1429, 749 N.E.2d 756 (Ohio 2001).

Keenan  filed a second Petition for Post-Conviction Relief on February 6, 2004.  He

raised the following grounds for relief:

1.      Petitioner was deprived of his right to effective assistance of counsel as guaranteed
        by the 6th and 14th Amendments to the U.S. Constitution when court-appointed
        counsel permitted the prosecution to illegally impeach defense witnesses.

2.      Petitioner was deprived of effective assistant of counsel as guaranteed by the 6th
        and 14th Amendments to the U.S. Constitution when court-appointed counsel
        permitted the prosecution to illicit hearsay and guesswork from witnesses.

13

3.   Petitioner was deprived of his right to effective assistant of counsel as guaranteed by
the 6th and 14th amendments to the U.S. Constitution when court-appointed counsel
engaged in ongoing collusion with the prosecutor throughout most of the guilt phase
of trial.

4.   Petitioner was deprived of his right to effective assistance of counsel as guaranteed
by the 6th and 14th amendments to the U.S. Constitution when court-appointed
counsel deliberately destroyed defendant's alibi defense by intentionally altering
the order of defendant's alibi witnesses in taking the stand.

5.   Petitioner was deprived of his right to effective assistance of counsel as guaranteed
by the 6th and 14th amendments when court-appointed counsel caused substantial
and injurious effect upon the jury during closing summation.

6.   Petitioner was deprived of his rights under the 5th, 6th, 8th, and 14th amendments,
since he is factually innocent of the offense of which he was convicted and
sentenced to death.

7.   Petitioner was deprived of his right to effective assistance of counsel as guaranteed
by the 6th amendment by court-appointed counsel's refusal to impeach state witness
Espinoza's perjury.

8.   Petitioner was deprived of his right to effective assistance of counsel as guaranteed
by the 6th Amendment by court-appointed counsel's refusal to impeach state witness
Paul Lewis' perjury.

9.   Petitioner was deprived of his right to effective assistance of counsel as guaranteed
by the 6th Amendment by court-appointed counsel's refusal to impeach state witness
Adam Flanik's perjury.

10.  Petitioner was deprived of his right to effective assistance of counsel as guaranteed
by the 6th Amendment by court-appointed counsel's refusal to impeach state witness
Mimsel Dendak's perjury.

11.  Petitioner was deprived of his right to effective assistance of counsel as guaranteed
by the 6th Amendment by court-appointed counsel's refusal to impeach state witness
Carolyn Rosell's perjury.

12.  Petitioner was deprived of his right to effective assistance of counsel as guaranteed
by the 6th Amendment by court-appointed counsel's refusal to impeach stated
witness Det. Leo Allen's perjury.

14

13.     Petitioner was deprived of his right to effective assistance of counsel as guaranteed by the 6th Amendment by court-appointed counsel's refusal to impeach state witness Edward Espinoza's pathological lies while under oath.

14.     Petitioner was deprived of his right to due process and a fair trial as guaranteed by the 5th, 6th, 8th, and 14th amendments to the U.S. Constitution when the prosecution suborned perjury in order to frame and convict one who is actually innocent.

15.     Petitioner was deprived of his right to due process and a fair trial as guaranteed by the 5th, 8th and 14th amendments when the prosecutor in case-in-chief relies primarily on the state witness Espinoza's testimony and the prosecutor knows his testimony is
contradicted by other state witnesses on material facts pertinent to the framing and conviction of one who is actually innocent.

16.     Petitioner was deprived of his right to due process and a fair trial as guaranteed by the 5th, 6th, 8th and 14th amendments where the prosecution's case relies in part on state witness Lewis' testimony and the prosecution knows his testimony is contradicted by other state witnesses on material facts pertinent to the framing and conviction of one who is actually innocent.

17.     Petitioner was deprived of his right to due process and a fair trial as guaranteed by the 5th, 6th, 8th, and 14th amendments when the prosecution's case relies in part on state witness Flanik's testimony and the prosecution knows his testimony is contradicted by other state witnesses on material facts pertinent to the framing and conviction of one who is actually innocent.

18.     Petitioner was deprived of his right to due process and a fair trial as guaranteed by the 5th, 6th, 8th, and 14th amendments when the prosecution's case relies in part on state witness Dendak's testimony and the prosecution knows her testimony is contradicted by other state witnesses on material facts pertinent to the framing and conviction of one who is actually innocent.

19.     Petitioner was deprived of his right to due process and a fair trial as guaranteed by the 5th, 6th, 8th, and 14th amendments when the prosecution's case relies in part on state witness Carolyn Rosell's testimony and the prosecution knows her testimony is contradicted by other state witnesses on material facts pertinent to the framing and conviction of one who is actually innocent.

20.     Petitioner was deprived of his right to due process and a fair trial as guaranteed by the 5th, 6th, 8th, and 14th amendments when the prosecution's case relies in part on state witness Russell's testimony, albeit from a former trial, and the prosecution knows his testimony is contradicted by other state witnesses on material facts pertinent to the framing and conviction of one who is actually innocent.

21. Petitioner was deprived of his right to due process and a fair trial as guaranteed by the 5th, 6th, 8th, and 14th amendments when the prosecution's case relies in part on state witness Russell's testimony, albeit from a former trial, and the prosecution knows his testimony is contradicted by other state witnesses on material facts pertinent to the framing and conviction of one who is actually innocent.

22. Petitioner was deprived of his right to due process and a fair trial as guaranteed by the 5th, 6th, 8th, and 14th amendments when the prosecutors presented evidence known to be fabricated in order to frame and convict one who is actually innocent.

23. Petitioner was deprived of his right to due process and a fair trial as guaranteed by the 5th, 6th, 8th, and 14th amendments when a prosecution witness recants his testimony regarding the time frame petitioner was seen.

24. Petitioner was deprived of his right to due process and a fair trial as guaranteed by the 5th, 6th, 8th, and 14th amendments when the prosecution presented evidence known to be false concerning a burglary and withheld exculpatory police reports in order to frame one who is actually innocent.

25. Petitioner was deprived of his right to due process and a fair trial as guaranteed by the 5th, 6th, 8th, and 14th amendments when the prosecution elicited false testimony from a police officer and other witnesses contrary to material facts in order to frame and convict one who is actually innocent.

26. Petitioner was deprived of his right to due process and a fair trial as guaranteed by the 5th, 6th, 8th, and 14th amendments when the prosecution used an expert witness to present testimony in half truths regarding scientific facts concerning width and minimum blade lengths of the murder weapon in order to frame and convict one who is actually innocent.

27. Petitioner was deprived of his right to due process and a fair trial as guaranteed by the 5th, 6th, 8th, and 14th amendments to the U.S. Constitution when the prosecutor permits evidence known to be false concerning state's witness Flanik and his false testimony on seeing D'Ambrosio supposedly holding a knife under Anthony Klann's chin in order to frame and convict one who is factually innocent.

28. Petitioner was deprived of his right to due process and a fair trial as guaranteed by the 5th, 6th, 8th, and 14th amendments when the prosecutor withheld *Brady* and *Bagley* evidence from petitioner in the form of test results on evidence in order to convict one who is factually innocent.

29.     Petitioner was deprived of his right to due process and a fair trial as guaranteed by the 5th, 6th, 8th, and 14th amendments when the prosecutor withheld *Brady and Bagley* evidence from petitioner in the form of exculpatory witness statements in order to convict one who is factually innocent.

30.     Petitioner was deprived of his right to due process and a fair trial as guaranteed by the 5th, 6th, 8th, and 14th amendments to the U.S. Constitution when Cleveland Police detectives entered another city to arrest petitioner and search the premises of Cindy Calire without having obtained any warrants to effect said arrest and search.

31.     Petitioner was deprived of his right to due process and a fair trial as guaranteed by the 5th, 6th, 8th, and 14th amendments to the U.S. Constitution when prosecutors and police manufactured an entire case based on falsehoods purported to be truths, fabricated evidence, suborned perjurious testimony and suppressed exculpatory material to fit the tale of the actual killer in order to convict one who is actually innocent.

32.     Petitioner was deprived of his right to due process and a fair trial as guaranteed by the 6th, 8th, and 14th amendments to the U.S. Constitution when the prosecutor withheld *Brady* and *Bagley* evidence in the form of exculpatory police reports and court-appointed counsel's refusal to look for or investigate exculpatory witnesses in order to convict one who is factually innocent.

(ECF No. 197, 8-11.)  The Cuyahoga County  Court of Common Pleas denied the Petition on January 3, 2006.  (Supp. App. to Return of Writ, Post-Conviction, vol. 5, 414.)  Keenan filed a timely appeal of the trial court's decision to the Eighth District Court of Appeals, which affirmed the judgment on November 16, 2006.  *State v. Keenan*, No. 87713, 2006 WL 3317922 (Ohio App. Nov. 16, 2006).  The Ohio Supreme Court declined to review the court of appeals' decision.  *State v. Keenan*, 114 Ohio St. 3d 1508, 872 N.E.2d 950 (Ohio 2007).

Keenan  filed a third Petition for Post-Conviction Relief on August 28, 2006.  He raised only choice of counsel as a ground for relief.  (ECF No. 197, 11.)  The Cuyahoga Court of Common Pleas denied the Petition on February 8, 2007.  (Supp. App. to Return of Writ, Post-Conviction, vol. 8, 41.)  Keenan filed a timely appeal of the trial court's

17

decision to the Eighth District Court of Appeals, which affirmed the judgment on February 28, 2008. *State v. Keenan*, No. 89554, 2008 WL 522711 (Ohio App. Feb. 28, 2008). Thereafter, the Ohio Supreme Court declined to exercise jurisdiction over the case. *State v. Keenan*, 119 Ohio St. 3d 1415, 891 N.E.2d 772 (Ohio 2008).

Keenan employed Paul Mancino to represent him on all of his post-conviction appeals.

**III.     Habeas Proceeding**

Keenan filed a Notice of Intention to file a Habeas Corpus Petition on September 7, 2001. (ECF No. 1). The Court appointed David Doughten and John Gibbons to represent Keenan. (ECF No. 6.) Keenan then filed a Motion and Supplemental Motion to Clarify and Amend Order of Appointment, seeking to add his counsel of choice, Paul Mancino. (ECF Nos. 7 and 9, respectively.) Respondent responded to the motion, asserting that Attorney Mancino had a conflict of interest, and filed a Motion for Ruling on Status of Counsel. (ECF Nos. 8, 14, respectively.) The Court held a hearing on this issue on February 20, 2002, after which Attorney Mancino withdrew as counsel, and the Court denied the motions as moot. (ECF No. 49.)

Keenan filed a Motion to Proceed In Forma Pauperis on November 20, 2001. (ECF No. 10.) On November 21, 2001, Keenan filed the Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254. (ECF No. 11.) Respondent filed a Return of Writ on January 18, 2002. (ECF No. 23.) She also filed a Motion to Dismiss the petition on the ground that it was not timely filed. (ECF No. 20.) Specifically, Respondent alleged that Keenan's state post-conviction petition was not "properly filed" pursuant to 28 U.S.C. § 2254(d)(2),

18

preventing that state court proceeding from tolling the one-year statute of limitation.  After

seeking and receiving multiple extensions of time, Keenan filed an opposition to the

motion to dismiss, contending, among other things, that Respondent had waived this

ground for dismissal when it failed to raise it earlier, and, in the alternative, that the statute

of limitations in Section 2254(d) should have been equitably tolled because he is actually

innocent of the crime of which he was convicted.  (EDF No. 57.)  Both Keenan and

Respondent filed supplemental briefs.  (ECF Nos. 60, 61, 63, and 66.)  The Court granted

Respondent's Motion to Dismiss on July 29, 2002, dismissed the case, and issued a

certificate of appealability. (ECF No. 69.)  Keenan filed a motion under Civil Rule 59(e)

seeking relief from the Court's decision to dismiss the petition.  (ECF No. 71.)  The Court

denied that motion.  (ECF No. 100.)

Keenan appealed the Court's decision to the Sixth Circuit Court of Appeals, which

vacated the Court's ruling and remanded the case to this Court for an evidentiary hearing

on whether Keenan was entitled to equitable tolling because he relied on a state order in

electing to pursue state post-conviction review rather than filing his petition for writ of

habeas corpus.  *Keenan v. Bagley*, 400 F.3d 417 (6th Cir. 2005).  After holding such a

hearing and reviewing post-hearing briefs, the Court found that equitable tolling should

apply to Keenan's petition .  (ECF No. 140.)

Keenan then filed a Motion for Summary Judgment on November 6, 2008.  In it he

argued that he is entitled to habeas relief because another judge on this Court found that his

co-defendant, Joe D'Ambrosio, established that the State violated his constitutional rights

by failing to disclose exculpatory evidence as required under *Brady v. Maryland*, 373 U.S.

19

83 (1963), and that finding has a preclusive effect on these proceedings under the doctrine of collateral estoppel. (ECF No. 179.) The Court denied Keenan's motion on September 21, 2010, on the ground that, as a matter of law, it could not apply non-mutual, offensive collateral estoppel in this case. (ECF No. 234.)

Keenan filed numerous motions to expand the record, primarily to include documents from co-defendant D'Ambrosio's federal habeas and state court retrial proceedings. (ECF Nos. 72, 167, 168, 186, 187, 188, 198, and 203.) Respondent did not object to Keenan's first motion to expand the record, and the Court granted it. (ECF Nos. 75 and 100, respectively.) Respondent also did not object to the successive motions to expand the record as long as the additional materials were subject to the requirements set forth in 28 U.S.C. § 2254(e)(2).[1] (ECF Nos.169, 189, 199, 204, 226.) The Court agreed with Respondent and granted those motions for the limited purpose of determining whether Keenan has complied with Section 2254(e)(2). The Court reserved the right to exclude the evidence from its consideration when reaching the merits of Keenan's claims if the Court found during the course of this habeas litigation that Keenan was not diligent in presenting obtainable evidence to the state court or had no excuse for failing to be diligent. (ECF Nos. 171, 190, 200, 205.)

Keenan also filed a Motion to Take Judicial Notice or in the Alternative Request for a Hearing on January 28, 2011. (ECF No. 237.) In it, he requested that the Court take judicial notice of these adjudicated facts found by Judge Kathleen O'Malley from co-

---

[1] That statute prevents a habeas petitioner from obtaining an evidentiary hearing in federal court if he or she "failed to develop the factual basis of a claim in State court . . . ." 28 U.S.C. § 2254(e)(2).

defendant D'Ambrosio's habeas case.  Respondent opposed the motion.  (ECF No. 238.)
The Court denied Keenan's motion on February 18, 2011, on the grounds that it restated
the claims set forth in his Motion for Summary Judgment and that the time to move for an
evidentiary hearing had expired.  (ECF No. 240.)

Keenan filed four Amended Petitions, the last on April 21, 2009.  (ECF Nos. 144,
145, 159, 197, respectively.)  Respondent filed an Amended Return of Writ on August 27,
2009, and Keenan filed an Amended Traverse on November 12, 2009.  (ECF Nos. 218 and
223, respectively.)  Respondent thereafter filed a Reply, and Keenan a Sur-Reply,
rendering the matter ripe for disposition.  (ECF Nos. 229 and 230, respectively.)

## IV.    Petitioner's Grounds for Relief

Keenan asserts twenty-two (22) grounds for relief.  These grounds are as follows:

1.    Petitioner was denied his right to counsel of his own choice at trial.

2.    Although Petitioner was permitted to participate as co-counsel at his re-trial, he was
      prohibited from participating fully.

3.    Petitioner was denied due process of law when the prosecutor was permitted to
      constructively amend the indictment by altering the date of the offense.

4.    Petitioner's request that the entire proceedings be recorded was denied by the trial
      court.

5.    Petitioner was denied due process of law and a fair trial when the court permitted
      Det. Leo Allen to testify as to information that was related to him by others.

6.    Petitioner was denied due process of law when the court permitted the coroner to
      testify as to the possibility that the knives offered into evidence could have caused
      the wounds on the decedent.

7.    Petitioner was denied due process of law and a fair trial when he was prevented from presenting a full and complete defense by reason of constant interference from the court.

8.    Prosecutorial misconduct during the trial deprived Mr. Keenan of his constitutional right to a fair trial and due process of law.

9.    Petitioner was deprived of his right to due process of law when the court constructively amended the indictment by altering the date despite the fact that Petitioner had filed an alibi defense.

10.    Petitioner was deprived his right to due process of law when the court brought to the attention of the jury that Petitioner was in jail.

11.    Petitioner was deprived of his right to a fair trial by the manner in which the trial court required a defense witness be shackled and handcuffed while testifying and the manner in which testimonies of former witnesses were read, demonstrated the court's bias.

12.    Petitioner was deprived of his right to due process when the court amended the indictment so as to charge Petitioner with the substantive offense of conspiracy.

13.    Petitioner was deprived of his right to due process of law when the court improperly instructed the jury.

14.    Petitioner was denied his right to due process of law when the court misinformed the jury concerning the criminal act which, in effect, amended the indictment.

15.    Petitioner was denied his right to effective assistance of counsel during the guilt phase of the trial.

16.    Petitioner was denied due process as he is factually innocent of the offenses for which he was convicted and sentenced to death.

17.    Petitioner was deprived effective assistance of counsel when court-appointed counsel refused to impeach State's witnesses by showing inconsistent testimony.

18.    Petitioner was deprived due process of law and fair trial when the prosecution relied upon false and contradicted testimony to convict Mr. Keenan.

19.     Petitioner was deprived of his right to due process and a fair trial when the prosecution presented evidence known to be false concerning a burglary and withheld exculpatory police reports in order to frame and convict petitioner who was factually innocent.

20.     Petitioner was deprived of his right to due process and a fair trial when the prosecution used an expert witness to present testimony to half truths reading pseudo scientific facts concerning width and minimum blade length of the murder weapon.

21.     Petitioner was deprived of his right to due process and a fair trial when the prosecution withheld *Brady* evidence from Petitioner.

22.     Petitioner was denied due process of law when the jury was not required to make a specific finding as to which manner and to unanimously agree as to which theory Petitioner had been found guilty.

(ECF No. 197, *passim*.)

**V.     Standard of Review**

The Antiterrorism and Effective Death Penalty Act of 1996 (hereinafter "AEDPA"), which amended 28 U.S.C. § 2254, was signed into law on April 24, 1996.  In *Lindh v. Murphy*, 521 U.S. 320, 336 (1997), the United States Supreme Court held that the provisions of AEDPA apply to habeas corpus petitions filed after that effective date.  *See also Woodford v. Garceau*, 538 U.S. 202, 210 (2003); *Barker v. Yukins*, 199 F.3d 867, 871 (6th Cir. 1999) ("It is now well settled that AEDPA applies to all habeas petitions filed on or after its April 24, 1996 effective date.").  Because Keenan's petition was filed on April 21, 2009, AEDPA governs this Court's consideration of his petition.

AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases, and 'to further the principles of comity, finality, and federalism.'" *Woodford*, 538 U.S. at 206 (quoting *(Michael) Williams v. Taylor*, 529 U.S. 362, 436 (2000)). The requirements of AEDPA "create an independent,

23

high standard to be met before a federal court may issue a writ of habeas corpus to set aside

state-court rulings." *Uttecht v. Brown*, 551 U.S. 1, 127 S. Ct. 2218, 2224 (2007) (citations

omitted).  Section 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to
> any claim that was adjudicated on the merits in State court proceedings
> unless the adjudication of the claim --
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme Court
> of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination
> of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  This legal standard establishes a multi-faceted analysis involving a

consideration of both the state court's statement and/or application of federal law and its

finding of facts.

    With respect to Section 2254(d)(1), "clearly established federal law" refers to the

holdings, as opposed to *dicta*, of the United States Supreme Court's decisions as of the

time of the relevant state court decision.  *Williams*, 529 U.S. at 412; *Barnes v. Elo*, 231

F.3d 1025, 1028 (6th Cir. 2000).  The "contrary to" and "unreasonable application" clauses

of Section 2254(d)(1) are independent tests and must be analyzed separately.  *Williams*,

529 U.S. at 412-13; *Hill v. Hofbauer*, 337 F.3d 706, 711 (6th Cir. 2003).  A state court

decision is "contrary to" federal law only "if the state court arrives at a conclusion opposite

to that reached by [the Supreme] Court on a question of law or if the state court decides a

case differently than [the Supreme] Court has on a set of materially indistinguishable

facts."  *Williams*, 529 U.S. at 412-13.

Even if the state court identifies the "correct governing legal principle," a federal habeas court may still grant the petition if the state court makes an "unreasonable application" of "that principle to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 413.  A state court decision also involves an unreasonable application if it unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. *Id.* at 407; *Hill*, 337 F.3d at 711.  As the Supreme Court has advised, "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable--a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410).  The reasonableness of the application of a particular legal principle depends in part on the specificity of the relevant rule. *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).  While the application of specific rules may be plainly correct or incorrect, courts may have more leeway in reasonably applying more general rules in the context of a particular case. *Id.*

The Supreme Court interpreted the "unreasonable determination of the facts" clause in Section 2254(d)(2) in *Wiggins v. Smith*, 539 U.S. 510 (2003).  In that case, the Court noted that a "clear factual error," such as making factual findings regarding the contents of social service records contrary to "clear and convincing evidence" presented by the defendant, constitutes an "unreasonable determination of the facts in light of the evidence presented." *Id.* at 528-29.  In other words, a state court's determination of facts is unreasonable if its findings conflict with clear and convincing evidence to the contrary.

25

This analysis mirrors the "presumption of correctness" afforded factual determinations made by a state court, which can only be overcome by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see also Mitchell v. Mason*, 325 F.3d 732, 737-38 (6th Cir. 2003); *Clark v. O'Dea*, 257 F.3d 498, 506 (6th Cir. 2001) ("regardless of whether we would reach a different conclusion were we reviewing the case *de novo*, the findings of the state court must be upheld unless there is clear and convincing evidence to the contrary").  This presumption only applies to basic, primary facts, and not to mixed questions of law and fact.  *See Mason*, 325 F.3d at 737-38 (holding ineffective assistance of counsel is mixed question of law and fact to which the unreasonable application prong of Section 2254(d)(1) applies).

By its express terms, however, Section 2254(d)'s constrained standard of review only applies to claims that were adjudicated on the merits in the state court proceeding. *Clinkscale v. Carter*, 375 F.3d 430, 436 (6th Cir. 2004).  When a state court does not assess the merits of a petitioner's habeas claim, the deference due under AEDPA does not apply. In such a case, the habeas court is not limited to deciding whether that court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, but rather conducts a *de novo* review of the claim.  *Morales v. Mitchell*, 507 F.3d 916, 930 (6th Cir. 2007) (citations omitted); *Newton v. Million*, 349 F.3d 873, 878 (6th Cir. 2003); *Maples v. Stegall*, 340 F.3d 433, 436-37 (6th Cir. 2003).  If the state court conducts a harmless error analysis but does not indicate whether its finding is based on state or federal constitutional law, however, a habeas court, while conducting an independent review of the facts and applicable law, must nonetheless determine "whether the state court result is contrary to or

unreasonably applies clearly established federal law." *Maldonado v. Wilson*, 416 F.3d 470, 476 (6th Cir. 2005) (citing *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000)).

Further, as the Sixth Circuit Court of Appeals recently observed, "The Supreme Court has made clear that § 2254(d), as amended by AEDPA, is a purposefully demanding standard." *Montgomery v. Bobby*, Nos. 07-3882/3893, 2011 WL 3654383, at *7 (6th Cir. Aug. 22, 2011). In *Harrington v. Richter*, 131 S. Ct. 770 (2011), the Supreme Court held that as long as "fairminded jurists could disagree on the correctness of the state court's decision," then relief is precluded under the AEDPA. *Id.* at 786 (internal quotation marks omitted). The Court admonished that a reviewing court may not "treat[] the reasonableness question as a test of its confidence in the result it would reach under *de novo* review," and that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 785. It noted that Section 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems" and does not function as a "substitute for ordinary error correction through appeal." *Id.* (internal quotation marks omitted). Thus, a petitioner "must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-87. This is a very high standard, which the Court readily acknowledges. *See id.* at 786 ("If this standard is difficult to meet, that is because it is meant to be.").

## I.      Exhaustion and Procedural Default

### A. Exhaustion

A state prisoner must exhaust his state remedies before bringing his claim in a federal habeas corpus proceeding.  28 U.S.C. § 2254(b), (c); *Rose v. Lundy*, 455 U.S. 509 (1982).  Exhaustion is fulfilled once a state supreme court provides a convicted defendant an opportunity to review his or her claims on the merits.  *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999).  A habeas petitioner satisfies the exhaustion requirement when the highest court in the state in which the petitioner has been convicted has had a full and fair opportunity to rule on the claims.  *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994); *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990).  If under state law there remains a remedy that a petitioner has not yet pursued, exhaustion has not occurred and the federal habeas court cannot entertain the merits of the claim.  *Rust*, 17 F.3d at 160.[2]

A petitioner "cannot obtain federal habeas relief under 28 U.S.C. § 2254 unless he has completely exhausted his available state court remedies to the state's highest court." *Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001) (quoting *Coleman v. Mitchell*, 244 F.3d 533, 538 (6th Cir. 2001)) (internal quotation marks omitted).  Rather than dismiss certain claims the Court deems unexhausted, however, a habeas court need not wait for exhaustion if it determines that a return to state court would be futile.  *Lott v. Coyle*, 261 F.3d 594, 608 (6th Cir. 2001).  In circumstances where the petitioner has failed to present a claim in state court, a habeas court may deem that claim procedurally defaulted because the Ohio state

---

[2]  The Court also notes that the *Perry* rule, discussed *infra*, would bar on grounds of *res judicata* an Ohio court from considering any issue that could have been, but was not, raised on direct appeal.

28

courts would no longer entertain the claim. *Buell*, 274 F.3d at 349. To obtain a merit review of the claim, the petitioner must demonstrate cause and prejudice to excuse his failure to raise the claim in state court, or that a miscarriage of justice would occur were the habeas court to refuse to address the claim on its merits. *Seymour v. Walker*, 224 F.3d 542, 550 (6th Cir. 2000) (citing *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)).

### B. Procedural        Default

#### 1. General       Law

In general, a federal court may not consider "contentions of general law which are not resolved on the merits in the state proceeding due to petitioner's failure to raise them as required by state procedure." *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977). If a "state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). To be independent, a state procedural rule and the state courts' application of it "must rely in no part on federal law." *Fautenberry v. Mitchell*, No. C-1-00-332, 2001 WL 1763438, at * 24 (S.D. Ohio Dec. 26, 2001) (citing *Coleman*, 501 U.S. at 732-33). To be adequate, a state procedural rule must be "'firmly established and regularly followed'" by the state courts at the time it was applied. *Beard v. Kindler*, – U.S. – , 130 S. Ct 612, 618 (2009). If a petitioner fails to fairly present any federal habeas claims to the state courts but has no remaining state remedies, then the petitioner has procedurally defaulted those claims.

29

*O'Sullivan v. Boerckel*, 526 U.S. at 848; *Rust v. Zent*, 17 F.3d at 160.

In *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986), the Sixth Circuit outlined the now familiar test to be followed when the state argues that a habeas claim is defaulted because of a prisoner's failure to observe a state procedural rule.  It is:

> First, the federal court must determine whether there is a state procedural rule that is applicable to the petitioner's claim and whether the petitioner failed to comply with that rule.  Second, the federal court must determine whether the state courts actually enforced the state procedural sanction -- that is, whether the state courts actually based their decisions on the procedural rule.  Third, the federal court must decide whether the state procedural rule is an adequate and independent state ground on which the state can rely to foreclose federal review of a federal constitutional claim.  Fourth, if the federal court answers the first three questions in the affirmative, it would not review the petitioner's procedurally defaulted claim unless the petitioner can show cause for not following the procedural rule and that failure to review the claim would result in prejudice or a miscarriage of justice.

*Williams v. Coyle*, 260 F.3d 684, 693 (6th Cir. 2001) (citing *Maupin*, 785 F.2d at 138) (further citations omitted).

In determining whether the *Maupin* factors are met, the federal court looks to the last explained state court judgment.  *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991); *Combs v. Coyle*, 205 F.3d 269, 275 (6th Cir. 2000).  "'[A] procedural default does not bar consideration of a federal claim on habeas corpus review unless the last state court rendering a reasoned opinion in the case clearly and expressly states that its judgment rests on a state procedural bar.'"  *Morales v. Mitchell*, 507 F.3d 916, 937 (6th Cir. 2007) (quoting *Frazier v. Huffman*, 343 F.3d 780, 791 (6th Cir. 2003)).  Conversely, if the last state court to be presented with a particular federal claim reaches the merits, then the procedural bar is removed and a federal habeas court may consider the merits of the claim in its review.

30

*Ylst*, 501 U.S. at 801.

If the three *Maupin* factors are met, the claim is procedurally defaulted. However, the federal court may excuse the default and consider the claim on the merits if the petitioner demonstrates that (1) there was cause for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error or (2) a fundamental miscarriage of justice would result from a bar on federal habeas review. *Maupin*, 785 F.2d at 138; *Hutchison v. Bell*, 303 F.3d 720, 735 (6th Cir. 2002); *Combs*, 205 F.3d at 274-75.

A petitioner can establish cause in two ways. First, a petitioner may "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Mohn v. Bock*, 208 F. Supp. 2d 796, 801 (E.D. Mich. 2002). Objective impediments include an unavailable claim, or interference by officials that made compliance impracticable. *Murray*, 477 U.S. at 488; *Mohn*, 208 F. Supp. 2d at 801. Second, constitutionally ineffective assistance of counsel constitutes cause. *Murray*, 477 U.S. at 488-89; *Rust v. Zent*, 17 F.3d 155, 161 (6th Cir. 1994); *Mohn*, 208 F. Supp. 2d at 804.

If a petitioner asserts ineffective assistance of counsel as cause for a default, that ineffective assistance claim must itself be presented to the state courts as an independent claim before it may be used to establish cause. *Murray*, 477 U.S. at 488-89. If the ineffective assistance claim is not presented to the state courts in the manner that state law requires, that claim is itself procedurally defaulted and can only be used as cause for the underlying defaulted claim if the petitioner demonstrates cause and prejudice with respect to the ineffective assistance claim. *Edwards v. Carpenter*, 529 U.S. 446, 452-53 (2000).

31

To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)).  "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000).

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the United States Supreme Court has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. *Dretke v. Haley*, 541 U.S. 386, 392 (2004) (citing *Murray*, 477 U.S. at 495-96).  When the Supreme Court extended this exception to claims of capital sentencing error, it limited the exception in the capital sentencing context to cases in which the petitioner could show "'by clear and convincing evidence that, but for constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law.'" *Id.* (quoting *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992)).

The Court will address the issues of exhaustion and procedural default presented in this case when it reviews Keenan's individual claims.

**VII.    Analysis of Petitioner's Grounds for Relief**

      **A.     *Nineteenth and Twenty-First Grounds for Relief: Suppression of Exculpatory Evidence***

In his nineteenth and twenty-first grounds for relief, Keenan asserts that prosecutors violated his constitutional rights when they failed to disclose numerous pieces of exculpatory evidence prior to trial, as required by *Brady v. Maryland*, 373 U.S. 83 (1963).

Specifically, he alleges that the State failed to disclose:

1.    evidence that Lewis allegedly raped Klann's roommate, Christopher Longenecker; that Klann had some knowledge of it; and that Lewis was never prosecuted for it;

2.    evidence that the police had identified Lewis as the anonymous caller who called to identify Klann as the victim and had information regarding the murder that was not publicly known;

3.    evidence that Lewis asked the police to help him resolve a DUI charge against him;

4.    evidence that Detective Allen, the lead investigating detective on the Klann murder case, reported the burglary of Paul (Stoney) Lewis' apartment on September 28, 1988, after Lewis claimed he had reported it to the police and after Keenan was arrested;

5.    evidence that the police learned there was bloody clothing in Keenan's parents' garage, where Espinoza had been keeping some of his clothes;

6.    evidence that the initial investigating detectives on the scene where Klann's body was discovered, Ernest Hayes and Melvin Goldstein, believed that Klann was murdered elsewhere and his body was dumped in Doan Creek;

7.    evidence that a cassette tape existed containing a statement by Angelo Crimi "implicating others in this crime";

8.    evidence that James Russell and Carolyn Rosell requested help from the police in relocating after the trial because some individuals, whom they believed to be D'Ambrosio's brothers, had threatened them;

9.    evidence that the coroner's trace evidence department showed that Klann was not wearing shoes or undershorts when his body was discovered;

10.    evidence that the Cleveland Heights Police Department's dispatch log showed that there was a disturbance in the area of Coconut Joe's on Thursday evening/Friday morning;

11.    evidence that Therese Farinacci, one of Lewis' neighbors, told police she was awakened at around 4:10 a.m. on Saturday morning by people making noise and saw a black truck parked on the street, and another couple who lived on the street heard someone say "Let's dump the body" on that same night;

12.    evidence that Linda Hudak (nee DeBlasis), a former barmaid at Coconut Joe's, told police she saw Klann alive late on Friday evening;

13.    evidence that after the police searched Keenan's truck, the repossession company subsequently found cocaine in it;

14.    results of tests performed on Keenan's truck;

15.    results of tests performed on D'Ambrosio's knives;

16.    statements to police of employees of Coconut Joe's and the Saloon; and

17.    a Cleveland Police Department forensic lab report containing results of tests done on soil samples from the area near Doan Creek where the victim was found.

(ECF No. 197, 58, 60; ECF No. 223, 136-39, 153-54.)[3]

### 1.    *Brady v. Maryland* and its progeny

The Supreme Court held in *Brady v. Maryland* that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or

---

[3] Keenan also includes allegations concerning unlawful searches and seizures, actual innocence, and various instances of ineffective assistance of counsel in the section of his Traverse containing his *Brady* claims.  (ECF No. 223, 141-51.)  The Court will address those allegations to the extent that they are part of independent claims asserted in his Petition; otherwise, they are irrelevant to his *Brady* claims and will not be addressed.

bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). The Court has explained that this protection "will serve to justify trust in the prosecutor as 'the representative . . . of a sovereignty . . . whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done.'" *Kyles v. Whitley*, 514 U.S. 419, 440 (1995) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)). As Justice Marshall wrote, "The message of *Brady* and its progeny is that a trial is not a mere 'sporting event'; it is a quest for truth in which the prosecutor, by virtue of his office, must seek truth even as he seeks victory." *Monroe v. Blackburn*, 476 U.S. 1145, 1148 (1986) (Marshall J., dissenting).

In order to establish a *Brady* violation, a petitioner must satisfy the following three requirements: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene,* 527 U.S. 263, 281-82 (1999).

The Supreme Court has held that *Brady* applies regardless of whether the defendant has expressly requested such evidence. *Strickler*, 527 U.S. at 280. In addition, courts have stressed that the inquiry must be objective, independent of the intent of the prosecutors. *Brady*, 373 U.S. at 87; *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000). Finally, a showing of prejudice need not mean that the evidence would have led to an acquittal, but merely "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles*, 514 U.S. at 433-34.

### 2.    Exhaustion

Respondent vigorously asserts that Keenan's *Brady* claims are unexhausted, and that any relief based on this claim therefore is "precluded." (ECF No. 218, 18-19; ECF No. 229, 1–4.)  She states that "few to none [of Keenan's *Brady* claims] appear at all in any filing made in state court."  (ECF No. 229, 3.)  Keenan responds that he could not have raised the claims before 2002, because the evidence at issue was only discovered after another judge on this Court, Judge Kathleen O'Malley, granted discovery in the habeas case of his co-defendant, Joe D'Ambrosio, that year.  Moreover, he states that he did raise several of the *Brady* claims he now asserts in a 2004 post-conviction petition, which the state courts denied, and any further attempt to raise the claims in state court would have been futile because there was not an adequate state remedy available to him.  (ECF No. 223, 118-21; ECF No. 230, 2.)

As explained above, a petitioner cannot obtain federal habeas relief unless he has completely exhausted his available state court remedies to the state's highest court.  *Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001); 28 U.S.C. § 2254(b)(1)(A) ("An application for a writ of habeas corpus . . . shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State . . . .").  Furthermore, as a general matter, a federal court may not grant a writ on a "mixed" petition, *i.e.*, one that contains both exhausted and unexhausted claims.  *See, e.g., Rose v. Lundy,* 455 U.S. 509 (1982); *Rhines v. Weber*, 544 U.S. 269, 273-74 (2005); *Wagner v. Smith*, 581 F.3d 410, 415 (6th Cir. 2009).  The Supreme Court has emphasized that the "interests of comity and federalism dictate that state courts must have the first opportunity to decide a petitioner's

claim," since "it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation." *Rhine*s, 544 U.S. at 273-74 (citations omitted). Accordingly, where a habeas petition contains unexhausted claims, there is a "strong presumption" in favor of requiring a petitioner to pursue his available state remedies. *Granberry v. Greer*, 481 U.S. 129, 131 (1987). *See also O'Guinn v. Dutton*, 88 F.3d 1409, 1412 (6th Cir. 1996) (stating that "the Supreme Court has been quite clear that exhaustion is the preferred avenue and that exceptions are to be for narrow purposes only").

Nevertheless, a habeas court need not wait for a petitioner's claims to be exhausted if it determines that a return to state court would be futile. AEDPA Section 2254(b)(1) provides that habeas relief may be granted on an unexhausted claim if "there is an absence of available State corrective process" or "circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1)(B).

In Ohio, a trial court may entertain an untimely petition for post-conviction relief, also called a second or successive petition, if: (1) the petitioner was unavoidably prevented from discovering the facts on which the petition is predicated, or (2) the United States Supreme Court has recognized a new federal or state right that applies retroactively to the petitioner and the petition asserts a claim based on that new right. In addition, the petitioner must "show by clear and convincing evidence that, but for constitutional error at trial, no reasonable fact finder would have found the petitioner guilty of the offense of

which the petitioner was convicted . . . ."[4]  Ohio Rev. Code § 2953.23(A)(1).  The Sixth Circuit has held that a district court was not required to dismiss a habeas petition containing an unexhausted claim when there was no available state remedy that the petitioner could pursue, including where a petitioner could not satisfy Ohio Revised Code § 2953.23(A)(1).  *Broom v. Mitchell*, 441 F.3d 392, 399-400 (6th Cir. 2000), *rehearing and rehearing en banc denied* (Aug. 9, 2006).  *See also Lott v. Coyle*, 261 F.3d 594, 608 (6th Cir. 2001).

Indeed, both this Court and the Sixth Circuit noted in the *D'Ambrosio* case that just that situation may have existed.  The courts did not decide the issue in *D'Ambrosio*, however, because they found that the respondent had waived the exhaustion requirement.  Judge O'Malley observed,

> While it may have been possible for D'Ambrosio to return to state court and assert the *Brady* claim in a successor state post-conviction petition, the time frame for such a filing has expired.  See Ohio Rev. Code § 2953.21.  Moreover, throughout this rather lengthy habeas proceeding, the Respondent has never asserted an exhaustion defense.  Finally, because the Court finds that the [S]tate is partly responsible for D'Ambrosio's failure to obtain the *Brady* evidence in time to present it to the state courts, the State cannot now assert D'Ambrosio's failure to exhaust this claim as a bar to this Court's
> review of it.

*D'Ambrosio*, 2006 WL 1169926, at *19 n.14.  The Sixth Circuit agreed, but for different reasons.  It stated:

We are skeptical of the warden's argument that a petition for post-

---

[4]        Keenan has long passed the deadline for filing a petition for post-conviction relief under Ohio Rev. Code § 2953.21, which would have been 180 days after the date on which the trial transcript was filed in the Ohio Supreme Court for the direct appeal of the judgment.  Ohio Rev. Code § 2953.21(A)(2).

conviction relief pursuant to Ohio Revised Code ("ORC") § 2953.21 is an available remedy.  A petition for post-conviction relief filed this late after the direct appeal would only be considered timely if D'Ambrosio could "show[] by clear and convincing evidence that, but for constitutional error at trial, no reasonable fact-finder would have found [him] guilty of the offense of which [he] was convicted." . . .  But to succeed on a *Brady* claim, D'Ambrosio needs to demonstrate merely that with the suppressed evidence there is "a reasonable probability of a different result" . . .

The warden's argument that D'Ambrosio can assert a *Brady* claim via a motion for a new trial pursuant to Ohio Rule of Criminal Procedure 33(B) is a closer question.  There is Ohio Supreme Court authority that holds that in cases involving newly-discovered evidence, a motion for a new trial cannot be granted unless the movant shows, among other things, that the new evidence "discloses a strong probability that it will change the result if a new trial is granted." . . .  *Brady* requires only that there is a "reasonable probability" that the result would have been different. . . . .  In addition, the warden's conduct during the course of the federal habeas proceedings indicates that she did not view Rule 33 as an available state remedy.  Until this appeal, the warden never argued that Rule 33 was a potential remedy that D'Ambrosio could have pursued.  This is in contrast to the post-conviction petition remedy, which the warden discussed as a potential remedy . . . with respect to procedural default. . . . .  On the other hand, this reading of the Rule 33 standard is questionable in light of *State v. Johnston*, 39 Ohio St. 3d 48, 529 N.E.2d 898, 908-12 (Ohio 1988), which held that Ohio courts of appeal should review a *Brady* claim in a Rule 33 motion under the federal *Brady* standard, not the stringent *Petro* standard.

*D'Ambrosio*, 527 F.3d 489, 497 n.5 (6th Cir. 2008) (internal quotation marks and citations omitted).

This Court finds that, contrary to Respondent's assertion, Keenan did pursue post-conviction relief and a new trial in 1999 and post-conviction relief again in 2004 based on several of the same *Brady* claims he now asserts, which the state courts denied.  In his March 26, 1999,  petition, Keenan raised his current *Brady* sub-claim 2, regarding Lewis's anonymous call to the police identifying Klann.  (Supp. App. to Return of Writ, Post-Conviction, vol. 4, 13-16.)  In his February 6, 2004, petition, Keenan asserted his current

*Brady* sub-claims 2, 4, 5, 6, 12, 14, 15, and 16, as enumerated above–which constitute eight out of his 17 *Brady* sub-claims–in substantially the same form.  (*Id*. at vol. 5, 65-67, 73-78, 85-89.)  Keenan also filed 223 pages of documents supporting his 2004 *Brady* claims.  (*Id*. at 109-333.)  The state courts denied both post-conviction petitions.  (*Id*. at vol. 4, 160-61; vol. 5,  414; and vol. 6, 320-27.)  The Ohio Supreme Court declined to review the appellate court's rulings.  *State v. Keenan*, 92 Ohio St. 3d 1429, 749 N.E.2d 756 (Ohio 2001); and *State v. Keenan*, 114 Ohio St. 3d 1508, 872 N.E.2d 950 (Ohio 2007).

In affirming the trial court's denial of the Keenan's 2004 petition, the Eighth District Court of Appeals declined to address Keenan's *Brady* claims on their merits, instead deciding that Keenan did not meet the procedural requirements of Ohio Rev. Code § 2953(A)(1)(a) for an untimely petition for post-conviction relief.  It found that Keenan did not "demonstrate that he was unavoidably delayed in obtaining evidence upon which to base his petition for relief," and that his new evidence did not "clearly and convincingly demonstrate that no reasonable jury would have found appellant guilty had this evidence been presented to it."  (Supp. App. to Return of Writ, Post-Conviction, vol. 6, 320-37.)

This Court does question why Keenan did not assert the remaining *Brady* sub-claims (with the exception of the last one, which apparently did not surface until shortly before D'Ambrosio's 2009 retrial).  *See supra* Part VI.A.3.d.  Keenan presumably was aware of this information.  (*See* Affidavit of Ralph DeFranco, dated April 25, 2003; ECF No. 223, Ex. GGG; Supp. App. to Return of Writ, Post-Conviction, vol. 5, 327-33.)

Nevertheless, there is no reason to expect that Keenan could prevail in an attempt to file yet a fourth successive post-conviction petition, when much of the *Brady* evidence at

issue surfaced at least seven years ago. Moreover, Respondent never suggests either post-conviction relief or a new trial under Rule 33 of the Ohio Rules of Civil Procedure as available remedies. Finally, this Court echoes the Sixth Circuit's concern in the *D'Ambrosio* case that Ohio's post-conviction statute and civil rule governing new trials require a higher degree of proof for *Brady* claims than *Brady* itself requires, creating an impermissibly high burden to obtain relief. Thus, under these circumstances, this Court finds that Keenan's *Brady* claims are exhausted for purposes of this case.

### 3. Section 2254(e)(2)

A second hurdle that Keenan must overcome before his *Brady* claims can be considered is 28 U.S.C. § 2254(e)(2), which generally governs habeas courts' ability to hold evidentiary hearings, but also applies to the introduction of new evidence without an evidentiary hearing, such as when the petitioner seeks to introduce new evidence based on a motion to expand the record. *Holland v. Jackson*, 542 U.S. 649, 653 (2004). Here, many of Keenan's *Brady* claims are based on new evidence – most of which he claims surfaced in the *D'Ambosio* habeas case – that he introduced through several motions to expand the record. (ECF Nos. 72, 167, 168, 186, 187, 188, 198, and 203.) This Court granted the motions, but reserved the right to exclude the evidence from its consideration when reaching the merits of Keenan's claims unless it first determined that Keenan had complied with the standards set forth in Section 2254(e)(2). (ECF No. 171, 3-4; ECF No. 190, 2-3; ECF No. 200; ECF No. 205.)

Section 2254(e)(2) provides that a habeas court may not expand the record and consider new evidence if a petitioner "failed to develop the factual basis of a claim in state

41

court proceedings" unless the petitioner demonstrates: (1) the claim relies on a new rule of constitutional law made retroactive to him or the factual predicate of the claim could not have been previously discovered through the exercise of due diligence, and (2) the facts underlying the claim establish, by clear and convincing evidence, that, but for the constitutional error, no reasonable jury would have found him guilty.  28 U.S.C. § 2254(e)(2)(A), (B).  Keenan argues that he meets this standard because, despite his efforts to obtain the material, "this evidence only came to light after the federal court order for discovery of 2002," and he therefore "was unable to develop the factual basis of these claims at the time of [his] first post-conviction petition in 1998."  (ECF No. 223, 154.)  Respondent does not address this issue at all other than to assert that Keenan impermissibly relies on facts that are outside the state court record to support his *Brady* claims.  (ECF No. 218, 19; ECF No. 229, 2.)

The Supreme Court has construed "a failure to develop the factual basis of a claim" to mean "a lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *(Michael) Williams v. Taylor*, 529 U.S. 362, 435 (2000).  Diligence "depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court; it does not depend upon whether those efforts could have been successful. " *Id.*  In the usual case, diligence requires that a petitioner seek an evidentiary hearing in state court in the manner prescribed by state law.  *Id.* at 437.  *Accord Mason v. Mitchell*, 320 F.3d 604, 621 n.6 (6th Cir. 2003) ("[T]he question is not whether the petitioner has succeeded in developing the record, but whether the petitioner has diligently attempted to do so."); *Thompson v. Bell*, 315 F.3d 566,

594 (6th Cir. 2003).

The Court finds that Section 2254(e)(2) does not proscribe its consideration of the suppressed evidence Keenan moved to admit to the record, because he did not "fail to develop" this claim in state court pursuant to the standard set forth in *(Michael) Williams v. Taylor*.  An examination of the development of Keenan's *Brady* claims during this long and complex case, and the symbiotic relationship between his case and that of his co-defendant, demonstrates that despite Keenan and D'Ambrosio's persistent discovery efforts, the State continued to withhold much of the evidence now at issue until its hand was forced in the *D'Ambrosio* case.

### a.    Keenan's 1993 and 1994 pretrial discovery motions

Before Keenan's 1994 retrial, both Keenan, *pro se*, and his trial counsel filed numerous broad discovery motions requesting exculpatory and other evidence and several motions to compel the discovery.  (App. to Return of Writ, Trial, vol. 1, 35-37, 68-69, 103, 108-20, 121-24, 147, 185-87, 188-89, 190-91, 192-93.)[5]  The trial court granted the motions, and the State responded to the requests.  (*Id*. at 105-06; 133-38, 158-59, 209-10; ECF No. 223, 15.)  According to Keenan and one of Keenan's trial counsel, James Kersey, the State did not, however, divulge the *Brady* evidence at issue here.  (ECF No. 223, 153-

---

[5]    Specifically, Keenan's discovery motions were entitled:  Motion for Discovery and to Examine Exculpatory and Mitigatory Material; Motion to Require the State to Divulge any Consideration Given or Promises to be Given to any Prosecution Witness in Exchange for Aid and/or Testimony in the Within Matter; Motion for Disclosure of Exculpatory Evidence; Motion for Pre-Trial Disclosure of the Prosecuting Witnesses Written or Recorded Statements; Motion to Compel the State of Ohio to Disclose Presentence Investigation/Report of Co-Defendant Edward Espinoza; Motion for Discovery to Trace Evidence Department of Cuyahoga Coroner's Office and S.I.U. of Cleveland Police.  (*Id*.)

54; ECF No.188-1.)

> **b.**  ***D'Ambrosio* habeas discovery and the 2004 evidentiary hearing**

As noted above, much of the evidence Keenan seeks to use to support his *Brady* claims surfaced in the habeas action of Keenan's co-defendant, Joe D'Ambrosio.  On December 2, 2002, Judge O'Malley ordered the Cuyahoga County Prosecutor, the Cuyahoga County Coroner, the Cleveland Police Department, and the Cleveland Heights Police Department to provide D'Ambrosio's habeas counsel with materials in their possession.  *See D'Ambrosio v. Bagley*, 688 F. Supp. 2d 709, 711 (N.D. Ohio 2010).  That year, Keenan filed his first motion to expand the record in this case, seeking to include in the record the *D'Ambrosio* trial transcript, the transcript of Espinoza's plea, and affidavits of Detectives Goldstein and Hayes.  (ECF No. 72.)  The motion was unopposed and granted.  (ECF No. 100, 18-19.)

In 2004, Judge O'Malley held a three-day evidentiary hearing, at which she found the following facts relating to D'Ambrosio's *Brady* claims:[6]

> D'Ambrosio's counsel first attempted to undercut Espinoza's version of the events leading up to the murder. Melvin Goldstein and Ernest Hayes, former Cleveland Police Detectives, took the stand and stated that, based on the fact that no grass or weeds surrounding the area of Doan's

---

[6]  The Court granted D'Ambrosio's motion for an evidentiary hearing on three grounds for relief in his petition:  actual innocence, spoliation of evidence, and his *Brady* claims.

*D'Ambrosio v. Bagley,* No. 1:00 CV 2521, 2006 WL 1169926, at *6 (N.D. Ohio March 24, 2006).  Although this Court declined to take judicial notice of the adjudicated facts found by Judge O'Malley in the *D'Ambrosio* case as broadly requested by Keenan (ECF Nos. 237, 240), the Court will take judicial notice strictly of the facts as found by the Court in that case, as opposed to any conclusions drawn from them, for purposes of clarity and judicial economy.  *See, e.g., Rodic v. Thistledown Racing Club, Inc.*, 615 F.2d 736, 738 (6th Cir. 1980).

Creek where Klann's body was found were disheveled or bloodied, they surmised that Klann had been killed elsewhere and that his body was dumped in the Creek. Both testified that, although they were the initial detectives to investigate the case when Klann's body was discovered, they had no subsequent participation in the investigation.  After their initial investigation, Cleveland Police Detective Leo Allen assumed all responsibilities for the case.

D'Ambrosio's counsel next attempted to develop his *Brady* claim through the testimony of Christopher Longenecker. Longenecker testified that Paul "Stoney" Lewis raped him shortly before Klann's murder. He also stated that, shortly after the rape occurred, Klann entered Lewis's apartment, permitting Longenecker a means of escape. Longenecker testified that he believed the impetus for Klann's visit was because Klann heard noises and was attempting to aid him. Although Longenecker did not tell Klann that he had just been raped, he testified that Klann knew he was distraught after leaving Lewis's apartment, that he had told Klann that "something had just happened," and that he suspected that Klann understood what had happened. Longenecker was subpoenaed to testify against Lewis for the rape but, being legally blind, Longenecker misread the subpoena and appeared on a later date. Consequently, the rape indictment against Lewis was dismissed.

Attorney Martin James Keenan, the brother of Thomas Michael Keenan, also testified regarding the connection between Longenecker's rape and Klann's murder. During Keenan's representation of his brother, he stated that, although he questioned Carmen Marino, the prosecutor  assigned to handle both D'Ambrosio and Keenan's cases, regarding a possible connection between  Klann's murder and the Longenecker rape, Marino belittled him, insisting that the two cases were unrelated. Keenan testified that Marino stated the rape case was a weak one because the witnesses did not appear.

Keenan testified that he and his co-counsel had become aware of and investigated the Lewis rape charge while representing his brother. They learned through court documents that Lewis had an extensive drug record. Keenan stated that, at some point during a pre-trial hearing, he learned that Lewis had twice been indicted for rape, that the first case was dismissed without prejudice, and the second was no-billed by the grand jury.

D'Ambrosio's counsel also attempted to develop his *Brady* and spoliation of evidence claims by calling Timothy Horval and Patricia Sanney of the Cleveland Police Department who both testified that, although they attempted to locate a cassette tape referred to in a police report which allegedly contained a statement by a man named Angelo Crimi

implicating others in Klann's murder, they were unable to located any such tape at the Cleveland Police Department.  Sanney specifically recalled that the prosecutor had signed out the physical evidence of the case in 1988 and that it had not been returned to the Cleveland Police Department since that time.

Gary Gabriel, a member of D'Ambrosio's trial team, testified that, to the best of his recollection and information, the prosecution never made defense counsel aware that an audio tape of Angelo Crimi existed or that Klann was a potential witness in the Lewis rape case. He also stated that he was present when prosecutors led members of D'Ambrosio's defense team inside the prosecutor's office to view police reports. He recalled that the defense was not permitted to physically view the police reports, but that a prosecutor read them to defense counsel. Additionally, Gabriel testified regarding his attempt to procure defense witnesses. In particular, Gabriel recalled speaking with D'Ambrosio about a female friend who was supposed to help D'Ambrosio pack on Thursday evening in anticipation of his eviction from his apartment. D'Ambrosio, however, could not remember her name or where she lived.

Gabriel stated that he did not recall any of the other alleged *Brady* evidence ever being presented to the defense team. Specifically, he did not recall the prosecution providing the defense with information regarding: (1) Hayes and Goldstein's conclusion that Klann was murdered elsewhere and dumped at Doan's Creek; (2) the Lewis rape case; or (3) the fact that Russell had requested protection during the trial because he believed he was being threatened by D'Ambrosio's brothers.

*D'Ambrosio v. Bagley,* No. 1:00 CV 2521, 2006 WL 1169926, at **6-8 (N.D. Ohio March 24, 2006*).*

Moreover, Judge O'Malley made the following findings concerning the discovery policy of the Cuyahoga County Prosecutor's Office generally and as it related to both D'Ambrosio and Keenan's cases:

Defense counsel DeFranco also testified that, although he made a discovery request to Marino, he did not receive any of the alleged exculpatory evidence prior to or during trial.  As with Gabriel, he neither saw copies of any police reports nor was made aware of the Lewis rape case.  Furthermore, DeFranco testified that he never learned that the police determined that Lewis was the individual who made an anonymous call

46

regarding Klann after the murder or that an attorney named David Rossi had called the police asserting that he was representing Lewis in connection with the murder investigation.  DeFranco testified that he was never shown a police report with a cassette tape from Angelo Crimi implicating others in Klann's murder.  DeFranco testified that he was not made aware that the disturbance at Coconut Joe's, pursuant to police dispatch logs, occurred at 1:30 a.m. on Friday morning.  He received no information that Linda DeBlasis (now Hudak) stated to police that she had seen Klann alone on Friday evening, the night *after* the events at Coconut Joe's, or that one police statement indicated that a witness in Lewis's apartment building heard someone say "Let's dump the body" during the early morning hours on Saturday.  DeFranco testified that all of this information would have helped shape a different defense strategy.  He asserted, moreover, that, had he known about the impressions of the initial investigating officers at the crime scene, he would have asked the trial court to provide him with a crime scene expert.

DeFranco stated that he and Marino had a pretrial conference in which Marino represented to him that the file before them was the entire file.  Additionally, pursuant to Marino's policy, DeFranco was not permitted to copy any police reports.  Instead, he took notes on anything of import to the case.  DeFranco concluded that, had he been in possession of the alleged Brady evidence prior to trial, he could have impeached several of the prosecution's witnesses.

Finally, Martin Keenan testified regarding the connection between Longenecker's rape and Klann's murder.  He stated that, although he questioned Carmen Marino, the prosecutor assigned to handle D'Ambrosio and . . . Keenan's cases, regarding a possible connection between Klann's murder and the Longenecker rape, Marino belittled him, insisting that the two cases were unrelated.  Keenan testified that Marino stated the rape case was a weak one because the witnesses did not appear.

*Id.* at **17-18.

Keenan moved to expand the record in his habeas case to include hundreds of pages

of testimony and exhibits from the *D'Ambrosio* hearing in 2008, soon after the Ohio

Supreme Court declined to review his final post-conviction petition. (ECF Nos. 168, 170,

195, 196.)  Keenan also submitted the affidavit of James Kersey, one of his trial counsel in

his 1994 trial.  (ECF No. 188-1.)  In it, Kersey declared that the some of the *Brady* material

47

that surfaced in the *D'Ambrosio* case – namely, Detectives Hayes' and Goldstein's opinion that the murder occurred elsewhere; that Anthony Klann was a witness in the rape case against Lewis; the Angelo Crimi statement; the information about James "Lightfoot" Russell wanting help to relocate; that the police were aware that the disturbance at Coconut Joe's occurred on Thursday night; and the police reports containing statements of Lewis' neighbors–was never revealed to him before Keenan's 1994 trial, yet it was of "major significance" and would have buttressed the defense theory that "the murder occurred elsewhere by someone else" or at least been useful for impeachment purposes.  (*Id.*)

### c.      Keenan's post-conviction petitions

As noted above, Keenan asserted some of his present *Brady* sub-claims in post-conviction petitions to state courts.  On February 17, 1998, Keenan filed a post-conviction petition and/or motion for new trial, claiming that the State violated *Brady* by withholding the police report regarding a burglary of Paul Lewis's apartment on September 28, 1988, several days after Klann's death.  (Supp. App. to Return of Writ, Post-Conviction, vol. 4, 13-16.)  The state courts denied the petition and motion for new trial.  (*Id.* at 160-61.)

In addition, on February 6, 2004, Keenan filed a successive post-conviction petition, asserting *Brady* claims based on information divulged in the *D'Ambrosio* discovery.  He identified the following *Brady* materials: (1) evidence that the police had identified Lewis as the anonymous caller who called to identify Klann as the victim and had information regarding the murder that was not publicly known; (2) evidence that Detective Allen, the lead investigating detective on the Klann murder case, reported the burglary of Paul (Stoney) Lewis's apartment on September 28, 1988, after Lewis claimed

48

he had reported it to the police and after Keenan was arrested; (3) evidence that the police

learned there was bloody clothing in Keenan's parent's garage, where Espinoza had been

keeping some of his clothes; (4) evidence that the initial investigating detectives on the

scene where Klann's body was discovered, Ernest Hayes and Melvin Goldstein, believed

that Klann was murdered elsewhere and his body was dumped in Doan Creek; (5) results of

tests performed on Keenan's truck; (6) results of tests performed on D'Ambrosio's knives;

(7) and statements to police of employees of Coconut Joe's and the Saloon.  (*Id*. at vol. 5,

65-67, 73-78, 85-89.)  Keenan informed the court in the petition that the information upon

which it was based "ha[d] just been discovered . . . ."  (*Id*. at 1.)  The state courts denied

this petition as well without considering the merits of the *Brady* claims.  (*Id.* at 414; vol. 6,

320-27.)

### d.    *D'Ambrosio* 2009 pretrial discovery

Additional previously undisclosed evidence surfaced in the *D'Ambrosio* case during

pretrial proceedings leading to D'Ambrosio's retrial, scheduled for March 2, 2009.[7]  In

mid-February 2009, the State provided to the defense a tissue sample taken from Klann and

a Cleveland Police Department lab report containing results of tests done on soil samples

from the area near Doan Creek where the victim was found.  Then, in late February, the

State produced four envelopes containing two soil samples, one latent boot print, and blood

samples taken from D'Ambrosio's apartment during the course of the murder investigation

---

[7]    Judge O'Malley had granted D'Ambrosio's petition for a conditional writ of habeas corpus on March 24, 2006, based on the State's *Brady* violations, concluding that a reasonable jury would be less likely to convict D'Ambrosio in light of the withheld evidence. *D'Ambrosio v. Bagley,* 2006 WL 1169926.  The Sixth Circuit affirmed the Court's ruling on June 5, 2008.  *D'Ambrosio v. Bagley,* 527 F.3d 489 (6th Cir. 2008).

which were still in the Special Investigation Unit ("SIU") lab.  *See D'Ambrosio v. Bagley*, 619 F. Supp. 2d 428, 434 (N.D. Ohio 2009).[8]  Finally, the State informed D'Ambrosio and the state court that Espinoza had died, but only after waiting nearly three months to disclose the information.  *D'Ambrosio v. Bagley*, 688 F. Supp. 2d 709, 712-13 (N.D. Ohio 2010).[9]  Keenan moved the Court to expand the record in his case with this evidence as well.  (ECF Nos. 187, 203.)

**e.      conclusion**

As the Supreme Court has explained, defendants are not required to "scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed."  *Banks v. Dretke*, 540 U.S. 668, 695 (2004).  Moreover, the Supreme Court has held that Section 2254(e)(2) was not intended to bar claims that the defense diligently pursued but that remained undeveloped in state court because of the prosecution's concealment of pertinent facts.  *(Michael) Williams v. Taylor*, 529 U.S. at

---

[8]      In this ruling, Judge O'Malley concluded that the State did not engage in a good-faith effort to comply with the Court's discovery order when it "did not respond to multiple discovery requests, produced material . . . discovery on the eve of trial, and then sought to interfere with the orderly progress of the trial through gamesmanship . . .," both before the state court and it.  *D'Ambrosio v. Bagley*, 619 F. Supp. 2d at 455.  The Court then issued an unconditional writ of habeas corpus, ordering D'Ambrosio's release from custody and expungement of his criminal record.  The Court did not, however, bar his reprosecution.  *Id*. at 430.

[9]      Judge O'Malley ruled in this opinion on March 3, 2010, that D'Ambrosio's defense was materially prejudiced by the State's "substantial inequitable conduct," including its failure to reprosecute him within the original 180-day time limit imposed by the conditional writ, and failure to notify the defense of Espinoza's death in a timely manner.  The Court therefore barred D'Ambrosio's reprosecution.  *D'Ambrosio* 688 F. Supp. 2d at 727-28.  The Sixth Circuit affirmed this ruling on August 29, 2011.  *D'Ambrosio v. Bagley*, 656 F.3d 379 (6th Cir. 2011).  The Supreme Court denied the respondent's petition for writ of certiorari on January 23, 2012.  *Bobby v. D'Ambrosio*, 132 S. Ct. 1150 (U.S. Jan. 23, 2012).

50

434; *see also Jaramillo v. Stewart*, 340 F.3d 877, 882 (9th Cir. 2003); *D'Ambrosio v. Bagley*, 2006 WL 1169926, at *18; *Albrecht v. Horn*, 314 F. Supp. 2d 451, 479 n.30 (E.D. Pa. 2004) (each finding that Section 2254(e)(2) did not bar an evidentiary hearing on the petitioner's *Brady* claims where the evidence at issue was unavailable to the petitioner until the federal court granted habeas discovery).

This Court finds that, for purposes of  Section 2254(e)(2), Keenan did not "fail to develop" his *Brady* claims in state court.  Throughout the twenty-three years of his case, Keenan persistently has sought discovery from the State, and was thwarted at every stage. He only obtained most of the information as a result of his co-defendant's highly contentious and hard-won habeas discovery.  And, contrary to Respondent's repeated, blanket assertion that Keenan's claims as a whole are premised on "so-called facts" outside the state court record (*see, e.g.*, ECF No. 218, 18-19; ECF No. 229, 2-3), much of the information at issue was in fact submitted to the state courts in support of his 2004 post-conviction petition.  Thus, the Court will consider the evidence Keenan submitted with his motions to expand the record when addressing his *Brady* claims.

### 4.      Procedural default and *Brady* determinations of suppression and favorability

As explained above, it is undisputed that Keenan failed to raise several of his *Brady* sub-claims in state court.  Those sub-claims, therefore, are procedurally defaulted. *Wainwright v. Sykes*, 433 U.S. 72 (1977); *Murray v. Carrier*, 477 U.S. 478 (1986); *Mapes v. Coyle*, 171 F.3d 408, 413 (6th Cir. 1999) (all holding that failure to raise a constitutional issue at all on direct appeal constitutes procedural default).  The *Brady* sub-claims Keenan did raise in post-conviction petitions also are procedurally defaulted, because the state

51

courts ruled that they were untimely.  *See supra* Part VI.A.2.

To overcome this procedural bar, Keenan must demonstrate cause and prejudice to excuse the default.  As the Supreme Court has noted, however, the cause and prejudice necessary to excuse procedural default can "parallel two of the three components of the alleged *Brady* violation itself."  *Strickler*, 527 U.S. at 282.  Consequently, the Court will analyze together the procedural status and first two prongs – suppression and favorability – of the three-pronged *Brady* test.

To meet the suppression requirement, the petitioner must show that the evidence was in the prosecution's exclusive control.  *Cone v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998), *cert. denied*, 528 U.S. 842, 120 (1999).  As noted above, a defendant should not be required to "scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed."  *Dretke*, 540 U.S. at 695.  Nevertheless, it is the defendant's duty to be vigilant in seeking exculpatory material.  There is no *Brady* violation "where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available . . . from another source because in such cases there is really nothing for the government to disclose."  *Cone,* 161 F.3d at 344 (internal quotation marks and citations omitted).

Evidence is considered to have exculpatory or impeachment value if it "would have resulted in a markedly weaker case for the prosecution and a markedly stronger one for the defense."  *Kyles*, 514 U.S. at 441.

Applying the above Supreme Court precedent, the Court will now address each of

52

Keenan's individual *Brady* claims, analyzing the exculpatory and suppression prongs of *Brady*. The Court addresses the materiality requirement of *Brady*, cumulatively, below. *See Kyles*, 514 U.S. at 436 n.10 ("We evaluate the tendency and force of the undisclosed evidence item by item; there is no other way. We evaluate its cumulative effect for purposes of materiality separately . . . ."). Notably, Respondent does not argue the merits of any of Keenan's *Brady* claims, contesting them only on procedural grounds. And even then, Respondent merely asserts in a summary fashion that Keenan's *Brady* claims are procedurally defaulted, without providing any basis for this conclusion. (*See* ECF No. 218, 19; ECF No. 229, 3.)

### a.   Connection between Lewis and Klann

Keenan's first three *Brady* sub-claims center on Paul "Stoney" Lewis. Keenan claims that prosecutors failed to disclose that Lewis had been indicted for the rape of Christopher Longenecker, then Klann's roommate; that Klann had some knowledge of this rape; and that Lewis was never prosecuted for it. Additionally, he claims that prosecutors withheld evidence that the police had identified Lewis as the anonymous caller who called the police to identify Klann as the victim and had information regarding the murder that was not publicly known, and that prosecutors suppressed evidence that Lewis asked the police to help him resolve a DUI charge against him in exchange for his testimony. (ECF No. 223, 157.)

On May 11, 1988, Longenecker filed a complaint with the Cleveland Police Department charging Lewis with rape. The police report states that after the alleged assault,

53

> the victim's roomate [*sic*] by the name of Tony (LNU) came downstairs and
> asked for a cigarette.  The victim then left out of the apartment with Tony
> and he went to his apartment.  The victim began to cry and Tony asked him
> what was wrong but he refused to tell him what happen [*sic*] to him.

(ECF No. 170, Ex. 8, 114-15.)  Longenecker testified at the 2004 *D'Ambrosio* hearing that

he did not tell Klann that he was raped, but told him "that something happened" and he was

going to the police department.  (*Id*. at Ex. 4, 66.)  Two days later, on May 13, 1988, Lewis

was arrested for aggravated rape, a felony, and incarcerated.  (*Id*. at Exs. 8, 14.)  Carmen

Marino was the original prosecutor on the case, but later assigned the case to another

prosecutor, whom he instructed to "get [the] last name of Tony."  (*Id*. at Exs. 7, 11.)  The

State subpoenaed "Tony Last Name Unknown" to testify at the trial, which was scheduled

for August 1, 1988.  (*Id*. at Ex. 12.)  Lewis himself subpoenaed "Anthony Klann"to testify.

(*Id*. at Ex. 13.)  The case was dismissed without prejudice the day of trial, however, when

Longenecker failed to appear, and Lewis was discharged.  (*Id*. at Exs. 14, 15.)

Longenecker, who is legally blind, testified that he did not appear at trial because he

misread his subpoena.  (*Id*. at Ex. 3, 74.)  Longenecker called the police and/or

prosecutor's office the next day to give them his correct contact information, and Lewis

was reindicted soon after with a court appearance scheduled for September 16, 1988.  (*Id*.

at Ex. 3, 69-70; Exs. 16, 17, 38.)  When Longenecker heard about Klann's murder, he

again called police and/or the prosecutor's office, and voiced his concerns regarding what

he considered a "strange" connection between Klann's murder and his involvement in the

Lewis rape case as its only third-party witness.  The prosecutors never returned his call.

(*Id*. at Ex. 3, 71-72; Ex. 38, 405-06.)  The case was "no-billed," or dismissed, on October

20, 1988.  (*Id*. at Ex. 18.)

In addition, Lewis was the first person to contact police about the murder.  He called the police anonymously early on Monday morning, less than forty-eight hours after Klann's body was discovered, and asked them questions that revealed information about the murder that was not publicly known.  (ECF No. 170, Ex. 20.)  Later that day, he went to the morgue to identify Klann, and while there spoke to detectives, identified Keenan, D'Ambrosio, and Espinoza as suspects, and led them to D'Ambrosio's apartment, where Espinoza and D'Ambrosio were arrested.  (App. to Return of Writ, Trial Tr., vol. 7, 1882-87.)  At some point, he asked the police to help him resolve a DUI charge against him since he was "a star witness" in Klann's murder case.  (*Id*. at Ex. 21.)

The Court finds that this information was suppressed.  Prosecutors either knew or should have known that there was a connection between Lewis' rape charge and Klann.  Martin Keenan, Keenan's brother and trial counsel in his first trial, testified at the 2004 *D'Ambrosio* hearing that he had broached the subject of Lewis' rape charge with Carmen Marino, who also was the lead prosecutor in Keenan's trial.  Martin Keenan testified that he discovered that Lewis had been indicted for rape when he looked up his criminal record, knowing that Lewis had an extensive record of drug offenses.  (*Id*. at Ex. 4, 83.)  The rape charge interested him because it was "no-billed" near the time Keenan and D'Ambrosio were charged with Klann's murder, which was rare in felony rape cases at the time.  (*Id*. at 84.)  He suspected there was a connection between the no-bill and the forthcoming testimony of Lewis.  But when he asked Marino about the case, Marino was "belittling," telling him that the rape charge had nothing to do with Keenan's case and that it was a weak case because witnesses did not appear at trial to testify.  (*Id*. at 85-86.)

55

Thus, as Judge O'Malley emphasized in *D'Ambrosio*, "Marino *was aware* of Klann's involvement." *D'Ambrosio,* 2006 WL 1169926, at *21 (emphasis original; footnote omitted).[10]  Marino knew Lewis was charged with rape shortly before the murder; the case originally was assigned to him. And he knew there was a "Tony LNU" involved. If he hadn't already, once Martin Keenan asked him about a possible connection between the Lewis rape and Klann murder, he had to have put the two together.

Moreover, even if Marino did not know that Klann was a witness to the alleged rape, the Supreme Court has held that "the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 513 U.S. at 437.  Accordingly, any information the police or other prosecutors possessed regarding Klann's involvement in the Lewis rape case is imputed to the prosecutors in Keenan's case.  When Longenecker called the police and/or the prosecutor's office about his concerns regarding the connection between Klann's murder and his involvement in the case as the only third-party witness to the rape, that knowledge is imputed to Marino and later to the prosecutors in Keenan's second trial, Frank Gasper and Mark Mahony.

Nevertheless, the record demonstrates that prosecutors did not give Keenan's 1994 trial counsel this information.  James Kersey, one of Keenan's trial counsel, states in an affidavit that he had no idea of Klann's connection to the alleged rape.  (ECF No. 188-1,

---

[10]     Judge O'Malley quoted a Sixth Circuit opinion that extensively documented the "shameful track record" of Carmen Marino, the prosecutor in D'Ambrosio's trial and Keenan's first trial.  *See D'Ambrosio*, 2006 WL 1169926, at *21 n.18 (quoting *Lott v. Coyle*, 366 F.3d at 433 n.1).

para. 5.)  This is supported by defense counsel's response to the prosecution's motion to

exclude any mention of Lewis' incarceration, made just before Lewis' cross-examination.

(App. to Return of Writ, Trial Tr., vol. 7, 1894-97.)  Prosecutor Gasper argued:

> We see no relevancy in regard to where this particular witness spent
> June, July, and August, and since there was no conviction involved with that
> incarceration we asked the Court to grant a motion in limine, so that the
> defense cannot inquire as to his whereabouts during those three months,
> unless they can show it is relevant to this particular trial, and I failed to see
> any relevancy.

(*Id*. at 1895.)  When the court asked defense counsel what the relevancy of his

incarceration was, defense counsel stated only the fact that he was in jail.  (*Id*. at 1896.)

The court granted the prosecution's motion.  (*Id*. at 1897.)  Defense counsel therefore

briefly questioned Lewis about Longenecker, but could not pursue the line of questioning.[11]

(*Id*. at 1930.)

    Thus, the Court finds that the prosecution withheld the evidence connecting Klann

to Lewis' rape charge.  The prosecution's suppression of this evidence also establishes

"cause" to excuse the procedural default of this sub-claim.

    As to the favorability prong of *Brady*, the Court finds that this evidence has

significant exculpatory and impeachment value.  Kersey states,

> If I had been provided information that there was a connection
> between the murder victim and the rape charges against [Lewis], I would

---

[11]     They asked:
Q:  Do you happen to know if Christopher Longenecker; you don't know who he
is?
A: The name, I might know him if I seen him, but the name don't sound familiar.
The Court: Any further questions?
Counsel: Judge, no.  We decided there are none.  Thank you.  Nothing further.
(*Id*.)

> have definitely questioned Lewis about that connection.  I did try to ask
> Lewis about the charges on which he was in the county jail, but the
> prosecutor objected to those questions which the judge sustained.

(ECF No. 188-1, para. 5.)  Kersey also claims that he would have questioned Lewis about

his anonymous call to the police about Klann and his request that the police assist him with

his other criminal charges.  He considers the information to be "most critical as it would

have established [that Lewis had] a compelling motive for the homicide . . . ."  (*Id*.)

Indeed, Lewis had a central role in the investigation of the murder; it was he who

first identified Klann for the police and identified Keenan, D'Ambrosio and Espinoza as

suspects.  He even led the police to D'Ambrosio's apartment to find them.  Lewis also

played an important role in the prosecution's theory that the murder occurred after the

defendants' frenetic search for Lewis on Thursday night/Friday morning.  As this Court has

previously found, Lewis' trial testimony was not pivotal for the prosecution, as he neither

identified Keenan as Klann's murderer nor placed him at the crime scene, but merely

corroborated other witnesses' statements regarding the events of Thursday evening/Friday

morning.  (ECF No. 100, 17.)  Nevertheless, had Keenan's trial counsel been aware of

Klann's connection to Lewis' rape charge, they could have aggressively impeached his

testimony and thereby thrown doubt on the State's entire case.  In fact, the information

could have led Keenan's counsel to develop a completely different theory of the defense,

one suggesting that Lewis murdered Klann to eliminate the only witness to the rape, and, at

a minimum, creating reasonable doubt as to Keenan's guilt.[12]  Keenan also could have used

---

[12]     For example, Lewis testified at Keenan's trial that he spent the night after the
night at Coconut Joe's, which he claimed was a Saturday, "[j]ust riding around" with a friend.
(App. to Return of Writ, Trial Tr., vol. 7, 1882.)  Defense counsel could have inquired more into

the evidence to impeach the detectives who investigated the murder, since they relied heavily on Lewis in their initial investigation, including the defendants' arrests and the warrantless seizure of property at D'Ambrosio's apartment, and apparently did not pursue other theories or follow through on important leads.

Use of the information connecting Lewis's rape charge to Klann, along with Lewis' role in the investigation and his relationship with the detectives "would have resulted in a markedly weaker case for the prosecution and a markedly stronger one for the defense." *Kyles*, 514 U.S. at 441.  Keenan, therefore, has satisfied the first two prongs for these *Brady* sub-claims and established cause and prejudice to excuse their procedural default.

**b.      Detective Allen's report of the Lewis burglary**

Keenan also claims that prosecutors violated *Brady* by withholding evidence that Detective Allen, the lead investigator on the Klann murder case, reported the burglary of Lewis' apartment on September 28, 1988, after Lewis claimed he had reported it to the police and after Keenan was arrested.  (ECF No. 223, 165, Exs. X, Y; ECF No. 170, Ex. 24.)[13]

This sub-claim lacks merit.  Keenan asserts that Lewis testified at "all three trials"

--------

his whereabouts to support a theory that he may have participated in the murder and/or its concealment on Friday night/Saturday morning.

[13]      Keenan also argues, without any citation to the record, that "the prosecution has claimed in writing that there had been two separate burglaries of the Lewis residence and that both occurred within five days of each other."  (ECF No. 223, 165.)  Although somewhat confusing, the Court presumes that the different dates stem not from two burglaries, but from one report recording the date the burglary was reported to police, and the other stating the date Lewis claimed the burglary took place.

that he reported the burglary to the police the morning after the Coconut Joe's incident, when he came home to find the door kicked in.  (ECF No. 223, 165.)  In fact, Lewis testified at Keenan's 1994 trial both that he did not recall when he called in the burglary *and* that he reported it on September 28, 1988.  (App. to Return of Writ, Trial Tr., vol. 7, 1923, 1926.)  Lewis specifically denied calling the police immediately after he returned to his apartment the morning after the Coconut Joe's incident.  (*Id*. at 1881, 1925-26.)

Moreover, the record shows that Keenan's trial counsel did, in fact, know that the burglary was reported on September 28, rather than on September 24, when Lewis claims the burglary occurred.  While cross-examining Detective Allen, defense counsel showed the detective a two-page police report of the burglary dated September 28, 1988, which they claimed they obtained a week before the trial.[14]  (App. to Return of Writ, Trial Tr., vol. 7, 1802-06.)  Detective Allen, when cross-examined by Keenan himself, also testified that he and his partner called in the report themselves.  (*Id*. at 1839-43.)

Accordingly, Keenan knew "the essential facts permitting him to take advantage of" this information about the burglary, and this *Brady* sub-claim fails.

### c.    bloody clothing

Keenan contends that prosecutors also unconstitutionally withheld  a detective's handwritten note that states "bloody clothes in Keenan's garage," with notations underneath of the height and weight of a "Joe" and "Ed," presumably referring to

---

[14]      It appears from the trial transcript that this report introduced at trial is the same report that Keenan now claims was suppressed.  Since the report was not admitted into evidence, however, the report introduced at trial is not in the record.  (*See* App. to Return of Writ, Trial Tr., vol. 8, 2425-29.)

60

D'Ambrosio and Espinoza.  (ECF No. 170, Ex. 32.)  Keenan contends that the note

demonstrates that the police actually found bloody clothing in Keenan's parents' garage,

but the prosecutors suppressed the clothes and the note because they knew that clothes

would have fit only Espinoza, who was considerably smaller than D'Ambrosio, and

therefore would have implicated Espinoza in the murder.  (ECF No. 223, 160-61.)

　　　　This sub-claim also is meritless.  First, as is the case with several of Keenan's

*Brady* claims, Keenan provides no support for his assertion that he received this document

only when D'Ambrosio's counsel gave it to him after obtaining it through habeas

discovery, which began in 2002.  (ECF No. 223, 160.)  Although the record shows that the

police department's file on the Klann murder was produced in the *D'Ambrosio* habeas

discovery, and D'Ambrosio's counsel, Ralph DeFranco, averred that he never knew of the

bloody clothes at the time of D'Ambrosio's trial (*id*. at Ex. GGG, para. 13(h)), Kersey does

not mention it in his affidavit.  (ECF No. 188-1.)  Thus, there is no evidence in the record

affirmatively establishing that Keenan's trial counsel did not have this evidence or were not

aware of this information.

　　　　Moreover, the note does not have significant exculpatory or impeachment value.

Keenan provides no support for his theory that the clothes "actually existed" except for the

affidavit of his father, Thomas Keenan, who averred that Espinoza had been storing his

clothing in his garage around the time of the murder.  (ECF No. 223, Ex. RR.)  While the

note does raise interesting questions, particularly about the police investigation, those

questions are merely speculative.  There is no evidence that police ever searched the

garage, which Keenan's father presumably would have been aware of, much less that they

discovered any bloody clothing there.

### d. Ernest Hayes' and Melvin Goldstein's theory of the murder occurring elsewhere

In this sub-claim, Keenan alleges that the prosecutors suppressed reports containing the conclusions of Cleveland Police Department detectives Ernest Hayes and Melvin Goldstein that because there was no blood or signs of struggle at the Doan Creek location where Klann's body was found, the murder must have occurred someplace else.  (ECF No. 223, 161-63.)

In affidavits submitted to D'Ambrosio's habeas counsel in 2001 and at the 2004 evidentiary hearing in *D'Ambrosio*, the detectives testified that they were the first Cleveland Police Detectives on the scene after Klann's body was discovered by joggers. (ECF No. 170, Ex. 1, 1; Ex. 2, 38; Ex. 34, para. 3; Ex. 35, para. 3.)  They observed that there was neither blood on the creek bed surrounding the body, nor signs of a struggle. They also noted that there were no tire marks or footprints in the wet ground leading up to the bank where Klann's body was discovered, and that Klann had no shoes or underwear on.  (*Id.* at Ex. 1, 7-9; Ex. 2, 40-42; Ex. 34, para. 3; Ex. 35, para. 3.)  Based on these observations, the detectives concluded that the murder had occurred elsewhere and the body had been dumped in Doan Creek.  (*Id.* at Ex. 1, 1; Ex. 2, 40; Ex. 34, para. 8; Ex. 35, para. 10.)  In fact, during the evidentiary hearing, Goldstein testified that Doan Creek often was used as a dumping ground and a place of criminal activity.  (*Id.* at Ex. 1, 4.)  The detectives averred in their affidavits that they recall including their opinion about the location of the murder in their initial report about the crime scene, but when the police

62

reports were produced, their opinion was not in them.[15]  (*Id*. at Ex. 34, para. 9; Ex. 35, para. 11.)

The Court finds that this information was suppressed.  Although Hayes testified in Keenan's 1989 and 1994 trials, he gave no opinion as to where he thought Klann was killed.  In fact, during the 1994 trial, Hayes was asked but refused to speculate how the murder occurred.[16]  Kersey states in his affidavit that the prosecutors never provided information to him that Hayes and Goldstein believed the murder occurred elsewhere and the body was dumped in Doan Creek.  (ECF No. 188-1, para. 8.)  He states that if he had known of their opinion, he would have called Goldstein as a witness, and the information would have bolstered his theory of the defense.  (*Id*.)

The Court further finds that the information has significant exculpatory and impeachment value.  It would undercut the State's theory of how the murder occurred and

---

[15]     Both detectives submitted a second affidavit in 2002 acknowledging the possibility that the murder may have occurred in the creek, which would account for the lack of blood on the bank of the creek. (ECF No. 170, Ex. 36, 37.)  Goldstein, however, still found that scenario "unlikely" and testified at the evidentiary hearing that he "still think[s] that [Klann] was killed someplace else and dumped in the creek."  (*Id.* at Ex. 1, 24; Ex. 36, para. 14.)  Indeed, Goldstein testified that Detective Allen stated to him in October 1988 that he believed the murder occurred in D'Ambrosio's apartment.  (*Id.* at Ex. 1, 22-23.)  Hayes testified that because he now knows that the coroner opined that it was possible Klann did not bleed externally from his throat wounds, he "has no opinion on [where the murder occurred] one way or the other," although he would expect there to be some external bleeding from that wound.  (*Id.* at Ex. 2, 50-51.)

[16]     The testimony was as follows:
Q:     Do you have any idea where this individual met his untimely death?
A.     No, I do not.
Q:     You don't know if it was there?
A:     No, I don't know anything about that individual other than he was found in that ditch.
(App. to Return of Writ, Trial Tr., vol. 5, 1142-43.)

could be used to impeach Espinoza's version of the events, considerably weakening the prosecution's case.  This sub-claim is well taken, and its procedural default is excused.

  e.  **Angelo Crimi cassette tape**

  Keenan next claims that prosecutors suppressed police reports concerning, and a cassette tape containing, conversations between an informant and an inmate who once lived with Klann named Angelo Crimi, in which Crimi may have implicated other persons in Klann's murder.  (ECF No. 223, 163.)  A police report produced in the *D'Ambrosio* habeas discovery states:  "Received a cassette tape of conversations between informant of PTL. HORVAL 2343 and one ANTHONY CRIMI who is incarcerated in our county jail, which may incriminate others in this crime.  This tape attached to this file."  (ECF No. 170, Ex. 26.)  The tape has never been found.  (*Id*. at Ex. 6, 115-16.)  Another police report produced in the *D'Ambrosio* habeas discovery showed that the police talked to the detective who handled Crimi's crime (burglary) and asked people in his Little Italy neighborhood about him and his connection to Klann.  (*Id*. at Ex. 25.)  But Detective Horval testified at the *D'Ambrosio* evidentiary hearing that while he does not recall the tape or its contents, he remembers Crimi was an informant and he does not understand why there is no report from him about the tape, which would have been customary.  (*Id*. at Ex. 5, 109-11.)

  The Court finds that this information was suppressed.  Although one of the State's witnesses, Memsel Dendak, mentioned Crimi as someone who worked with Keenan and worked with Klann "around the neighborhood," when further questioned about Crimi on cross-examination (by Kersey), she testified she knew little about him other than he had

fought with Keenan over bad checks and missed pay.  (App. to Return of Writ, vol. 5, 1277-78.)  Kersey states in his affidavit that he "is positive" that he was never given this information.  (ECF No. 188-1, para. 6.)

Furthermore, the information has significant impeachment value.  Since the language of the report is somewhat ambiguous, without the tape we will never know if its information is exculpatory.  But it clearly could have been used to impeach Espinoza, since he claimed that only he, Keenan and D'Ambrosio were involved in the murder.  It also could have been used to impeach the police concerning their investigation, as the defense could have argued that the jury could infer from the tape's disappearance that Crimi's information would have been unfavorable to the prosecution.

This report qualifies as *Brady* material, thereby establishing cause and prejudice to excuse the procedural default as well.

### f.  James Russell's and Carolyn Rosell's relocation request

Keenan also asserts that prosecutors violated *Brady* by failing to provide him with evidence that James "Lightfoot" Russell and his girlfriend, Carolyn Rosell, requested assistance from the police in relocating after testifying at the trials.  (ECF No. 223, 163-64.)  A police report produced in the *D'Ambrosio* discovery stated that on December 10, 1988, before the *Keenan* and *D'Ambrosio* trials, Russell called the police to request the relocation because he had been threatened by two men who came to his door looking for him, and he feared for his family's safety.  (ECF No. 170, Ex. 22.)[17]

---

[17]  Specifically, the report stated: "Russell says that about 2 weeks ago 2 goons came looking for him.  He said late at night 2 large white males came knocking at his door looking for JAMES LIGHTFOOT.  He denied that he was him and said that LIGHTFOOT wasn't there.

Kersey states in his affidavit that prosecutors did not provide him with this information.  (ECF No. 188-1, para. 7.)  He claims he would have used it at trial, especially since prosecutors were unable to locate Russell to secure his testimony at trial and therefore his testimony from the first trial was read into the record.  He explains,

> If I had known that the police helped him relocate, and therefore may have known to where he was relocated, then I would have objected to his unavailability and sought discovery about whether this relocation was part of some larger benefit provided by the State in exchange for his testimony. In my vast trial experience in the Ohio state courts, I have never heard of the state prosecutors assisting a witness in relocating in these circumstances.

(*Id*.)

The Court finds that this evidence could have been used to impeach Russell's credibility, since he may have had reason to retaliate against Keenan for the threats or embellish his testimony to gain favor with prosecutors and receive assistance in relocating. The information also could have supported defense counsel in their attempt to have the witnesses' prior trial testimony excluded.

The Court finds this *Brady* sub-claim well taken, thereby  establishing cause and prejudice to excuse the procedural default.

### g.      trace evidence report

Keenan's next *Brady* sub-claim concerns a memo from the coroner's office entitled "Summary of Trace Evidence Examination," which reported that Klann was not wearing

---

They seemed satisfied and left.  He stated that their faces were made up in make up [*sic*] and they drove off in either a brand new black CADDILAC [*sic*] or a brand new BUICK 4 door. RUSSELL was unable to describe them any better and when he was asked if he knew who they were he was hesitant for fear of repraisals [*sic*] but stated that he thought that they were brothers of JOE D'AMBROSIO."  (*Id*.)

shoes (although he was wearing socks) or undershorts.  (ECF No. 170, Ex. 19, 142 .)
Keenan argues that this information was not furnished until the *D'Ambrosio* discovery, and
that it would have bolstered the defense theory that Espinoza's account of the murder was
false and the murder occurred elsewhere, since it is implausible that Klann would have
been walking down a major street on a rainy night in just his socks.  (ECF No. 223, 164-
65.)

      The Court finds this sub-claim lacks merit.  Keenan has presented no evidence
showing that his trial counsel did not have this information.  Moreover, Keenan's trial
counsel should have been alerted to the fact that Klann was not wearing shoes or
undershorts when he was found by the lack of any mention of them, and they could have
obtained more information about Klann's clothing from multiple sources.  As the Sixth
Circuit has held, "No *Brady* violation occurs where a defendant knew or should have
known the essential facts permitting him to take advantage of any exculpatory information,
or where the evidence is available from another source."  *Byrd v. Collins*, 209 F.3d 486,
517 (6th Cir. 2000) (internal quotation marks and citations omitted).

      For instance, defense counsel introduced ten photographs of Klann's clothing taken
by the coroner's office as trial exhibits, including a photograph of his socks.  The absence
of shoes and undershorts is apparent.  (*See* App. to Return of Writ, Trial Tr., vol. 8, 2437;
Def. Exs. SS, TT, UU, VV, XX, AAA, BBB, and CCC.)  In fact, Keenan's trial counsel
asked Dr. Balraj, the coroner, what Klann was wearing when he arrived at the morgue.  She
answered, "He had on a grayish-white, with red and blue letter, a T-shirt.  He had a pair of
shoes.  He had Levi Strauss pants, and a pair of white socks."  (App. to Return of Writ,

Trial Tr., vol. 7, 1585-86.)  Since there were no coroner photos of shoes or undershorts, defense counsel could have cross-examined her on this point.  (*Id.* at 1938.)  Keenan's defense counsel also could have cross-examined Detective Hayes, who was the first detective on the scene, at trial about what Klann was wearing when he was found.  And they could have subpoenaed Detective Goldstein, who also was at the crime scene, to testify; Goldstein testified at the *D'Ambrosio* evidentiary hearing that he recalls Klann being shoeless when he was found.  (ECF No. 170, Ex. 1, 8.)  It also is possible that at least one of the crime scene photos of Klann as he was found in the water and when he was lifted out of the water shows that Klann has no shoes on.  (*See, e.g.,* App. to Return of Writ, Trial Tr., vol. 7, 1938, St. Exs. 1B, 1C, 1F.)

Thus, this information was easily discoverable from other sources and does not qualify as *Brady* material.

### h.  Cleveland Heights Police Department's dispatch log

Keenan next argues that the prosecutors failed to furnish to him the Cleveland Heights Police Department dispatch log that shows that the disturbance at Coconut Joe's happened on Thursday night/Friday morning, not Friday night/Saturday morning as the prosecution suggested.  (ECF No. 223, 165-66.)  Detective Goldstein wrote about the log and a conversation the police had with Cleveland Heights police regarding the disturbance in a report dated September 30, 1988.  (ECF No. 170, Ex. 28.)

This sub-claim is meritless.  Keenan himself acknowledges that "court-appointed counsel did utilize this important impeachment evidence."  (ECF No. 223, 166.)  In fact, Keenan's trial counsel called Detective David Watson from the Cleveland Heights Police

68

Department as a witness, and questioned him about the dispatch log from Thursday night/Friday morning.  (App. to Return of Writ, Trial Tr., vol. 7, 2333-38; Def. Ex. FFF.) It is difficult for this Court to fathom how Keenan's own trial exhibit could constitute *Brady* material.

### i.       statements of neighbors

In this sub-claim, Keenan contends that the prosecution suppressed the statements of several neighbors of Lewis' to police regarding what they had seen or heard on Friday night/Saturday morning.  (ECF No. 223, 166.)  Therese Farinacci, who lived on Lewis' street, Fairview Court, told Detective Allen that after returning around midnight on Friday night, she noticed a black pickup truck parked on the street, and at 4:10 a.m. that morning, she was awakened by "loud yelling of obscenities"and "loud pounding on a door."  She did not look out of her windows because she was frightened.  (ECF No. 170, Ex. 29.)[18]  In addition, Carmon Pizone, who it appears owned two buildings near Lewis' apartment,[19] told the police that "an older couple who live at 2026 Murray Hill (up) were heard to have made the comment that they heard someone at about the same time that the truck was on Fairview Ct. say 'Lets [*sic*] dump the body in the basement.'"  (*Id*. at Ex. 30, 392.)

---

[18]      In another police report, Farinacci's daughter, Stacy Forman, who "knew the victim pretty good" and had just ended a relationship with him the week before his murder (but would not tell the police why), told police she returned from a wedding with her mother that Friday night, and repeated her mother's story of what she heard outside later Saturday morning. (ECF No. 170, Ex. 25, 383.)

[19]      The police report states that Pizone was "the owner of the buildings," but it is unclear to which buildings it was referring.  Another police report, however, states that Pizone owns 2022 Murray Hill, and as this report concerns tenants at 2026 Murray Hill, it appears that Pizone owned 2022 and 2026 Murray Hill.  (ECF No. 170, Ex. 25, 382.)

This evidence was suppressed.  Kersey states in his affidavit that he never saw these reports, and that if he had, he would have called the neighbors as witnesses to bolster the defense theory that the murder occurred on Friday night/Saturday morning, when Espinoza had Keenan's truck and Keenan had an alibi that he was attending a party with his girlfriend.  (ECF No. 188-1, para. 10.)

This Court finds that this evidence also has significant exculpatory and impeachment value.  As Kersey posits, the evidence would have supported the defense argument, also strengthened by the Hayes and Goldstein conclusions, that the murder occurred on Friday night/Saturday morning someplace other than Doan Creek.  The defense also could have used the evidence to implicate Lewis in the crime, since the yelling was heard and the truck was seen outside his apartment.  Finally, the evidence could have been used to impeach the police about the thoroughness and integrity of their investigation, raising an inference that the police either did not pursue seemingly important leads because they contradicted their theory of the case, or that they did pursue the leads but suppressed the information obtained because, again, it did not support their case.

Keenan has satisfied the first two prongs for this *Brady* sub-claim, thereby establishing cause and prejudice to excuse the procedural default as well.

### j.    Linda Hudak statement

Keenan further contends that the prosecutors violated *Brady* by failing to provide to him a September 30, 1988, police report containing the statement of Linda Hudak, who said she saw Klann alive the night after the events at Coconut Joe's.  (ECF No. 223, 167-68.)  The police stated in this report that they "learned . . . that the incident in the bar

70

happened last THURSDAY night (September 22nd)." (ECF No. 170, Ex. 31, 393.)
Hudak, who worked at Coconut Joe's at that time, told police she knew all three suspects
and further stated:

> [T]hey were pretty regular in the bar and had all been previously known as
> 'pretty nice guys'. She said that last Thursday they were all pretty loaded
> and got into an argument with the victim (known to them as 'LITTLE
> ANTHONY'). The manager and a bouncer had problems with them but
> finally got them outside. She called the manager over to further explain
> that. She added that the victim had come into the bar with the male she
> knows as 'STONEY', and that ANTHONY was the only one she has seen
> since the problems that night, when he came in Friday evening and
> borrowed money from her. He didn't stay in the bar after that.

(*Id.*)[20]

This information does not qualify as *Brady* material. Again, there is no evidence
that Keenan's trial counsel did not know this information. In addition, defense counsel
"knew or should have known the essential facts permitting him to take advantage" of the
information, and the evidence was available from another source.

During Keenan's trial, the prosecutor asked Detective Allen on direct examination
if any Cleveland police officers went to Coconut Joe's to investigate. He answered that
two detectives went there and interviewed the manager and a barmaid. (App. to Return of
Writ, Trial Tr., vol. 6, 1772.) When defense counsel tried to inquire into these interviews
on cross-examination, the prosecution successfully, if somewhat misleadingly, blocked this

---

[20]        Keenan acknowledges that Hudak later, both by affidavit and at the *D'Ambrosio*
evidentiary hearing, claimed that the report was mistaken and that she saw Klann for the last time
on Thursday night, not Friday night. (ECF No. 223, 167.) This evidence is not part of the record
in this case, however. Furthermore, even if it were, it would be immaterial to the Court's *Brady*
analysis, since that only concerns the exculpatory nature of the evidence at the time of the trial.
*See D'Ambrosio*, 2006 WL 1169926, at *29.

line of inquiry.  (*Id*. at 1799-801.)  Nevertheless, the defense called David Oliver, the bouncer at Coconut Joe's, and Steve Gaines, the manager of the bar, to testify.  Clearly, Keenan was aware of Hudak and could have discovered what she knew about Klann and the events that night at Coconut Joe's.

Accordingly, this sub-claim lacks merit.

### k.    evidence regarding Keenan's truck

Keenan next claims that prosecutors violated *Brady* when they suppressed evidence that the company that repossessed Keenan's car after he was arrested found cocaine after the police had searched it, demonstrating that the police had not thoroughly searched the truck and undercutting the State's theory that the murder occurred at the creek.  (ECF No. 223, 168; ECF No. 170, Ex. 33.)  Keenan also claims that the results of the tests police performed on his truck were exculpatory, and that prosecutors failed to furnish him with the results. (*Id*. at 137; Ex BB.)

This sub-claim lacks any merit whatsoever.  Keenan again is basing a *Brady* claim on information contained in his own trial exhibits.  Keenan introduced as an exhibit, although it was not admitted into evidence, a police report dated October 13, 1988, which stated that the company that repossessed his truck had found marijuana, cocaine and drug paraphernalia in it.  (App. to Return of Writ, Trial Tr., vol. 6, at 1788-90.)  And defense counsel cross-examined Detective Allen extensively concerning the police's search, specifically questioning him why the Scientific Investigation Unit ("SIU") of the Cleveland Police Department did not find the drugs.  (*Id*. at 1782-85.)  In addition, prosecutors gave Keenan's defense counsel two reports regarding the police's processing of the truck shortly

72

before trial, a police report dated October 12, 1988, and a "processing sheet" dated September 26, 1988. (App. to Return of Writ, Pre-Trial and Voir Dire Tr., vol. 1, 27-31.) And Keenan introduced into evidence a "Truck Processing Form" dated October 1, 1988, indicating that SIU searched his truck for fingerprints, blood, and narcotics, and reported finding no evidence. (App. to Return of Writ, Trial Tr., vol. 6, 1777, 1786-88; vol. 7, 1829; Def. Ex. H.).

This information, therefore, was not suppressed and does not qualify as *Brady* material.

### l.        tests performed on D'Ambrosio's knives

Keenan's *Brady* claim regarding tests performed on D'Ambrosio's knives is similarly meritless. Keenan argues that Detective Allen "confiscated everyone [*sic*] of the test results performed by Trace Evidence including their originals," which "would refute some of the prosecution's allegations and are all exculpatory evidence in nature." (ECF No. 223, 137-38.) But a SIU representative testified at Keenan's trial that tests were performed on the knives, and those tests failed to reveal human blood. (App. to Return of Writ, Trial Tr., vol. 7, 2126-23.) And Keenan himself cross-examined Detective Allen to confirm that the reports containing the tests results still exist. (*Id*. at 1843-44.)

Again, this information was not suppressed under *Brady*.

### m.        statements of Coconut Joe's and Saloon employees

In this sub-claim, Keenan argues that the prosecution unconstitutionally withheld "exculpatory witness statements" of employees of Coconut Joe's and the Saloon, which could "prove Mr. Keenan was not one of the patrons on that Friday as claimed by the

73

prosecution and state witnesses Espinoza and Lewis" and "verify that the state's witnesses and the victim were patrons on Friday."  (ECF No. 223, 138-39.)  Keenan does not identify any particular material other than to say that he "had learned" that two Cleveland Police detectives questioned "various" employees who worked at Coconut Joe's on the Thursday and Friday nights at issue on September 30, 1988.  (*Id*. at 139.)  The Court infers that Keenan may be referring to the police report dated September 30, 1988, which as discussed above, recounts information the police obtained from Coconut Joe's barmaid, Linda Hudak, and manager, Steven Gaines.  (ECF No. 170, Ex. 31.)  As to the Saloon employees, he cites to two affidavits of his attorney recounting interviews with employees of the Saloon and an affidavit of his brother who was a bartender there.  (ECF No. 223, at 139, Exs. T, U, V.)

There is no *Brady* violation here.  As already noted with regard to Hudak, the Court finds that this information was not suppressed.  Detective Allen testified at trial that detectives interviewed Coconut Joe's manager and barmaid.  Keenan used Gaines as a defense witness at trial, and he was aware that Hudak had spoken to detectives and could have discovered from her what she knew about Klann and the events at Coconut Joe's.  And Keenan does not even demonstrate that the police or prosecutors possessed the information about the Saloon employees contained in the affidavits, much less suppressed it.

### n.     lab report of tests done on soil samples

Finally, Keenan argues that the prosecution violated *Brady* by withholding an envelope that at one time contained ground dirt from the area near Doan Creek where

74

Klann was discovered and a lab report that indicated the soil did not contain blood.  (ECF No. 197, 60; ECF No. 196, Docs. 223-3, 224-2.)  He claims that this evidence was previously undisclosed and would have impeached Espinoza's account of the murder because, had the murder occurred the way he described, "there would have been a great deal of blood in that area."  (*Id.*)

This sub-claim has no merit.  At trial, Keenan's counsel questioned Joseph Serowik, a scientific examiner for the Cleveland Police Department, regarding testing of soil from the Doan Creek area.  Serowik testified that his department had received a soil sample taken from the bed of Keenan's truck that had been collected during the initial investigation, but the soil was never tested.  (*Id.* at vol. 8, 2444-47; Jt. Ex. B.)  He further testified that a second soil sample "from some crime, from some scene outside, somewhere" was submitted for comparison with the soil sample from the truck, under a separate laboratory number and in a separate envelope, soon after the first soil sample was submitted.  The comparison was never requested and therefore never performed.  He recounted that just before the 1994 trial, however, the prosecutor asked his department to test the second soil sample for the presence of blood, which they did and found no blood presence in the soil.  (*Id.* at 2448-50.)   In addition, both Detective Hayes and Detective Allen made it clear at trial that no blood was found in the ground near Doan Creek where the victim was found.  (App. to Return of Writ, Trial Tr., vol. 5, 1143, 1146-47; vol. 7, 1806-07.)

Information regarding the Doan Creek soil sample, therefore, was not suppressed and does not form the basis of a *Brady* violation.

5.        **Materiality analysis**

The Sixth Circuit has noted that "[p]rejudice (or materiality) in the *Brady* context is a difficult test to meet." *Jamison v. Collins*, 291 F.3d 380. 388 (6th Cir. 2002).  In order to establish prejudice, "the nondisclosure [must be] so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler*, 527 U.S. at 281.  The *Brady* standard is not met, however, if the petitioner shows merely a reasonable *possibilit*y that the suppressed evidence might have produced a different outcome; rather, a reasonable *probability* is required.  *Id.* at 291; *see also Kyles*, 514 U.S. at 434, and *United States v. Agurs*, 427 U.S. 97, 109-10 (1976).  A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

In *Kyles*, the Supreme Court elaborated upon the materiality standard set forth in *Brady* and its progeny.  *Kyles*, 514 U.S. at 434-38.  There, the Court explained that *Brady* materiality "is not a sufficiency of evidence test." *Id.* at 434.  Nor does *Brady* "require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Id.*  Ultimately, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.*  In making this determination, courts review the evidence "collectively, not item by item." *Id.* at 436.  Moreover, the Sixth Circuit has repeatedly acknowledged that "[e]vidence that is merely cumulative to evidence presented at trial is not material for purposes of *Brady* analysis." *Brooks v. Tenn.*, 626 F.3d 878, 893

76

(6th Cir. 2010) (internal quotation marks omitted).

The Supreme Court also has recently clarified that reviewing courts must consider the totality of the evidence–and not merely exculpatory facts in isolation–when evaluating a claim of error for its prejudicial effect.  In *Wong v. Belmontes*, 130 S. Ct. 383 (2009), the Supreme Court stated:

> In evaluating th[e] question [of prejudice], it is necessary to consider *all* the relevant evidence that the jury would have had before it if [the defense] had pursued [a] different path–not just the mitigation evidence [the defense] could have presented, but also the [other] evidence that almost certainly would have come in with it.

*Id.* at 386.

Here, Keenan could have used the information at issue in his meritorious *Brady* sub-claims in primarily three ways, each of which the Court already has touched upon in addressing the information's exculpatory and impeachment value.  First, Keenan could have used the evidence to impeach Espinoza, and, because Espinoza was the State's sole witness to the crime and the only evidence linking Keenan to the murder, thereby undercut the State's entire case.  The Supreme Court has held, "When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within this [*Brady*] rule."  *Giglio v. United States*, 405 U.S. 150, 153 (1972) (internal quotation marks and citations omitted).  The opinions of Detectives Hayes and Goldstein that Klann was murdered elsewhere and then dumped in Doan Creek would have been persuasive testimony.  Both men are experienced Cleveland homicide detectives, and their testimony would have directly contradicted Espinoza's story not only in where the murder occurred, but in the way it occurred.  Espinoza's account of the

77

crime–that Keenan slit Klann's throat and ordered Klann to walk in circles, which he did, before being led to and pushed in the creek (and all this with no blood being spilled)–already strains credulity.[21]

Keenan could have used the neighbors' testimony as well to impeach Espinoza and to buttress a defense theory that the murder occurred at a different place on a different day. Ms. Farinacci's account that she saw a black pickup truck parked on Lewis' street at midnight on Friday and was awakened at 4:10 a.m. Saturday morning by loud yelling and pounding on a door, and the "older couple" who heard someone at about the same time that the truck was on the street say, "Lets [*sic*] dump the body in the basement," could have persuaded the jury that the murder occurred on Friday night/Saturday morning, rather than Thursday night/Friday morning as the prosecution suggested.  This is the time frame, Keenan could have argued, when the coroner originally thought the murder occurred, Espinoza had Keenan's truck, and Keenan had an alibi that he was attending a party with his girlfriend.  As with the detectives, these neighbors would have provided powerful testimony, serving as a stark contrast to the State's witnesses, who were either entangled with the defendants, biased due to deals made with the police or prosecutors, or convicted criminals, alcoholics and drug addicts.

The second way Keenan could have used the *Brady* material is to impeach the police and call into question the thoroughness and integrity of their investigation.  Keenan

---

[21]    This is especially true since Espinoza testified that on Thursday and into early Friday morning, when the disturbance at Coconut Joe's occurred, he had consumed twenty-six cans of beer and four shots of tequila, smoked marijuana and snorted cocaine.  (App. to Return of Writ, Trial Tr., vol. 5, 1312-13, 1319; vol. 6, 1435.)  Espinoza claimed he was intoxicated, "but not to the point of being overly drunk."  (*Id*. at vol. 5, 1319-20.)

already possessed evidence that the police conducted seemingly cursory searches of the

crime scene and his truck.  Thus, evidence regarding the "no-billing" of Lewis' rape charge

and Lewis' request for assistance with a DUI charge, as well as the possible deal the police

made with state witnesses Russell and Rosell, could have further impugned the police's

reliance on Lewis early in their investigation and many of their other witnesses.  For

example, there is nothing in the record to indicate whether the police inquired into Lewis'

history of drug use or criminal activities, even though he told them Keenan was looking for

him for stealing cocaine.

Armed with this new evidence, Keenan also could have questioned the police about

why they did not follow up with Ms. Farinacci, locate the "older couple" and possibly other

neighbors of Lewis' who may have seen or heard something, or conduct a thorough search

of Lewis' apartment and apartment building.  Finally, the Crimi cassette tape could have

been used to raise the specter of spoilation of evidence, further undermining the police's

credibility by creating an inference that Crimi's information must not have supported the

police's theory of the case and was therefore destroyed.

The third, and perhaps most significant, way Keenan could have used the

suppressed information is to implicate others in the murder, at a minimum creating

reasonable doubt regarding his participation in the crime.  The neighbors' statements could

have been used to implicate Espinoza.  As discussed above, their observations bolster the

theory that the murder occurred on Friday night/Saturday morning, when Espinoza had the

opportunity to murder Klann, since he had the truck, and Keenan had an alibi.  After all,

Keenan already had demonstrated at trial that it was Espinoza who immediately pointed to

79

D'Ambrosio and Keenan when confronted by the police and quickly made a deal with the police after being arrested to testify in exchange for a lesser sentence; it was Espinoza who confessed that he hit Klann first, with a bat he brought with him on the search for Lewis, and later was present during the murder; it was Espinoza who argued with Klann at Coconut Joe's, which he denied; it was Espinoza who threatened people outside the bar with a broken beer bottle; and it was Espinoza who threatened to kill Lewis.  Conversely, Keenan did not take a weapon with him to search for Lewis, and did not threaten to kill Lewis once he found him.  And there is no evidence that Keenan felt any animosity toward Klann aside from his frustration at Klann's inability to locate Lewis.  *See Keenan*, 81 Ohio St. 3d at 157-58, 689 N.E.2d at 950-51 (Moyer, J., concurring in part and dissenting in part) (finding no "prior calculation and design" to support the crime of aggravated murder under Ohio Rev. Code § 2903.01(A)).

Moreover, the Lewis-Klann connection could have supplied Keenan with an entirely new defense theory:  that Lewis had the motive to murder Klann and point the police toward others.  The Crimi cassette tape, which a detective reported "may implicate others in this crime," also could have supported this theory.

Having established that Keenan could have used the suppressed information to significantly strengthen his case and weaken the State's, the pivotal question remains:  is there a reasonable probability that the suppressed evidence would have produced a different verdict sufficient to undermine confidence in the outcome of the trial?  The Court finds that there is such a reasonable probability.  As already noted, the State had only one witness to the murder–Espinoza, an accomplice who testified in return for a reduced charge

80

and sentence–and no physical evidence at all.[22] Espinoza's testimony, moreover, was rife

with inconsistencies[23] and contradicted numerous witnesses on key points.[24] And the jury

_____

[22]     Courts have long recognized the "inherently questionable credibility of those witnesses who had earlier pled guilty to related charges," or accomplice testimony. *United States v. Carr*, 5 F.3d 986, 992 (6th Cir. 1993). The Supreme Court has cautioned, "The use of informers, accessories, accomplices, false friends, or any of the other betrayals which are 'dirty business' may raise serious questions of credibility." *On Lee v. United States*, 343 U.S. 747, 757 (1952); *see also Banks v. Dretke*, 540 U.S. 668, 701-02 (2004); *Goff v. Bagley*, 601 F.3d 445, 470 (6th Cir. 2010). For that reason, defendants are entitled to "broad latitude to probe credibility by cross-examination and to have the issues submitted to the jury with careful instructions." *On Lee*, 343 U.S. at 973-74. Accordingly, Keenan was permitted to vigorously cross-examine Espinoza, and the jury was instructed:

> Whether Edward Espinoza was an accomplice and the weight to give his testimony are matters for you to determine from all of the facts and circumstances in evidence.
>
> The testimony of an accomplice does not become inadmissible because of his complicity, his moral turpitude, or self-interest, but the admitted or claimed complicity of a witness may affect his credibility, and make his testimony subject to grave suspicion, and require that it be weighed with great caution.
>
> It is for you, as jurors, in light of all the facts presented to you and from the witness stand to evaluate such testimony, and to determine its quality and worth, or its lack of quality and worth.

(App. to Return of Writ, Trial Tr., vol. 8, 2362-63.)

[23]     Examples of inconsistencies in Espinoza's testimony include: Espinoza first testified that Klann yelled "[p]lease don't kill me" while he was running from D'Ambrosio in the creek. (App. to Return of Writ, Trial Tr., vol. 6, 1373-74.) He later testified that he heard nothing while D'Ambrosio and Klann were in the creek. (*Id*. at 1499.) Espinoza also testified first that he saw Klann stumbling in the creek after Keenan pushed Klann into the water. (*Id*. at 1373.) He later testified that he did not see Klann in the creek at all. (*Id*. at 1496-99.) Finally, Espinoza first testified that after the murder, he, Keenan and D'Ambrosio went to D'Ambrosio's apartment, then Keenan's motel room, then back to the apartment with only an hour or less sleep at the motel or in the truck. (*Id*. at 1376-78.) He later testified that after the murder he and D'Ambrosio went back to D'Ambrosio's apartment and slept; Keenan rejoined them there later that day. (*Id*. at 1509-11, 1512-13.)

[24]     For example, Espinoza testified that he never argued with Klann at Coconut Joe's. (App. to Return of Writ, Trial Tr., vol. 5, 1321; vol. 6, 1438-39.) But employees of Coconut Joe's testified that Espinoza was arguing very loudly with Klann that night. (*Id*. at vol. 7, 2211-13; vol. 8, 2241.) Espinoza also claimed that Adam Flanik spoke to him, Keenan and D'Ambrosio from Flanik's apartment's rooftop. (*Id*. at vol. 5, 1352.) Although Flanik's

already knew that he was cooperating with the prosecution.  Given these inherent

weaknesses in the State's case, then,[25] this Court concludes that the questions raised by the

suppressed evidence, about Espinoza's credibility and role in the murder; about the

thoroughness and integrity of the police investigation; and Lewis' motive to kill Klann, are

sufficient to undermine confidence in the outcome of Keenan's trial.

### 6. Conclusion

Respondent calls Keenan's *Brady* claims "scurrilous contentions of wrongdoing."

(ECF No. 229, 3.)  This Court disagrees.  Although the Court notes that several of

Keenan's *Brady* sub-claims are blatantly meritless,[26] since Keenan either possessed or

discovered the alleged *Brady* material at trial, others constituted serious and disturbing

violations of the State's constitutional obligation to produce to defendants any and all

exculpatory information in their possession.  The State had a clear obligation to reveal the

---

girlfriend testified that their apartment building did have a flat roof overlooking the street that
they could climb out onto (*id*. at 1257), she and Flanik both testified that Flanik went downstairs
and outside to talk to the group.  (*Id*. at 1156, 1241.)  Finally, Espinoza testified that Keenan
drove the truck to the Doan Creek area where Klann was murdered.  (*Id*., vol. 6, 1361.)  Flanik
testified that Espinoza was driving the truck as they drove away from Lewis' apartment building.
(*Id*. at vol. 5,1234.)

[25]     The Ohio Supreme Court also noted the weakness of the State's case against
Keenan in their decision overturning Keenan's first conviction, and the State's case was virtually
identical in the second trial.  The court opined,

> [T]he evidence here was not overwhelming.  Espinoza, the sole eyewitness to the
> murder, had participated in the crime.  Facing the death penalty for aggravated
> murder, he pled guilty to voluntary manslaughter and other noncapital crimes
> pursuant to a plea agreement; testifying was his end of the bargain. Moreover,
> Espinoza himself admitted past quarrels with Klann, and the way he treated Klann
> at Coconut Joe's made his feelings clear.

*Keenan*, 66 Ohio St. 3d at 410-11, 613 N.E.2d at 210.  The court went on the describe several
ways in which "[c]redible evidence contradict[ed] Espinoza's testimony." *Id*. at 411.

[26]     And, the Court would add, an unproductive use of the Court's time and resources.

82

information it possessed concerning Lewis' rape charge, request for assistance from the police and role in the early investigation; the initial police theories of where the murder occurred; the statement of a former roommate of the victim regarding who was involved in the murder; and the statements of wholly disinterested witnesses to activities near Lewis' apartment on Friday night/Saturday morning. The State failed to fulfill those obligations at Keenan's trial and continued to stonewall for nearly twenty years after. As the Supreme Court recently observed, "Although the State is obliged to 'prosecute with earnestness and vigor,' it 'is as much [its] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Cone v. Bell*, 556 U.S. 449, 469 (2009) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)).

**B.** ***Eighteenth and Twentieth Grounds for Relief: Presentation of False Testimony***

In Keenan's eighteenth and twentieth grounds for relief, he claims that in addition to suppressing exculpatory evidence, the prosecution violated his constitutional rights by presenting false testimony and evidence. (ECF No. 223, 121-32.) Specifically, he claims that the prosecution "knew or should have known" that state witnesses testified inconsistently and/or were contradicted by other witnesses. (*Id*. at 121-26.) He further argues that the prosecution presented evidence regarding four issues that was "known to be false." (*Id*. at 127-32.) Finally, he objects to the prosecution's presentation of the coroner's testimony about D'Ambrosio's knives, which he contends contained "half truths regarding pseudo[-]scientific facts concerning width and minimum blade length." (*Id*. at 134.) Respondent does not address the merits of these claims.

83

### 1.    Procedural Posture

Keenan raised his false-testimony claims in his 2004 post-conviction appeal.  (App. to Return of Writ, Post-Conviction, vol. 5, 49-73.)  The Eighth District Court of Appeals found the claims untimely and did not address their merits.  *State v. Keenan*, No. 87713, 2006 WL 3317922 (Ohio App. Nov. 16, 2006).  As with Keenan's *Brady* claims, Respondent argues that these claims are procedurally defaulted, unexhausted, and rely on materials that are not part of the state court record.  (ECF No. 218, 18-19; ECF No. 229, 1-3.)  The Court already has addressed these arguments in relation to Keenan's *Brady* claims. *See supra* Part VII.A.2-4.  The Court declines to engage in further analysis of the procedural posture of these related claims, however, because it finds these claims are meritless.  *See* 28 U.S.C. § 2254(b)(2) (courts may deny unexhausted habeas petitions on the merits); *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) (courts may skip complicated "procedural-bar issues" if the merits are "easily resolvable against the habeas petitioner").

### 2.    Merits

The Supreme Court has long recognized that due process is denied where "[the] state has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured."  *Mooney v. Holohan*, 294 U.S. 103, 112 (1935).  Such conduct by the prosecution is "inconsistent with the rudimentary demands of justice."  *Id*.  This is also true "when the State, although not soliciting false evidence, allows it to go uncorrected when it appears."  *Napue v. Illinois*, 360 U.S. 264, 269 (1959).  This false-testimony claim falls within the *Brady* disclosure doctrine.  *United*

84

*States v. Agurs*, 427 U.S. 97, 103-04 (1976). The Supreme Court defined the claim in two

cases: *Napue v. Illinois, supra*, and *Giglio v. United States*, 405 U.S. 150, 153-54 (1972).

The Sixth Circuit applies a three-part test for determining if the prosecution has

committed a *Brady-Napue-Giglio* violation:

> The knowing use of false or perjured testimony constitutes a denial of due
> process if there is any reasonable likelihood that the false testimony could
> have affected the judgment of the jury. In order to establish prosecutorial
> misconduct or denial of due process, the defendants must show (1) the
> statement was actually false; (2) the statement was material; and (3) the
> prosecution knew it was false. The burden is on the defendants to show that
> the testimony was actually perjured, *and mere inconsistencies in testimony
> by government witnesses do not establish knowing use of false testimony.*

*Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998) (quoting *United States v. Lochmondy*, 890

F.2d 817, 822 (6th Cir. 1989) (emphasis added)). A false statement is material under this

standard, and "[a] new trial is required[,] if the false testimony could in any reasonable

likelihood have affected the judgment of the jury." *Giglio*, 405 U.S. at 154 (quoting

*Napue*, 360 U.S. at 271) (alterations and internal quotation marks omitted).

Because the state courts never adjudicated these claims on the merits, this Court

reviews the claims *de novo*. *See, e.g., Morales v. Mitchell*, 507 F.3d 916, 930 (6th Cir.

2007).

The Court finds these claims meritless. First, Keenan has not shown that the

inconsistent and/or contradictory testimony about which he complains qualifies as false

under the *Napue/Giglio* standard. Keenan provides a comparison of the state witnesses'

testimony at his two trials and D'Ambrosio's trial that shows "more than 550 instances"

where the witnesses testified differently. (ECF No. 223, 122; Exs. E-L.) Keenan also

provides a detailed account of how state witnesses were contradicted by other witnesses at

85

the three trials.  (*Id*. at 123, Ex. E.)  This demonstration, while comprehensive, falls far short of satisfying his burden under *Napue* and *Giglio*.  Keenan does not show which testimony, if any, was actually false, that it was material, or that the prosecution knew it was false.  That he offers nothing but sheer speculation on the most basic elements of his claim is well demonstrated by his assertion that "[o]ne *could* characterize much of the testimony of these witnesses as untruthful and therefore perjured," and that "[t]he prosecution had to know, *or should have known*, that Espinoza testified falsely . . . ." (*Id*. at 122 and 126, respectively (emphasis added).)  As the Sixth Circuit has held,  "[M]ere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony."  *Coe*, 161 F.3d at 343.

Keenan also fails to meet his burden of demonstrating that the prosecution presented false testimony and evidence regarding certain key issues.  First, he claims that prosecutors knowingly presented Espinoza's false testimony in which Espinoza denied that he murdered Klann.  (ECF No. 223, 126-27.)  Keenan argues that Espinoza's plea agreement establishes that he was guilty of the murder because Espinoza pled guilty.  This argument is not well founded.  It was public record at the time of Keenan's 1994 trial that Espinoza pled guilty to charges of voluntary manslaughter (along with kidnapping and aggravated burglary), but as an aider and abettor; he did not admit to being Klann's sole murderer.

Keenan next argues that the prosecution presented false evidence regarding Keenan's whereabouts on Friday night to support their account of the murder occurring on Friday night/Saturday morning.  (*Id*. at 127-28.)  He points to Espinoza's testimony that

86

Keenan was with him in the bars on Friday night, which was contradicted by employees of the Saloon.  This argument also fails.  Keenan again is identifying contradicted testimony rather than perjured testimony.

Keenan also asserts that the prosecution presented false evidence in the form of photographs of Doan Creek that were taken from the opposite side of the creek than the side where Espinoza claimed the murder occurred.  (*Id*. at 128-29.)  Keenan concedes, however, that Detective Hayes explained the location from which the photograph was taken at his trial.  (*Id.* at 129.)  The evidence, therefore, was not false.

Keenan also asserts that the prosecution presented false evidence when Espinoza and Lewis testified that the disturbance at Coconut Joe's took place on Friday night/Saturday morning.  (*Id.* at 129.)  He points to the Cleveland Heights Police Department log showing that the police were called to Coconut Joe's early Friday morning.  (*Id*.)  This argument is false.  Espinoza consistently testified that the events at Coconut Joe's took place on Thursday night/Friday morning.  (*See, e.g.,* App. to Return of Writ, Trial Tr., vol. 6, 1479.)

Keenan finally contends that the prosecution presented false evidence when Flanik testified that he saw D'Ambrosio pointing a knife at Klann's neck while D'Ambrosio and Klann were sitting in Keenan's truck outside Flanik's apartment.  (ECF No. 223, 129-30.)  Keenan claims that this testimony was "scientifically impossible."  (*Id*. at 130.)  Keenan still does not show that Flanik's testimony constituted perjury, however, or that it was

material, or that prosecutors knew that it was false.[27]  This sub-claim also fails.

In Keenan's last sub-claim of prosecutorial misconduct, he objects to the coroner's testimony regarding D'Ambrosio's knives.  As discussed below, this Court finds that Dr. Balraj's testimony was admissible because it assisted the jury in understanding the evidence, and did not render Keenan's trial so fundamentally unfair as to result in a due process violation.  *See infra* Part VII.G.2.d.  Keenan may vehemently disagree with Dr. Balraj's conclusions; that is why he had the opportunity to fully cross-examine her.  But it is not improper for the prosecution to present evidence that is admissible.  Thus, this sub-claim is not well taken.

Keenan has not supported his claims that the prosecution presented false testimony in violation of his constitutional rights, and these claims are denied.

## C.     *Sixteenth Ground for Relief: Actual Innocence*

Keenan's sixteenth claim for relief asserts that he is actually innocent of the crimes for which he was convicted.  (ECF No. 197, 53; ECF No. 223, 98-100; ECF No. 230, 4-5.)  The exact nature of the claim, however, is not entirely clear from Keenan's Petition and Traverse.  The Court assumes that he is asserting a "gateway" actual innocence claim under *Schlup v. Delo*, 513 U.S. 298 (1995), in order to overcome the procedural default of other

---

[27]     Keenan also notes, with no argumentation, that Detective Allen testified about drugs found in Keenan's truck after the police released it, when he testified at Keenan's first trial and at D'Ambrosio's trial that police searched the truck only for fingerprints and trace evidence and a report showed police did search the truck for drugs.  (*Id.* at 128.)  It is unclear to the Court what Keenan's argument is relating to this issue; the only discrepancy appears to be in the detective's *prior* testimony.

underlying constitutional claims.[28]  As the Supreme Court has explained, "[A] claim of

'actual innocence' is not itself a constitutional claim, but instead a gateway through which

a habeas petitioner must pass to have his otherwise barred constitutional claim considered

on the merits."  *Herrera v. Collins*, 506 U.S. 390, 404 (1993).  Keenan makes several

references to his ineffective-assistance-of-counsel claims in this context, but it is unclear

whether his actual innocence argument pertains only to those claims or generally to all of

his claims.  Regardless, the Court finds that Keenan has not satisfied his burden of

establishing actual innocence, which is significantly higher than the *Brady* standard applied

above, and the actual innocence exception does not apply to any of his claims.[29]

In *Schlup v. Delo*, the Supreme Court clarified the standard to be used when a

habeas petitioner raises a claim of actual innocence to avoid a procedural bar to

consideration of the merits of his or her constitutional claims.  It held:

> It is not the district court's independent judgment as to whether reasonable
> doubt exists that the standard addresses; rather the standard requires the
> district court to make a probabilistic determination about what reasonable,
> properly instructed jurors would do.  Thus, a petitioner does not meet the

---

[28]     The Supreme Court stated in *dicta* in *Herrera v. Collins*, 506 U.S. 390 (1993), that
"in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would
render the execution of a defendant unconstitutional" regardless of whether any constitutional
violation occurred during trial.  *Id*. at 417.  Even if Keenan were asserting such a "free-standing"
actual innocence claim, however, it is unclear whether such a claim is cognizable on habeas.
The claim has never been applied, and, although the circuit courts are divided on this issue, the
Sixth Circuit repeatedly has held that such a claim is not a valid ground for habeas relief.  *See,
e.g., Cress v. Palmer*, 484 F.3d 844, 854-55 (6th Cir. 2007).  Moreover, the *Herrera* Court
emphasized that "the threshold showing for such an assumed right would necessarily be
extraordinarily high."  *Herrera*, 506 U.S. at 417; *see also House v. Bell*, 547 U.S. 518, 520
(2006).

[29]     This Court also rejected this claim when Keenan asserted it to excuse the
untimeliness of his original habeas petition.  (*See* ECF No. 69, 10-13; ECF No. 100, 6-17.)

> threshold requirement unless he persuades the district court that, in light of
> the new evidence, no juror, acting reasonably, would have voted to find him
> guilty beyond a reasonable doubt.

*Schlup*, 513 U.S. at 329.  The *Schlup* Court explained that the new evidence must be "reliable," such as "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence [] that was not presented at trial."  *Id*. at 324.  *Schlup* "does not require absolute certainty about the petitioner's guilt or innocence," but it "is [a] demanding [standard] and permits review only in the extraordinary case."  *House v. Bell*, 547 U.S. 518, 538 (2006) (internal quotation marks omitted).  In reviewing such a claim, the district court "is not bound by the rules of admissibility that would govern at trial," and the habeas court may have to make some credibility assessments.  *Schlup*, 513 U.S. at 324.

Thus, before addressing the procedural posture of Keenan's remaining claims, the Court must decide whether *Schlup v. Delo* applies by showing that no juror, acting reasonably, would have voted to convict Keenan beyond a reasonable doubt.  As noted above, the State's case against Keenan undoubtedly possessed some weaknesses.  Most significantly, there was no physical evidence linking Keenan to the murder, and the State was reliant on testimony from the sole witness to the crime, Eddie Espinoza, a co-defendant.  As demonstrated, Espinoza's testimony contained many inconsistencies and contradictions, in addition to other problems.  *See supra* Part VI.A.5.  Nevertheless, Keenan's defense was not without its own shortcomings.  The new evidence strengthened Keenan's argument that the murder occurred on Friday night/Saturday morning, and someplace other than the Doan Creek area where Klann was discovered.  But it did not provide such strong evidence that *no juror*, acting reasonably, would have voted to find

him guilty beyond a reasonable doubt.

Most significantly, even if the murder had occurred on Friday night/Saturday morning, Keenan's alibi was not air-tight.  He claimed he was at a party from 10:50 p.m. Friday night until 10:45 a.m. the following morning at his friends Robert and Michelle Doyle's hotel room to celebrate his girlfriend, Cindy Calire's, birthday.  He also claims Calire stayed in her car for most of that time because Michelle had insulted her.  (App. to Return of Writ, Trial Tr., vol. 8, 2285, 2290, 2301-02.)  But Calire never testified on Keenan's behalf to corroborate his story,[30] and Robert Doyle did not prove to be a "trustworthy" witness.[31]

Moreover, even if Keenan's alibi was irrefutable, Keenan's evidence that the murder occurred on Saturday morning is far from conclusive.  Although the coroner testified in Keenan's first trial that Klann died within twenty-four hours of the time of his autopsy, she revised her opinion in his second trial to include the possibility that the

---

[30]    Indeed, the record contains an oral statement taken from Calire soon after she was arrested for the murder (she was later released), which prosecutors produced to Keenan before trial, that refutes Keenan's alibi.  She told police, "On Friday evening Mike came to the Turfside at 11:00 p.m., they drove to [the Doyles' hotel room], stayed for one (1) hour, then returned to the Turfside and both went to bed.  They woke up at 8:00 a.m., and she drove him to his mother's house on Berkshire at 10:00 a.m."  (App. to Return of Writ, Trial, vol. 1, 210.)

[31]    Robert Doyle was incarcerated at the time of the trial for drug trafficking and parole violation.  (App. to Return of Writ, Trial Tr., vol. 8, 2279.)  He considered Keenan a brother since Keenan's father had represented him in a criminal matter when he was young and he had lived with Keenan's family for a time.  (*Id*. at 2297-99.)  He did not come forward with his story concerning the Friday night party until Keenan's second trial.  (*Id*. at 2296, 2300.)  He also claimed that he met Keenan at the Saloon on Thursday night from 10 p.m. to 11:30 p.m., and then Keenan and Cindy returned to the hotel with him and stayed with him all night until 3 a.m. or 4 a.m. Friday morning.  (*Id*. at 2312-15, 2319.)

91

murder could have occurred as early as 48 hours before.[32]  And, had the crime occurred on

Thursday night/Friday morning, Keenan's claim that he left Klann and Espinoza in his

truck and drove off with Calire who had been following them is similarly weak.  It was

corroborated only by D'Ambrosio, an accomplice, since, again, Calire did not testify.

Thus, Keenan has not satisfied the high burden of establishing actual innocence,

and the actual innocence exception to procedural default does not apply to any of his

claims.

**D.**     *Eighth Ground for Relief:  Prosecutorial Misconduct*

---

[32]     The coroner's testimony regarding Klann's time of death has its own weaknesses, however.  In Keenan's first trial, she testified that the "estimated time" of death was "24 hours or less" before the autopsy was performed, which was at 8:15 a.m. Sunday morning.  This would put the time of death in the early hours of Saturday, September 24.  (App. to Return of Writ, 1989 Trial Tr., vol. 3, 70.)  She explained that the time of death written in her autopsy report "is consistent with him dying on the 24th of September. . . .  That is an estimated time of death based on the appearance of the body, the amount of stiffness in the body.  The body was found in the water. . . .  The food in the stomach, all of these, and also the investigations surrounding his death." (*Id*. at 67.)  She acknowledged that the time of death was an estimate and could have been "a little more" or "a little less" than the twenty-four hours.  (*Id*. at 71.)  But she testified that "everything goes along with him dying on the 24th" (*id*. at 68), and repeated the twenty-four hours "or less" estimate numerous times.  (*Id*. at 70, 71, 76.)  When asked if the time of death could have been forty-eight hours before the autopsy, she replied, "*[p]robably not, because the body had not undergone decomposition*." (*Id*. at 71 (emphasis added).)

At Keenan's second trial, she revised her opinion on cross-examination by defense counsel to include the possibility that the time of death could have occurred "even forty-eight hours" before the autopsy, which would have put the time of death at 8:15 a.m. Friday morning, still several hours past when Espinoza claims the murder occurred, which was before sunrise.  (App. to Return of Writ, Trial Tr., vol. 6, 1580, 1376.)  She denied that her previous testimony was different, but conceded that it "could be" "more likely that it was twenty-four hours." (*Id*. at 1588.)  The coroner also changed her characterization of the estimated time of death, now calling it "just an official time, for administrative reasons." (*Id*. at 1581.)  Rather than capitalizing on this discrepancy in the coroner's testimony and highlighting the significance of Klann's time of death, however, Keenan's counsel further confused the issue when he calculated the time of death from the time the body was found on Saturday rather than the Sunday autopsy, pushing the time of death back as early as Thursday afternoon.  (*Id*. at 1580-81.)

For his eighth ground for relief, Keenan alleges further prosecutorial misconduct rendered his trial fundamentally unfair.  He asserts that he should be granted relief because the prosecution:

1. made improper comments during closing arguments about Keenan's decision not to testify;

2. badgered D'Ambrosio during cross-examination;

3. vouched for state witnesses;

4. denigrated Keenan and defense witnesses;

5. falsely accused Keenan of manipulating witnesses;

6. misstated testimony;

7. urged the jury to convict Keenan for his lifestyle;

8. argued Keenan was not an aider and abettor; and

9. questioned witnesses about whether they had testified at Keenan's first trial.

(ECF No. 197, 40-44.)  Respondent addressed the merits of only the first sub-claim, and opposed all of the claims on procedural grounds.  (ECF No. 218, 15-18.)

### 1. Procedural Posture

Keenan raised these claims on direct appeal.  (App. to Return of Writ, Direct Appeal, vol. 3, 63-83.)  The Ohio Supreme Court ruled Keenan waived all claims except sub-claim 9 because counsel did not object to the conduct at trial.  *Keenan*, 81 Ohio St. 3d at 149, 689 N.E.2d at 945.  Respondent argues that Keenan's prosecutorial-misconduct claims are procedurally defaulted because Keenan's counsel did not object to the alleged errors at trial.  (ECF No. 218, 15.)  Keenan does not seek to excuse the default through evidence of cause and prejudice, other than to generally assert the actual innocence

93

exception to any procedural default of his habeas claims.  (ECF No. 230, 4.)  As discussed above, this Court rejects that claim.  *See supra* Part VII.C.  Keenan's claims of prosecutorial misconduct 1 through 8, therefore, are procedurally defaulted.  Sub-claim 9 is preserved for habeas review.

## 2.    Merits

Even if all of Keenan's prosecutorial-misconduct claims were ripe for review, they lack merit.  To assert a successful claim for prosecutorial misconduct in a habeas proceeding, a prosecutor's conduct must be "so egregious as to render the petitioner's trial fundamentally unfair."  *Buell v. Mitchell*, 274 F.3d 337, 364 (6th Cir. 2001).  It "is not enough that the prosecutors' remarks were undesirable or even universally condemned.  The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)); *Durr v. Mitchell*, 487 F.3d 423, 439 (6th Cir. 2007).  The Sixth Circuit has stressed the narrow scope of a habeas court's review of this due process claim, stating, "We do not possess supervisory powers over state court trials."  *Byrd v. Collins*, 209 F.3d 486, 529 (6th Cir. 2000).  "[I]t is the responsibility of the [state courts] to police their prosecutors; we have no such authority."  *Cook v. Bordenkircher*, 602 F.2d 117, 119 n.5 (6th Cir. 1979).

The Sixth Circuit recently set forth the standards to apply to habeas claims of prosecutorial misconduct in *Wogenstahl v. Mitchell*, 668 F.3d 307 (6th Cir. 2012).  It explained that courts must apply a "two-part test to determine whether the state court

94

reasonably applied the federal standard in holding that prosecutorial misconduct did not render [the petitioner's] trial fundamentally unfair." *Id.* at 328 (quoting *Irick v. Bell*, 565 F.3d 315, 324 (6th Cir. 2009)). First, the court must determine whether the prosecution's conduct was improper. Second, it must determine whether that improper conduct was flagrant by considering four factors: (1) whether the evidence against the defendant was strong; (2) whether the conduct of the prosecution tended to mislead the jury or prejudice the defendant; (3) whether the conduct or remarks were isolated or extensive; and (4) whether the remarks were made deliberately or accidentally. *Id.*

Claims of prosecutorial misconduct "must be answered in light of the totality of the circumstances in the case." *Lundy v. Campbell*, 888 F.2d 467, 473 (6th Cir. 1989), *cert. denied*, 495 U.S. 950 (1990). The analysis must focus on "'the fairness of the trial, not the culpability of the prosecutor.'" *Byrd*, 209 F.3d at 529 (quoting *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1355 (6th Cir. 1993)). To constitute a denial of due process, the misconduct must be "so pronounced and persistent that it permeates the entire atmosphere of the trial." *Id.*

### a. improper comments during closing arguments about Keenan's decision not to testify

Keenan claims that prosecutors made constitutionally impermissible comments during closing arguments about Keenan's decision not to testify. Specifically, he complains about the following remarks:

1. "How do you explain [the letters he wrote to Espinoza and Rossell]? Why is he writing the witnesses?" (App. to Return of Writ, Trial Tr., vol. 8, 2513.)

2. "Well, ladies and gentleman [*sic*], that makes him a drug dealer.

You don't have to pay for your drugs.  Anybody who dispenses drugs is a drug dealer, and that is what the evidence shows in this case, and there was no contradiction to that testimony, none whatsoever." (*Id*. at 2515.)

3.    "Look at the pickup truck, Mr. Keenan's truck.  He's driving this when that morning he is arrested.  Ask yourselves, where was he when his two buddies were arrested?" (*Id*. at 2522.)

4.    "The Defendant testified in this case through various means.  What is the first time he testified?  When he was arrested on Tuesday he told Detective Leo Allen, after being advised of his rights, that on that Friday evening that he was out at a person's house.  That is his first testimony. . . .  The second time he talks to us is when we find out about the letters.  Now, these were not gentle reminders to Espinoza to tell the truth." (*Id*. at 2581-82.)

5.    "He talks to us through his alibi." (*Id*. at 2583.)

6.    "The alibi is the third time the defendant speaks to us, and he says that he is out in Strongsville that night." (*Id*. at 2590.)

7.    "He was not physically in the building at the time, just missed it and, of course, when he finds out that his good friends are arrested, and they got his truck, he runs down to the Police Department and says, hey, what's going on here?  You got my truck.  You got my employees.  What happened?  What's going on?" (*Id*. at 2593.)

(ECF No. 197, 40.)  Respondent counters that, applying *Griffin v. California*, 380 U.S. 609

(1965), these remarks do not amount to prosecutorial misconduct because they are

"indirect" rather than "direct" references to Keenan's failure to testify.  (ECF No. 218, 16.)

As noted above, the Ohio Supreme Court ruled that Keenan's counsel waived this

claim by not objecting to the comments at trial.  *Keenan*, 81 Ohio St. 3d at 149, 689 N.E.2d

at 945.  The court went on, however, to apply a plain error review.          Generally citing

*Griffin*, the court found the remarks regarding how Keenan "testified" in the case could be

construed as indirect comments on Keenan's silence.  It stated, "While not 'manifestly

96

intended' to reflect on the accused's silence, these remarks may have been 'of such a character' that the jury would have taken them as such." *Id*. (citations omitted). The court found no error, however, since the trial court instructed the jury that Keenan's failure to testify could not be considered for any purpose. It concluded, "Because of that, the indirect nature of the comments at issue, and the strength of the state's evidence, the prosecutor's comments do not clearly appear to be outcome-determinative." *Id*. The court found the remaining comments even less direct, and concluded, "it is doubtful whether they could even be construed as comments on Keenan's failure to testify." *Id*.

The Ohio court's review, however, does not qualify as an "adjudication on the merits" for purposes of Section 2254(d). *See, e.g., Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000); and *State v. Long*, 53 Ohio St. 2d 91, 95, 372 N.E.2d 804, 807 (Ohio 1978) (citing *United States v. Rudinsky*, 439 F.2d 1074, 1076 (6th Cir. 1971) (noting that the plain error rule is invoked "only in exceptional circumstances to avoid a miscarriage of justice")). Thus, the deference due under the AEDPA does not apply, and this Court will conduct a *de novo* review of the claim. *See, e.g., Murphy v. Ohio*, 551 F.3d 485, 498-99 (6th Cir. 2009); *Morales v. Mitchell*, 507 F.3d 916, 930 (6th Cir. 2007).

In *Griffin*, the Supreme Court held that a prosecutor's direct reference to a criminal defendant's failure to testify is a violation of the defendant's Fifth Amendment privilege against compelled self-incrimination. *Griffin*, 380 U.S. at 614-15. Contrary to Respondent's assertion, however, the Sixth Circuit has held that *Griffin* applies to indirect as well as direct commentary. *Byrd*, 209 F.3d at 533 (noting that indirect references on the failure to testify can also violate the Fifth Amendment privilege). Nevertheless, a

97

reviewing court need not reverse a sentence or verdict, however, if it finds that the comment amounted to harmless error beyond a reasonable doubt. *Lundgren v. Mitchell*, 440 F.3d 754, 780 (6th Cir. 2006). An error may be harmless when the State presents an otherwise "compelling case of guilt" and a review of the record as a whole shows that the jury verdict would have been the same. *Id*.

This Court finds that this sub-claim lacks merit. Even if the comments regarding Keenan's "testimony" may have indirectly called the jurors' attention to Keenan's decision not to testify, given the State's closing argument as a whole and the trial court's jury instruction on the issue, the comments were not damaging enough to result in prejudice. In addition, the Court agrees with the Ohio Supreme Court's conclusion that the other comments hardly qualified even as indirect references to Keenan's silence. *See Byrd*, 209 F.3d at 535 (holding that the prosecutor's remark that the petitioner's comments were "shallow" because the petitioner did not accept more complete responsibility for his actions and for the victim's death, but merely stated that he was "sorry for what happened" and "sorry for [the victim] and his family" was not a reference to the petitioner's failure to present sworn testimony and to acknowledge his guilt as the principal offender but rather a fair comment on the evidence); *Lorraine v. Coyle*, 291 F.3d 416, 443-44 (6th Cir. 2002) (prosecutor's comment on petitioner's unsworn statement to jury during penalty phase of capital trial was basically a fair response to petitioner's unsworn statement and did not result in actual prejudice).

Accordingly, this sub-claim fails.

> **b.     badgering D'Ambrosio during cross-examination**

For his next sub-claim, Keenan argues that the prosecution improperly badgered and, in effect testified for, D'Ambrosio during his cross-examination while questioning him about a conversation the prosecutor had had with D'Ambrosio in which he offered D'Ambrosio a life sentence in return for his testimony against Keenan.  (ECF No. 197, 41.) Without citing any applicable federal law,[33] Keenan summarily asserts, "This type of procedure has been found to be inappropriate and condemned as violation of the defendant's constitutional right to a fair trial and due process as guaranteed by the Fifth and Fourteenth Amendments."  (*Id*.)  The Ohio Supreme Court ruled this claim was waived. *Keenan*, 81 Ohio St. 3d at 150, 689 N.E.2d at 945.

This Court has reviewed this testimony and finds nothing improper in the prosecutor's questioning.  This sub-claim, therefore, is meritless.

### c.        vouching for state witnesses

Keenan next contends that the prosecutors improperly vouched for state witnesses. (ECF No. 223, 50-53.)  He points to the following examples of improper vouching by the prosecution:

1.    "Edward Espinoza is telling the truth, because the story at that point in time, from what the detective knows, it fits.  It makes sense." (App. to Return of Writ, Trial Tr., vol. 8, 2492.)

2.    "Now, ladies and gentlemen, if [Espinoza is] manufacturing all this evidence, if he is laying it all out, why wouldn't he say, I saw D'Ambrosio jump in the Creek?  I saw him stab him three times in

---

[33]    Keenan cites to two cases that address improper prosecutor comments, but neither is applicable:  *Sawyer v. Smith,* 497 U.S. 227, 235 (1990), in which the prosecutor led the jury to a false belief that responsibility for determining the appropriateness of a defendant's capital sentence rested elsewhere, and *Davis v. Zant*, 36 F.3d 1538 (11th Cir. 1994), in which the prosecutor misstated material facts.

99

the chest, come out, and says, 'Hey, boss, I did it.'  You didn't hear that testimony, and why not?  Because it didn't happen that way." (*Id*. at 2591.)

3.    "When the police investigate a case and hand it to the Prosecutor's Office we have to take our witnesses as they come in.  If they come in and say, this is what happened, this is how it happened, this is when it happened, that is what we have to go with.  We cannot manufacture witnesses and we don't.  We have to take them at their word as to what they say happened, and that is what we present to you."  (*Id*. at 2501.)

4.    "Preposterous that he would do something like that, Detective Allen, that he would change Espinoza's testimony."  (*Id*. at 2589.)

5.    "Now, someone may get up and argue later that somehow the police bungled this case, somehow they fumbled the football.  Well, from what I just told you nothing could be farther from the truth, and if anyone stands in this courtroom and says that somehow the Cleveland Police Homicide Unit misjudged this case, or didn't do something they should, that is not true."  (*Id*. at 2497.)[34]

6.    "Stoney is the only person who came into this courtroom, got up on the witness stand, well, not the only person, one of the persons who got up on the witness stand and basically told everything that happened just as it happened."  (*Id*. at 2514.)

(ECF No. 223, 50.)  The Ohio Supreme Court ruled that these claims were waived and did not address the merits.  *Keenan*, 81 Ohio St. 3d at 150, 689 N.E.2d at 945.

In *Wogenstahl*, the Sixth Circuit stated that "[i]mproper vouching occurs when a prosecutor supports the credibility of a witness by indicating a personal belief in the witness's credibility thereby placing the prestige of the [government] behind the witness." *Wogenstahl,* 668 F.3d at 328 (quoting *Johnson v. Bell*, 525 F.3d 466, 482 (6th Cir. 2008)).

_____

[34]    Keenan states that the prosecutor vouched for Detective Allen throughout his closing argument and cites to four examples.  (ECF No. 223, 50.)  The Court, however, could identify only these two instances that arguably could constitute improper vouching.

100

It further explained, "Generally, improper vouching involves either blunt comments that imply that the prosecutor has special knowledge of facts not in front of the jury or of the credibility and truthfulness of witnesses and their testimony." *Id*. (quoting *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999)). Thus, "[i]t is patently improper for a prosecutor either to comment on the credibility of a witness or to express a personal belief that a particular witness is lying." *Id*. (quoting *Hodge v. Hurley*, 426 F.3d 368, 378 (6th Cir. 2005)). Nevertheless, "[a] state's attorney is free to argue that the jury should arrive at a particular conclusion based upon the record evidence." *Id*. at 329 (quoting *Caldwell v. Russell*, 181 F.3d 731, 737 (6th Cir. 1999), *abrogated on other grounds as recognized by Mackey v. Dutton*, 217 F.3d 399, 406 (6th Cir. 2000)).

The court held in *Wogenstahl* that the prosecutor's comments regarding the veracity of state witnesses and a FBI agent "verge[d] on improper vouching," but that they were harmless given that the evidence against the petitioner was strong, the comments were isolated, and the comments were unlikely to mislead the jury or prejudice the petitioner. *Id*. at 329.

Similarly, the Court finds here that the statements of which Keenan complains relating to the veracity of state witnesses (excluding statement 3 above, which does not implicate veracity at all) come close to improper vouching, since the prosecution is "support[ing] the credibility of a witness by indicating a personal belief in the witness's credibility." Even assuming that these statement were improper, however, they were not so flagrant that they rendered Keenan's trial fundamentally unfair. The prosecution's comments were made in closing argument, in the context of an extensive trial record. The

101

references to Espinoza, Stoney and Detective Allen were supported by evidence that had been presented in court and demonstrated no special knowledge of the prosecution. Moreover, the comments were isolated and unlikely to mislead the jury or prejudice Keenan.

Accordingly, the Court finds the statements were harmless, and this sub-claim lacks merit.

### d.      denigrating Keenan and defense witnesses

Keenan also complains that the prosecution improperly maligned him and other defense witnesses.  He cites to four examples of the prosecution accusing or implying to the jury that he lied, and five where they accused defense witnesses of lying.  (ECF No. 223, 50.)  These include several instances when the prosecutor stated outright during closing arguments that Keenan "lied" to police about where he was Friday night (App. to Return of Writ, Trial Tr., vol. 8, 2495, 2581); and Keenan's brother, David Keenan, was "lying' when he testified that he saw Keenan pick up Klann early Friday morning on Mayfield Road (*id*. at 2520, 2584, 2585).  The Ohio Supreme Court ruled that these claims were waived and did not address their merits.  *Keenan*, 81 Ohio St. 3d at 150, 689 N.E.2d at 945.

As the Sixth Circuit explained in *Wogenstahl*, "The prosecution necessarily has 'wide latitude' during closing argument to respond to the defense's strategies, evidence and arguments." *Wogenstahl*, 668 F.3d at 329 (quoting *Bedford v. Collins*, 567 F.3d 225, 233 (6th Cir. 2009)).  The propriety of the prosecution's closing argument depends on the circumstances of the case and "what the defense has said or done (or likely will say or

102

do)." *Id.* "[T]he prosecutor may not simply belittle the defense's witnesses or deride legitimate defenses. . . ." *Id.* Specifically, "it is improper for a prosecuting attorney in a criminal case to state his personal opinion concerning the credibility of witnesses or the guilt of the defendant." *Id.* at 331 (quoting *Hall v. Vasbinder*, 563 F.3d 222, 235 (6th Cir. 2009) (internal quotation marks omitted)). However, "a prosecutor may assert that a defendant is lying during her closing argument when emphasizing discrepancies between the evidence and that defendant's testimony." *Id.* (quoting *Francis*, 170 F.3d at 551). "To avoid impropriety . . .such comments must reflect reasonable inferences from the evidence adduced at trial." *Id.* (internal quotation marks omitted).

In *Wogenstahl*, the court agreed with the district court that the prosecutor "was careful to tie his comments to the evidence that had been introduced." *Id.* Here, too, the prosecution linked his comments about Keenan and his brother to the evidence introduced, namely, Keenan's original alibi and his brother's claim about Friday night. These comments also were found within a larger discussion of Keenan's credibility and that of his witnesses. The statements, therefore, do not rise to level of flagrancy required to constitute prosecutorial misconduct, and this sub-claim fails.

### e. falsely accusing Keenan of manipulating witnesses

In this sub-claim, Keenan asserts that the prosecution "accused defendant of manipulating people through letters," referring to letters he wrote to Espinoza and Rosell about their testimony. (ECF No. 223, 53.) He claims that the prosecution falsely implied that the letters contained physical threats, and misled the jury by telling them "to be certain to read these letters." (*Id.*) The Ohio Supreme Court ruled that these claims were waived

and did not address their merits.  *Keenan*, 81 Ohio St. 3d at 150, 689 N.E.2d at 945.

This Court has reviewed the statements about which Keenan complains and finds nothing improper.  Characterizing Keenan's letters as an attempt to manipulate witnesses is a permissible inference drawn from evidence introduced at trial.  Moreover, the prosecutors did not imply that the letters contained physical threats, nor did they instruct the jury to be certain to read them.  This claim lacks merit.

### f.    misstating testimony

Keenan next argues that the prosecution misstated testimony of several witnesses.  He lists nineteen statements that he contends are false. (ECF No. 197, 42-43.)  Keenan concedes that trial counsel failed to object to any of these statements.  (*Id.*)  The Ohio Supreme Court found these claims also were waived and did not address their merits.  *Keenan*, 81 Ohio St. 3d at 150, 689 N.E.2d at 945.

The Court begins, and ends, its analysis of this sub-claim by considering whether the statements at issue were improper.  The law is clear that prosecutors cannot misstate evidence.  *See, e.g., United States v. Carter*, 236 F.3d 777, 784 (6th Cir. 2001).  Nevertheless, prosecutors have "leeway to argue reasonable inferences from the evidence" during closing arguments.  *Byrd v. Collins*, 209 F.3d at 535 (internal citations omitted).  Here, Keenan does not satisfy his burden of showing that any of the statements are false and therefore improper, much less flagrantly so.

First, Keenan does not provide any explanation whatsoever as to how several of the statements at issue are false.  Many of these remarks appear to be inartful rather than deliberately false or misleading.  For example, Keenan complains of the prosecutor's

remark that "Klann lives at Lewis." (*Id*.)  Keenan does not explain what is wrong with this statement.  The Court presumes the prosecutor intended to convey that Klann was living with Lewis, and, in fact, Lewis testified that Klann *was* living with him at the time of Klann's murder.  (App. to Return of Writ, Trial Tr., vol. 7, 1905.)  Similarly, Keenan objects to the prosecutor's statement "some mention of packages delivered," but offers no explanation of how this is false.  (ECF No. 197, 42.)  The Court infers that the prosecutor was referring to Robert Doyle's testimony when cross-examined by Keenan himself that he would "deliver" "something" that Keenan needed when Keenan would call for him with his beeper.  (App. to Return of Writ, Trial Tr., vol. 8, 2327-28.)  The prosecutor's statement was a reasonable inference from Doyle's testimony.

Keenan asserts that other statements of the prosecutors are contradicted by trial testimony.  However, even if that is true, the Court finds that the statements were directly supported by, or reasonably inferred from, other evidence and therefore proper.  For example, Keenan complains that the prosecution stated "Flanik sees them kicking the door" and "they are kicking the door," when Flanik testified that Espinoza alone kicked in the door.  (ECF No. 197, 42.)  However, Espinoza himself testified that *both* he and Keenan kicked Lewis' apartment door.  (App. to Return of Writ, Trial Tr., vol. 5, 1354.)  Similarly, Keenan objects to the prosecutor's remark that "there is testimony [Klann] has got his hands up . . . defensive wounds," which was contrary to Espinoza's testimony.  (ECF No. 197, 43.)  But the coroner testified that Klann had defensive wounds on his left wrist and right forearm, thereby supporting the prosecutor's statement.  (App. to Return of Writ, Trial Tr., vol. 6, 1544.)

Finally, Keenan provides a brief, conclusory explanation of why the remaining statements are false, but provides no citation or support for his version of the "truth" or explanation of why the statements are even material.  Keenan finds fault, for example, with the prosecutor's statement that Klann was "wet in light rain," and he states that "the testimony was it was a heavy rain."  (ECF No. 197, 42.)  He does not cite to that testimony or explain why it matters whether the rain was light or heavy.  Keenan likewise objects to the prosecutor's statement that "these guys are thrown out of the bar" because he claims that "Espinoza was the only one thrown out of the bar."  (*Id*.)  But the manager of Coconut Joe's, David Oliver, testified that he threw Espinoza, Keenan and D'Ambrosio out of the bar.  (App. to Return of Writ, Trial Tr., vol. 7, 2222.)

Thus, Keenan has not demonstrated that any of the statements about which he complains were improper.  Moreover, even if these statements were improper, the Sixth Circuit has held that the trial court can generally correct such improprieties by instructing the jury that closing arguments are not evidence.  *See, e.g., United States v. Crosgrove,* 637 F.3d 646, 664 (6th Cir. 2011).  Here, the trial court instructed the jury:

> When the presentation of all the evidence was completed, and just moments ago, counsel for the state and the defense addressed the jurors in what are referred to as closing arguments.

> In those closing arguments they are able to set forth and develop theories or conclusions which they believe may reasonably be drawn from all of the evidence in the case.

> The opening statements and closing arguments of counsel are permitted in an effort to assist the jury, if possible, in understanding and reaching the conclusions as to the issues which you are called upon to decide; that being the guilt or non-guilt of the accused.

> You are instructed that such opening statements and closing

106

arguments do not constitute evidence in the case and will not be considered as evidence by the jury.

(App. to Return of Writ, Trial Tr., vol. 8, 2609-10.)

Accordingly, the Court finds that this sub-claim is meritless.

### g.  urging the jury to convict Keenan for his lifestyle

For his next sub-claim, Keenan argues that during closing arguments, the prosecution improperly "urged the jury repeatedly to convict Mr. Keenan because of his life style [*sic*]." (ECF No. 197, 43.)  He cites to the Ohio Supreme Court's ruling overturning his first conviction in part because the court found that the prosecutor had "argue[d] explicitly that the bad character of Keenan's friends reflected on Keenan's character, when that character was wholly irrelevant."  *State v. Keenan*, 66 Ohio St. 3d 402, 409, 613 N.E.2d 203, 209 (Ohio 1993).  Specifically, Keenan objects to the following portion of the prosecution's closing argument:

Do we have to pick and choose as to Thursday night or Friday?  I don't know.  I don't know.  I think you as jurors have to examine the lifestyle of all these witnesses at the time, back in 1988.

Thursday, Friday, Saturday.  Maybe the only day of significance to them might be Sunday, because maybe the bar wasn't open on Sunday, and we don't even know that for sure, but the kind of lifestyle that these people led at this time, and all the witnesses, both the witnesses for the State, and some of the witnesses for the defense, they were not leading admirable lives at that time.

They were working for just enough money to do drinking, to do drugs, and that is obvious from their testimony, and Thursday, Friday, Saturday all ran into one for these people, so Espinoza says, as best as he recalls, and again, if he got him wired to testify against the defendant, we can't get that guy off of Thursday night.  In his mind he believed it was Thursday night.

He had thirty-some beers that night, thirty-two, a lot of beers.  He

107

believes it happened on Thursday night.

> . . .

> I think you as jurors have to take into consideration the kind of witnesses, and we can't make them testify to a particular thing.

> . . .

> They gave statements back then to the best of their recollection, and I think their recollection was nowheres [*sic*] near what this panel is today, because of the kind of lifestyle that they were living, the kind of existence, itinerant kind of people.

> . . .

> . . . [N]ot an admirable lifestyle for anybody, ladies and gentlemen, but that is the kind of witnesses they are, so when you listen to their testimony, and you sort that out, and is it really essential as to did this happen on Thursday night?

(App. to Return of Writ, Trial Tr., vol. 8, 2596-99.)  Again, Keenan concedes that trial

counsel did not object to this segment of the State's closing argument.  (ECF No. 223, 57.)

For that reason, the Ohio Supreme ruled this claim was waived and did not discuss the

merits.  *Keenan*, 81 Ohio St. 3d at 150, 689 N.E.2d at 945.

Keenan's argument is not well taken.  The prosecutor did not use the bad character

of Keenan's friends to attack Keenan's character, as the prosecution did in the first trial.  In

that trial, the prosecutor stated, "[Lewis] is this man's [Keenan's] acquaintance . . . .  That

tells you something about this man.  Tell me who your friends are and I'll tell you what

you are like."  *Keenan*, 66 Ohio St. 3d at 409, 613 N.E.2d at 209.  Rather, the prosecution

used the bad character of Keenan's friends to call into question the credibility of the friends

themselves as witnesses and the value of their testimony concerning the dates of the events

in question.  This is within the proper scope of closing argument.  As noted above,

prosecutors have "leeway to argue reasonable inferences from the evidence" during closing

arguments.  *Byrd v. Collins*, 209 F.3d at 535 (internal citations omitted).  In addition, "[t]he prosecution necessarily has 'wide latitude' during closing argument to respond to the defense's strategies, evidence and arguments."  *Wogenstahl*, 668 F.3d at 329 (quoting *Bedford v. Collins*, 567 F.3d 225, 233 (6th Cir. 2009)).

This sub-claim also fails.

### h.  arguing Keenan was not an aider and abettor

Keenan next contends that the prosecution improperly argued to the jury that Keeanan "was not an aider and abetter [*sic*]" when the jury was instructed that Keenan was being prosecuted as an aider and abbettor.  (ECF No. 197, 43.)  He cites to the following statement in the prosecution's closing argument during the mitigation phase of the trial: "Do you have any reasonable doubt that this man was the leader that night, that he called the shots, that he caused the death of Anthony Klann?  He wasn't an aider and abettor, lookout, he was the main man."  (App. to Return of Writ, Trial Tr., vol. 9, 2787.)
The Ohio Supreme ruled this claim was waived and did not discuss the merits.  *Keenan*, 81 Ohio St. 3d at 150, 689 N.E.2d at 945.

This argument also lacks merit.  The Court infers that the prosecutor used the term "aider and abettor" in the statement at issue to convey that Keenan was not an aider and abettor in the colloquial sense that he played only a minor, assisting role in the crime, such as a lookout; rather, he was the leader of the group committing the crime.  This use of the term does not contradict the trial court's broader, legal definition of  "aider and abettor" in the jury instructions, which was:

>An aider and abettor is when two or more persons have a common
>purpose to commit a crime and one does one part and the other person

109

performs the other part.

As to an aider and abettor the mere fact a person is present when the criminal act is committed does not make him an aider and abettor unless he does an overt act in the furtherance of the crime or crimes charged in the indictment.

What is aid?  Aid means to aid, to help, to assist, to strengthen.

Abet means to encourage, to counsel, to incite, or to assist.

(App. to Return of Writ, Trial Tr., vol. 8, 2628.)  The statement, as the Court interprets it, emphasizes that Keenan played a larger role in the murder than the term aider and abetter normally implies.  Thus, while inartful and perhaps confusing, the statement was not false or misleading, and thereby improper.  This sub-claim is meritless.

### i.    questioning witnesses about whether they had testified at Keenan's first trial

In this sub-claim, Keenan asserts that the prosecution improperly questioned many defense witnesses about whether they had come forward to testify at Keenan's first trial. (ECF No. 223, 58-64.)  Keenan's counsel objected to these questions, and Keenan raised this issue on direct appeal.  The Ohio Supreme Court adjudicated this claim on the merits but applied only Ohio law, ruling that these questions did not violate an Ohio statute providing that in new trials awarded on appeals "the accused shall stand for trial . . . as though there had been no previous trial thereof."  *Keenan*, 81 Ohio St. 3d at 150, 689 N.E.2d at 945-46.  The court reasoned that it would not read this statute to conflict with the evidentiary rule that "[c]ross-examination shall be permitted on all . . . matters affecting credibility," and that "[a] witness's failure to come forward earlier with relevant information certainly affects his credibility."  *Id*. at 946.

110

The Court finds that this claim lacks merit.  Keenan fails to cite any federal case or constitutional law to support this argument, and presents no evidence that the conduct complained of "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  As the Supreme Court has noted, a habeas court's review is a "narrow one of due process, and not the broad exercise of supervisory power that (it) would possess in regard to (its) own trial court."  *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974) (internal quotation marks and citations omitted).  It explained, "We regard this observation as important for not every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a failure to observe that fundamental fairness essential to the very concept of justice."  *Id.*

### 3.    Conclusion

Viewing all of these sub-claims cumulatively, this Court concludes that Keenan's non-*Brady* claims of  prosecutorial misconduct do not entitle him to habeas relief. The Court found few instances of improper conduct among these claims, and even if those that verged on improper were viewed cumulatively, Keenan has failed to demonstrate flagrancy, or that it was "so pronounced and persistent that it permeate[d] the entire atmosphere of the trial." *See Wogenstahl*, 668 F.3d at 335.  As the Supreme Court has noted, "[a litigant] is entitled to a fair trial but not a perfect one, for there are no perfect trials*." McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 553 (1984) (internal quotation marks and citations omitted).

### E.    *First Ground for Relief: Counsel of Choice*

Keenan's first claim for relief is that the trial court denied him the right to choose

111

his own counsel in violation of the Sixth Amendment when it replaced his retained counsel, Paul Mancino, Jr. and John Higgins, with court-appointed counsel on conflict-of-interest grounds.  (ECF No. 197, 31-32; ECF No. 223, 20-26.)  After conducting a hearing on the matter, the trial court ruled that Mancino's and Higgins' prior representation of Keenan's co-defendant, Joe D'Ambrosio, created an actual conflict of interest that precluded them from representing Keenan under DR 5-105.[35]  (App. to Return of Writ, Pre-Trial Tr., vol. 1, 15-18.)  Higgins had previously represented D'Ambrosio at his trial, and Mancino had represented D'Ambrosio on his direct appeal.  Higgins then represented D'Ambrosio on his appeal to the Ohio Supreme Court.  (*Id*. at 11-12.)  Moreover, D'Ambrosio's case had been remanded to the court of appeals, and at the time of the hearing, Mancino was representing D'Ambrosio on that appeal.  (*Id*. at 12-13.)

### 1.    Procedural Posture

Keenan raised this claim on direct appeal to the Ohio Supreme Court, which adjudicated, and dismissed, the claim on the merits.  *Keenan*, 81 Ohio St. 3d at 136-37, 689 N.E.2d at 936-37.  It is therefore preserved for federal habeas review.

### 2.    Merits

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense."  U.S. Const. amend. VI..  This includes the right to representation "by an otherwise qualified attorney

---

[35]    Keenan then petitioned the court of appeals for writs of mandamus and prohibition to compel vacatur of the trial court's disqualification order.  The writs were denied, and the Ohio Supreme Court affirmed that denial.  *State ex rel. Keenan v. Calabrese,* 69 Ohio St. 3d 176, 631 N.E.2d 119 (1994).

whom the defendant can afford to hire, or who is willing to represent the defendant even though he is without funds." *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624-25 (1989).  The right to choice of counsel, however, is "circumscribed in several important respects."  *Wheat v. United States*, 486 U.S. 153, 159 (1988).  Courts have an "independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them."  *Id*. at 160.  The Sixth Circuit has further explained that "the important right to counsel of choice is not absolute; it must be balanced against the court's authority to control its own docket, and a court must beware that a demand for counsel may be utilized as a way to delay proceedings or trifle with the court . . . ."  *United States v. Green*, 388 F.3d 918, 921 (6th Cir. 2004).  Thus, as the Supreme Court has observed, "while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers."  *Wheat*, 486 U.S. at 159.

*Wheat v. United States* is directly on point.  In that case, the Supreme Court addressed the extent to which a criminal defendant's right under the Sixth Amendment to his chosen attorney is qualified by the fact that the attorney had represented other defendants charged in the same criminal conspiracy.  In *Wheat*, the district court refused to permit a defendant to substitute his counsel for that of his two co-defendants in a complex drug distribution scheme, where the Government intended to call one of the co-conspirators as a witness in another's trial.  *Id*. at 163-64.  Like Keenan, the defendants had proffered a

113

waiver of any conflict of interest.  The Court found that the district court had acted within its discretion.  *Id.* at 164.

The *Wheat* Court first noted that while multiple representation is not "*per se* violative of constitutional guarantees," it poses "special dangers of which a court must be aware." *Id.* at 159-60.  "[U]nregulated multiple representation," it stated, can jeopardize the courts' institutional interest in rendering just verdicts that will remain intact upon appeal. *Id*. at 160-61.  The Court explained,

> [T]rial courts confronted with multiple representation face the prospect of being 'whip-sawed' by assertions of error no matter which way they rule.  If a district court agrees to the multiple representation, and the advocacy of counsel is thereafter impaired as a result, the defendant may well claim that he did not receive effective assistance.  On the other hand, a district court's refusal to accede to the multiple representation may result in a challenge such as petitioner's in this case.

*Id*. at 161.  The Court also addressed the issue of waiver.  It stated that trial courts "must be allowed substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses." *Id.* at 163.  Thus, it held, trial courts

> must recognize a presumption in favor of petitioner's counsel of choice, but that presumption may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict.  The evaluation of the facts and circumstances of each case under this standard must be left primarily to the informed judgment of the trial court.

*Id*. at 164.

Here, the Ohio Supreme Court held that the trial court's decision to replace Mancino and Higgins with court-appointed counsel on conflict-of-interest grounds was not

114

an abuse of discretion.  *Keenan*, 81 Ohio St. 3d at 137, 689 N.E.2d at 937.  It concluded that the "existence of a potential conflict is fatal to Keenan's claim."  *Id.*  The court noted that under *Wheat* a defendant has only a presumptive right to employ his own chosen counsel, and that presumption may be overcome by demonstrating an actual conflict or serious potential for conflict, which the trial court has a "wide latitude" in determining.  *Id.* It also found Keenan and D'Ambrosio's waiver of the conflict "irrelevant" since "*Wheat* makes clear that the trial court may 'refus[e] waivers of conflicts of interests.'"  *Id.* (quoting *Wheat*, 486 U.S. at 163).

The question before this Court is whether, under Section 2254(d)(1), it is possible for a fairminded jurist to believe the Ohio Supreme Court's rationale comports with the holding in *Wheat*.  Keenan claims the Ohio Supreme Court failed to properly apply *Wheat* because there was no actual conflict or serious potential conflict, and the prosecutors were disingenuous in their representation to the court that they may call D'Ambrosio as a prosecution witness.  (ECF No. 223, 22.)  The *Wheat* Court acknowledged, however, that "the Government may seek to 'manufacture' a conflict in order to prevent a defendant from having a particularly able defense counsel at his side," but that "trial courts are undoubtedly aware of this possibility, and must take it into consideration along with all of the other factors which inform this sort of a decision."  *Wheat*, 486 U.S. at 163.

The Court finds that the Ohio Supreme Court correctly and reasonably applied *Wheat* in finding no abuse of the trial court's "broad discretion" by disqualifying Mancino and Higgins.  This claim, therefore, is meritless.

**F.      *Third and Ninth Grounds for Relief:  Indictment***

115

For his third and ninth grounds for relief, Keenan contends that his due process rights were violated when the prosecutors and trial court "constructively" amended the indictment by altering the date of the offense. (ECF No. 197, 33, 45-46; ECF No. 223, 28-31.)  Specifically, Keenan argues that the prosecutor argued to the jury that the State did not have to prove the exact date of the offense, yet the indictment alleged that Keenan committed the charged offenses "on or about" September 24, 1988.  Keenan argues that "[t]his was improper, as Mr. Keenan had filed a notice of alibi for that specific date and offered substantial evidence at trial in support of that defense."  (ECF No. 197, 33.)  Additionally, Keenan contests the following jury instruction:

> The date of this offense alleges that it is on or about September 24, 1988. It is not necessary that the State prove that the offense was committed on the exact date charged in the indictment.
>
> It is sufficient to prove that the offense took place on a date reasonably near the date claimed.

(App. to Return of Writ, Trial Tr., vol. 8, 2259.)  Keenan claims that through this instruction the trial court "told the jury to ignore the defense's claim of alibi . . . ."  (ECF No. 197, 45-46.)

### 1.      Procedural Posture

Keenan raised his third claim on direct appeal to the Ohio Supreme Court, which adjudicated, and dismissed, the claim on the merits.  *Keenan*, 81 Ohio St. 3d at 138-39, 689 N.E.2d at 938.  It is therefore preserved for federal habeas review.

Respondent argues that Keenan's ninth ground for relief is procedurally defaulted due to the lack of a contemporaneous trial objection.  (ECF No. 218, 7.)  The Ohio Supreme Court likewise found that Keenan did not object to this jury instruction at trial,

116

which "absent plain error, constitutes a waiver." *Keenan*, 81 Ohio St. 3d at 151, 689 N.E.2d at 946.  The court then found no plain error, such that had the jury instruction not been given, the outcome of the trial clearly would have been different.  *Id.*  The court therefore dismissed the claim without inquiring into its merits.  *Id.*  Keenan does not offer any excuse for this claim's procedural default. This Court, therefore, finds this claim procedurally defaulted.

### 2. Merits

Even if both claims were ripe for review, neither warrants habeas corpus relief.  As the Ohio Supreme Court correctly observed, Keenan had ample notice of the State's position that the murder may have occurred on September 23 or September 24; the issue was contested by the parties in both of Keenan's trials.  *See State v. Keenan*, 66 Ohio St.3d at 411, 613 N.E.2d at 210; *Keenan*, 81 Ohio St. 3d at 133-34, 689 N.E.2d at 935.  "Beyond notice, a claimed deficiency in a state criminal indictment is not cognizable on federal collateral review."  *Roe v. Baker*, 316 F.3d 557, 570 (6th Cir. 2002); *see also Mira v. Marshall*, 806 F.2d 636, 639 (6th Cir. 1986) ("The indictment here had sufficient information to provide petitioner with adequate notice and the opportunity to defend and protect himself against future prosecution for the same offense.  Any other deficiencies in the indictment alleged by petitioner are solely  matters of state law and so not cognizable in a federal habeas proceeding.").  Keenan's third and ninth grounds for relief are overruled.

### G. *Second, Fourth, Fifth, Sixth, Seventh, Tenth, and Eleventh Grounds for Relief: Trial Court Errors*

Keenan contends that the trial court violated his constitutional rights in numerous respects in his second, fourth, fifth, sixth, seventh, tenth and eleventh grounds for relief.

Specifically, he claims that the trial court improperly:

1.      prohibited him from participating fully as co-counsel at trial (ground 2);

2.      denied Keenan's request that the entire proceedings be recorded (ground 4);

3.      permitted hearsay testimony from Detective Allen (ground 5);

4.      permitted speculative expert testimony (ground 6);

5.      interfered with the defense (ground 7);

6.      informed the jury that Keenan was in jail (ground 10); and

7.      required a defense witness be shackled in court (ground 11).

(ECF No. 197, 32-39, 46-48.)

### 1.      Procedural Posture

Keenan raised each of these claims on direct appeal.  *See Keenan*, 81 Ohio St. 3d at

138-39, 142-48, 689 N.E.2d at 937-44.  The Ohio Supreme Court overruled claims 2, 4, all

but sub-claim 1 of claim 5, 6, and parts of claim 7 on procedural grounds, and those claims

are therefore procedurally defaulted.  The remaining claims – parts of 5 and 7, 10, and 11–

are preserved for habeas review.

### 2.      Merits

Even if portions of these claims were not defaulted, the Court would find they all

lack merit.

### a.      Keenan's participation at trial

Keenan argues in his second ground for relief that "[t]he trial court's decision to

only allow [him] to participate as co-counsel in a limited fashion violated [his]

constitutional rights as guaranteed by the Sixth Amendment."  (ECF No. 197, 32.)  At a

118

pretrial conducted on January 12, 1994, the trial court ruled on Keenan's *pro se* motion to

participate in his trial as co-counsel.  The court granted his motion in part, allowing him to

examine witnesses but not to argue to the jury.  The relevant portion of the pretrial is as

follows:

> The Court: . . .  Now, we have another motion here to allow the defendant to participate in the trial as co-counsel.  Mr. Keenan, do you still wish to be the co-counsel in his [*sic*] case?
>
> The Defendant:  My purpose in filing that motion was so that I could ensure that all the proper questions were asked of the various witnesses.
>
> The Court:  Are you still asserting that today?
>
> The Defendant:  Yes, Your Honor.
>
> The Court:  Mr. Gasper, does the State have any position on the defendant being allowed to act as co-counsel?
>
> Mr. Gasper:  Your Honor, the State feels that the defendant has competent co-counsel.  The only thing we ask if – we certainly don't mind him consulting with his own counsel in regards to that.  We don't think he should play a separate part, in other words, that he be permitted to ask questions of witnesses after his counsel has asked those questions. . . .
>
> The Court:  Mr. Kersey.
>
> Mr. Kersey:  We won't ask for opening statements or closing.  The reason for the motion is there are some peculiar facts that I understand Mr. Keenan is well aware of, and it would be things that would be in a clean up sort of a cross-examination or direct exam, if that is the case.
>
> The Court:  You are not asking for opening or closing arguments?
>
> The Defendant:  No, Your Honor.
>
> Mr. Kersey:  None of that.  It's strictly cross-examination.
>
> The Court:  Specifically asking for specific questions limited in nature?

The Defendant:  Yes, no repeats of any questions counsel asks.

The Court:  I'll grant that with the limitations placed on there that is alluded to on the record.

(App. to Return of Writ, Pre-Trial Tr., vol. 2, 44-47.)

The Ohio Supreme Court overruled this claim, holding that Keenan waived his right to act as his own counsel when he requested a hybrid arrangement of acting as a co-counsel and specifically stating to the trial court that he was not asking for permission to argue to the jury.  *Keenan*, 81 Ohio St. 3d at 138, 689 N.E.2d at 937-38.  The court concluded, "By permitting Keenan to act as 'co-counsel' for the purpose of examining witnesses, the trial judge gave Keenan all that he had asked for (and more, incidentally, than he had any right to demand)."  *Id*. at 138, 689 N.E.2d at 938.

As the Ohio Supreme Court noted, a criminal defendant has a constitutional right to represent himself.  *Faretta v. California*, 422 U.S. 806 (1975).  Additionally, the right of self-representation includes the right to personally argue to the jury.  *McKaskle v. Wiggins*, 465 U.S. 168, 174 (1984).

Through his motion and during the pretrial hearing, Keenan asked only to participate as "co-counsel" alongside his appointed counsel.  (App. to Return of Writ, Trial, vol. 1, 143-46; App. to Return of Writ, Pre-Trial Tr., vol. 2, 44-47.)  He never objected to the court's ruling, but, in fact, expressly agreed to it.  The Ohio Supreme Court's ruling on this claim was neither contrary to, nor an unreasonable application of, federal law. Accordingly, Keenan's second ground for relief fails.

### b.    recording of entire court proceedings

In his fourth ground for relief, Keenan complains that the trial court denied his

120

rights to a fair trial and due process when it overruled his pretrial motion to record all sidebars.  (ECF No. 197, 34; App. to Return of Writ, Trial, vol. 1, 104; App. to Return of Writ, Pre-Trial Tr., vol. 3, 37-38.)  Keenan claims that there were forty unrecorded sidebars at his trial.  (ECF No. 223, 32.)

Keenan asserted this claim on direct review to the Ohio Supreme Court.  It ruled that although all proceedings in serious offense cases must be recorded, including sidebars, under the Ohio Rules of Criminal Procedure, Keenan waived this error when he did not follow the Ohio Appellate Rules by reconstructing the content of the unrecorded sidebars and showing prejudice.  *Keenan*, 81 Ohio St. 3d at 139, 689 N.E.2d at 938.

Respondent counters that this claim is not cognizable in habeas.  (ECF No. 218, 14.)  The Sixth Circuit, however, has recognized that due process rights can be violated by the absence of transcripts.  *Bransford v. Brown*, 806 F.2d 83, 86 (6th Cir. 1986) (applying Supreme Court cases *Griffin v. Illinois*, 351 U.S. 12, 18 (1956) (holding that it is a violation of equal protection to deny trial transcript to indigent defendants) and *Norvell v. Illinois*, 373 U.S. 420, 423 (1963) (refusing to extend *Griffin* to cases where transcript was unavailable due to court reporter's death)).  The court has held that federal habeas relief is available because of a missing transcript, but only where the petitioner can show prejudice. *Id.; see also Scott v. Elo*, 302 F.3d 598, 604 (6th Cir. 2002).  In *Bransford v. Brown*, the court further explained, "Although this court recognizes the difficulty in demonstrating prejudice where the transcripts are missing, petitioner must present something more than gross speculation that the transcripts were requisite to a fair appeal."  *Id*. at 86.  *See also Jalowiec v. Bradshaw,* No. 1:03 CV 0645, 2008 WL 312655, at * 58 (N.D. Oh. Jan. 31,

2008), aff'd, 657 F.3d 293 (6th Cir. 2011), *as amended* (Nov. 23, 2011), *reh'g denied and reh'g en banc denied* (Jan. 5, 2012) (failure to transcribe peremptory challenges, pretrial conferences and sidebars not prejudicial); *Jackson v. Renico*, 320 F. Supp. 2d 597, 602-03 (E.D. Mich. 2004), *aff'd*, 179 Fed. Appx. 249 (6th Cir. 2006) (prejudicial error not shown concerning failure to transcribe jury instructions).

Here, the trial court stated when it overruled defense counsel's motion to have all sidebars recorded that sidebars would be recorded if they concerned a "particularly crucial point." (App. to Return of Writ, Trial Tr., vol. 3, 38.) And it did, in fact, have numerous sidebars recorded. (*See id*. at vol. 4, 746, 738, 744, 749, 755, 867; vol. 5, 913, 1052, 1144, 1172, 1279, 1329; vol. 6, 1396, 1623, 1678, 1683, 1760; vol. 9, 2724.) Moreover, Keenan does not articulate, beyond mere assertion, how the failure to transcribe any particular sidebar resulted in prejudice. Keenan's fourth claim, therefore, is meritless.

### c.      admission of hearsay testimony

Keenan also assails the trial court in his fifth ground for relief for allowing Detective Allen to provide hearsay testimony during his direct examination, which he claims violated his "constitutional right to confrontation, due process and a fair trial . . . ." (ECF No. 197, 34-35.) He cites no specific examples of the hearsay evidence in his Petition, but identifies in his Traverse five portions of Allen's testimony that he claims were improperly admitted. (ECF No. 223, 34-35.)  They are:

> 1.      Allen testified of his initial interview with D'Ambrosio, "At that time he said he didn't know anything that I was talking about, meaning the death of Anthony Klann. I asked him if he knew Anthony Klann. He said, yes, he knew him, and that the last time he saw him was about 2:00 o'clock in the morning, Saturday morning, at Coconut Joe's." (App. to Return of Writ, Trial Tr., vol. 6, 1757.)

122

2.    Allen testified that Nancy Somers told him that Keenan was not at her home on Friday night/Saturday morning, but was there for a brief time earlier on Friday night and for the evening of Saturday into Sunday morning.  (*Id*. at 1763-64.)

3.    Allen testified that he interviewed two witnesses about Keenan's alibi but they did not give him any information.  (*Id*. at 1768.)

4.    Allen testified that the leasing company that owned D'Ambrosio's truck told police that they had found drugs in the truck when it was turned over to them.  (*Id*. at 1783-84.)

5.    Allen testified that an examination of D'Ambrosio's apartment and a review of the photographs did not show the presence of any blood at the D'Ambrosio's apartment, but the police department's forensic examiner testified that human blood was found there.  (*Id*. at 1855; *id*. at vol. 8, 2445-46.)

(ECF No. 223, 34-35.)  Defense counsel objected only to the statement at issue in the first sub-claim cited above.  (*Id*. at 1757.)

Keenan raised each of these sub-claims on direct appeal.  (App. to Return of Writ, Direct Appeal, vol. 2, 119-23.)  The Ohio Supreme Court addressed only the first sub-claim on the merits.  The court found that testimony hearsay, but held that the admission of hearsay does not violate the Confrontation Clause if the declarant testifies at trial under *California v. Green*, 399 U.S. 149 (1970).  It further found the error harmless because there was "substantial other evidence" to support Keenan's guilty verdict.  The court ruled that Keenan's remaining hearsay claims were not preserved by objection at trial and therefore were deemed waived.  *Keenan*, 81 Ohio St. 3d at 142, 689 N.E.2d at 940-41.

Keenan states in his Petition that the court's ruling was "contrary to the record and to the clearly established law" and in his Traverse that it was an "unreasonable application of law and facts," but does not cite to any clearly established federal law in support of his

123

argument.  (ECF No. 197, 35.)  Respondent contends that Keenan's hearsay claims are not

cognizable on habeas.  (ECF No. 229, 4.)

Indeed, it is well settled that a state court's evidentiary ruling is generally not

cognizable as ground for federal habeas relief.  *Henness v. Bagley*, 644 F.3d 308, 326 (6th

Cir. 2011); *Bey v. Bagley*, 500 F.3d 514, 519-20 (6th Cir. 2007).  The Supreme Court

declared in *Estelle v. McGuire*, 502 U.S. 62 (1991),

> Today, we reemphasize that it is not the province of a federal habeas court
> to reexamine state-court determinations on state-law questions.  In
> conducting habeas review, a federal court is limited to deciding whether a
> conviction violated the Constitution, laws, or treaties of the United States.

*Id*. at 67-68.  *See also* 28 U.S.C. § 2254(a); *Pulley v. Harris*, 465 U.S. 37, 41 (1984).  The

Sixth Circuit further held, "When reviewing a claim of evidentiary error in a federal habeas

petition, we defer to the state court's interpretation of its own rules of evidence and

procedure."  *Henness*, 644 F.3d at 326.  Nevertheless, where the admission of the disputed

evidence rendered the trial "so fundamentally unfair as to constitute a denial of federal

rights," it may provide grounds for granting a writ of habeas corpus.  *Clemmons v.

Sowders*, 34 F.3d 352, 356 (6th Cir. 1994); *Henness*, 644 F.3d at 326.

Habeas courts routinely have rejected claims based on the admission of hearsay

evidence.  *See, e.g., Reedus v. Stegall*, 197 F. Supp. 2d 767, 776-78 (E.D. Mich. 2001),

*aff'd*, 79 Fed. Appx. 93, 97, 2003 WL 22360990, at *4 (6th Cir. Oct. 14, 2003); *Flores v.

State of Minnesota*, 906 F.2d 1300, 1304 (8th Cir. 1990).  Specifically, as the Ohio Supreme

Court stated, admission of hearsay does not violate the Confrontation Clause if the

declarant testifies at trial.  *California v. Green*, 399 U.S. 149, 161 (1970) (noting that

"none of our decisions interpreting the Confrontation Clause requires excluding the out-of-

court statements of a witness who is available and testifying at trial").

Applying these standards, Keenan's claim fails.  As to the first statement, the Ohio Supreme Court correctly applied the law and there was no constitutional error since D'Ambrosio testified at trial.  The second statement does not constitute constitutional error for the same reason, since Nancy Somers also testified at trial.  The third and fifth statements are not hearsay at all:  the third sub-claim concerns the *lack* of a statement and the fifth is an allegation of false testimony and, again, does not concern any hearsay, or out-of-court statement, at all.  Finally, even if the fourth statement is hearsay, Keenan has provided no showing that the statement rendered the trial unfair to any degree, much less to the level of a denial of fundamental fairness.  Keenan's counsel cross-examined Detective Allen extensively about the leasing company's discovery of drugs.  In fact, this evidence could be viewed as favorable to Keenan, since, as his counsel implied during the cross-examination, it suggests that the police did not thoroughly search the truck first, thereby challenging the quality of  the police's entire investigation.  (*See* App. to Return of Writ, Trial Tr., vol. 6, 1783-90.)

### d.    coroner's testimony regarding the knives

In Keenan's sixth ground for relief, he asserts that he was denied due process when the trial court improperly permitted the coroner, Dr. Balraj, to provide testimony that "was full of unsubstantiated speculation and possibilities."  (ECF No. 197, 35.)  He cites two instances in which Dr. Balraj, who performed the autopsy on Klann, testified that D'Ambrosio's knives "could" have caused Klann's wounds.  (ECF No. 223, 35-36; App. to Return of Writ, Trial Tr., vol. 6, 1552, 1555.)  Keenan concedes that his counsel did not

125

object. (ECF No. 233, 35.)

Keenan raised this claim on direct appeal.  The Ohio Supreme Court ruled that Keenan waived this claim when his counsel failed to object to the testimony.  It then found no plain error, referencing the court's opinion in D'Ambrosio's appeal, in which it held that similar testimony by Dr. Balraj about the same facts and exhibits was properly admitted. *Keenan*, 81 Ohio St. 3d at 142-43, 689 N.E.2d at 941.  In the *D'Ambrosio* decision, the court noted that Rule 702 of the Ohio Rules of Evidence at the time allowed expert opinion that "will assist the trier of fact to understand the evidence or to determine a fact in issue." *State v. D'Ambrosio*, 67 Ohio St. 3d 185, 191-92, 616 N.E.2d 909, 915 (quoting Ohio R. Evid. 702).

Keenan argues that the Ohio Supreme Court's ruling is an unreasonable application of the law, but again cites no federal law in his Petition, and in his Traverse, only federal law relating to insufficiency of evidence.  (ECF No. 223, 37.)

As stated above, a state court's evidentiary ruling is generally not cognizable on habeas unless the decision was so fundamentally unfair that it amounts to a due process violation. *Henness*, 644 F.3d at 326.  This Court finds that Dr. Balraj's testimony was admissible because it assisted the jury in understanding the evidence, and did not render Keenan's trial so fundamentally unfair as to result in a due process violation. *See id.* at 327-28 (finding admission of coroner's speculative testimony did not render capital murder trial fundamentally unfair).

### e.      judicial bias

In Keenan's seventh and eleventh grounds for relief, he argues that he was denied

his due process right to a fair trial in a fair tribunal "when he was prevented from

presenting a full and complete defense by reason of judicial interference" and "court bias."

(ECF No. 223, 36-39, 68-70.)  Keenan complains of thirteen instances of judicial bias.

They are:

1.     The court would not allow defense counsel to read testimony of James Russell from the *D'Ambrosio* trial transcript.

2.     The court would not allow defense counsel to cross-examine Lewis regarding his incarceration the summer before the murder.

3.     The court would not allow Patrick Keenan to testify about a conversation he had with another witness, Adam Flanik.

4.     The court struck from the record testimony of Thomas Keenan about Keenan's defense.

5.     The court overruled defense counsel's request to inspect a police report Detective Hayes had prepared.

6.     The court "interjected itself into the process" during D'Ambrosio's testimony to such an extent that it undermined D'Ambrosio's credibility.

7.     During voir dire, the trial court incorrectly explained the mitigation phase of the trial by stating that the prosecution would present evidence that Keenan was a bad person, while the defense would present evidence that he was a good person.

8.     The court made disparaging remarks about some of the defense witnesses.

9.     The court complimented prosecutors and interrupted the trial to introduce fellow judges in the courtroom.

10.    The court would not allow Keenan to introduce a "declaration" from witness Nancy Somers.

11.    The court ordered his execution opened to the media contrary to state statute.

12.    The court required D'Ambrosio to testify while in shackles and handcuffs.

127

13.    The court allowed prior  testimony of unavailable witnesses to be read into the record in a prejudicial manner.

(ECF No. 197, 36-39, 47-48.)

Keenan presented these claims to the Ohio Supreme Court on direct appeal.  The court overruled them "*in toto*."  It found most of  them waived because Keenan's counsel did not object at the time, and ruled that the remaining claims were either false, harmless error, or invited error.  The court styled most of these claims as "interfere[nce] with [the] defense," and did not cite to or apply any federal constitutional law relating to judicial bias in its analysis of them. *Keenan*, 81 Ohio St. 3d at 143-48, 689 N.E.2d at 941-44.  The court did, however, apply federal law to the question of whether a witness may be required to appear in court in shackles.  *Id*. at 143-44, 689 N.E.2d at 941-42.

Keenan argues that the Ohio Supreme Court's ruling is an unreasonable application of "the law."  (ECF No. 197, 39.)  He cites to no federal law in his Petition, but in his Traverse cites the general principle that due process requires a fair trial and an impartial judge.  (ECF No. 223, 38, 45, 70.)  Respondent counters that Keenan's judicial-bias claims are non-cognizable on habeas.  She argues that "judicial intemperance"does not implicate the federal Constitution, only "statutory schemes and mechanisms of decision-making that bring about biased decisions," citing as support *Tumey v. Ohio*, 273 U.S. 510 (1927), *Mayberry v. Pennsylvania*, 400 U.S. 455 (1971), and *In re Murchison*, 349 U.S. 133 (1955).  She concludes, "In other words, the presence or absence of actual bias was irrelevant to the decisions in these cases."  (ECF No. 218, 20-21.)

Respondent's argument is not well founded.  The Supreme Court has stated, "[T]he floor established by the Due Process Clause requires a fair trial in a fair tribunal, before a

128

judge with no actual bias against the defendant or interest in the outcome of his particular case."  *Bracy v. Gramley*, 520 U.S. 899, 904-05 (1997) (citation and quotation marks omitted).  And the Sixth Circuit has held, "[i]f a habeas court determines that bias by a state judge resulted in a constitutional violation, then the court is required to overturn the state court decision."  *Alley v. Bell*, 307 F.3d 380, 386 (6th Cir. 2002) (citing *Maurino v. Johnson*, 210 F.2d 638, 645 (6th Cir. 2000) ("Because judicial bias infects the entire trial process it is not subject to harmless error review.")).

Nevertheless, a petitioner's burden to prove judicial bias is extremely high.  The Supreme Court has cautioned, "[o]nly in the most extreme of cases would disqualification on the basis of bias and prejudice be constitutionally required."  *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 821 (1986).  Courts ordinarily "presume that public officials have properly discharged their duties."  *Bracy,* 520 U.S. at 909.

The Sixth Circuit has looked to the Supreme Court's decision in *Liteky v. United States*, 510 U.S. 540, 552 (1994), to provide the standard for deciding judicial bias claims.  *See Alley*, 307 F.3d at 386, and *Maurino*, 210 F.3d at 645.  In *Liteky*, the Court explained that "the pejorative connotation of the terms 'bias' and 'prejudice' demands that they be applied only to judicial predispositions that go beyond what is normal and acceptable."  *Liteky,* 475 U.S. at 552.  The *Liteky* Court further explained:

> [O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgement impossible.  Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge.  They *may* do so if they reveal an opinion that derives from an extrajudicial

129

source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.

*Liteky*, 510 U.S. at 555 (emphasis original).  Thus, prejudice or bias in this context means "a favorable or unfavorable disposition or opinion that is somehow *wrongful* or *inappropriate*, either because it rests upon knowledge that the subject ought not possess . . ., or because it is excessive in degree."  *Id.* at 550.

Keenan's allegations fail to present a viable claim of constitutionally impermissible judicial bias.  Keenan does not allege that the trial court's bias stemmed from an extra-judicial source.  Neither has he demonstrated that the trial court had such a high degree of favoritism toward the prosecution or antagonism toward Keenan as to make fair judgment impossible.  Many of the instances of purported bias are no more than routine evidentiary rulings.  Others, as the Ohio Supreme Court noted, are not supported by the record.  Thus, Keenan has not successfully rebutted the presumption that the trial court properly discharged its duties, and his claim fails.  *See Alley*, 307 F.3d at 388 (noting that petitioner had not even "come close" to state a judicial-bias claim where he alleged that the trial judge answered jurors' questions in the jury room during deliberations and later stopped by a picnic that the jurors had).  For the same reasons, the Ohio Supreme Court's decision was not contrary to, or an unreasonable application of, clearly established federal law.  Although the court's analysis failed to identify or apply the relevant federal law regarding judicial bias, it arrived at the conclusion compelled by federal law.  *See Early v. Packer*, 537 U.S. 3, 8 (2002) (holding that the state court need not cite or even be aware of the relevant United States Supreme Court cases, "so long as neither the reasoning nor the result . . . contradicts them").

130

**f.      reference to Keenan's imprisonment**

In his tenth ground for relief, Keenan claims that the trial court violated his right to a fair trial when it mentioned to the jury that Keenan was being held in jail.  He asserts that this "interfered with the presumption of innocence in which [he] was to be cloaked throughout the trial."  (ECF No. 197, 46.)  Specifically, Keenan object to the following remarks by the trial judge, who was explaining why the start of the trial was delayed that day:

> [T]his Court had a sentencing in another case, scheduled for 9:00 a.m., a five-minute sentencing hearing, which we ordinarily would do prior to starting in the morning.
>
> The Jail, not our deputies here, but the Correction people downstairs, were not able to either locate or bring the defendant up until 10:00 a.m.

(App. to Return of Writ, Trial Tr., vol. 6, 1774.)

On direct appeal, the Ohio Supreme Court overruled this claim, finding it "based on a simple misreading of the record."  *Keenan*, 81 Ohio St. 3d at 143, 689 N.E.2d at 941.  It explained that the defendant referenced in the judge's remarks "clearly" meant the defendant who was being sentenced.  It concluded, "We see no reasonable possibility that the jury could have misconstrued the judge's remarks as referring to Keenan."  *Id*.

This Court agrees with the Ohio Supreme Court, and likewise finds this claim meritless.

**H.      *Twelfth, Thirteenth, and Fourteenth Grounds for Relief: Jury Instructions***

In Keenan's twelfth, thirteenth and fourteenth grounds for relief, Keenan alleges that the trial court erred when charging the jury on three separate occasions.  Specifically,

131

he complains of instructions concerning conspiracy (his twelfth ground), "aider and abettor" (his thirteenth ground), and "failure to act" (his fourteenth ground).  (ECF No. 197, 48-51.)   Respondent argues that these claims are non-cognizable in habeas.  (ECF No. 218, 7-8.)

### 1.     Procedural Posture

Keenan asserts that he raised each of these claims on direct appeal and therefore these claims are "properly before this Court for federal review."  (ECF No. 197, 49-51.)  Respondent counters that Keenan's claims regarding the instructions on aiding and abetting and failure to act are procedurally defaulted because Keenan did not object to them during trial.  (ECF No. 7.)  On direct appeal, the Ohio Supreme Court noted that Keenan failed to object at trial to these instructions, and further found no plain error without addressing the merits.  *Keenan*, 81 Ohio St.3d at 151, 689 N.E.2d at 946.  Keenan does not offer any excuse for the default.  These two sub-claims, therefore, are procedurally defaulted.  The first is ripe for review.

### 2.     Merits

Even if the each of these claims were preserved for review, the Court would find that none of them merits relief.  The Supreme Court has held that an incorrect jury instruction does not warrant federal habeas corpus relief if it was merely undesirable, erroneous, or universally condemned.  Instead, the instruction must violate a constitutional right.  *Estelle v. McGuire*, 502 U.S. 62, 72 (1991).  On habeas review, a court must determine whether there is a reasonable likelihood that the jury applied the instruction in a way that prevented consideration of constitutionally relevant evidence.  *Boyde v.*

132

*California*, 494 U.S. 370, 380 (1990).  The impropriety of the instruction must be considered in the context of the instructions as a whole and of the entire trial record.  *Id*.

Because jury instruction errors typically are matters of state law, the standard for demonstrating that a jury instruction caused constitutional error in a habeas proceeding "is even greater than the showing required to establish plain error on direct appeal." *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977).  A habeas petitioner's "burden is especially heavy [when] no [affirmatively] erroneous instruction was given. . . .  An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law."  *Id*. at 155.

### a.      conspiracy instruction

Keenan first complains that when the trial court instructed the jury about conspiracy, it in effect altered the charge without notice, since his indictment did not include a separate charge of conspiracy.  (ECF No. 223, 70-75.)  The Ohio Supreme Court rejected this claim, explaining,

> One who "[c]onspire[s] with another to commit [an] offense in violation of [R.C.] 2923.01" is also guilty of complicity under R.C. 2923.03(A)(3).  R.C. 2923.03(F) states, "A charge of complicity may be stated in terms of this section, or *in terms of the principal offense*."  (Emphasis added.)  This provision places defendants on notice that the jury may be given a complicity instruction even though the defendant has been charged as a principal offender.  *Hiss v. Perini* (C.A.6, 1986), 788 F.2d 406, 407-08.

*Keenan*, 81 Ohio St.3d at 151, 689 N.E.2d at 946.  The Court finds this to be neither contrary to, nor an unreasonable application of, federal law.  Accordingly, this claim is not well taken.

### b.      aider and abettor instruction

133

Keenan claims that the trial court improperly instructed the jury concerning aider

and abettor.  (ECF No. 223, 75-78.)  It instructed the jury:

> Now, in this case the defendant is charged as an aider and abettor
> under the complicity statute.  An aider and abettor is when two or more
> persons have a common purpose to commit a crime and one does one part
> and the other person performs the other part.

(App. to Return of Writ, Trial Tr., vol. 8, 2627-28.)  Keenan also points to the court's

instruction requiring foreseeability as an element of aggravated murder.  The court stated:

> There is a requirement of foreseeability.  The test for foreseeability
> is not whether the defendant should have foreseen the injury in its precise
> form.
> The test is whether a reasonably prudent person, in light of all the
> circumstances, would have anticipated that death was likely to result to
> anyone from the performance of the unlawful act or the failure to act.

(*Id*. at 2639-40.)  Keenan contends that these instructions "created a mandatory

presumption," "transform[ing] the case from requiring a proof of a specific intent to cause

the death of another to one allowing the jury to convict merely on proof of actions of

another or negligence."  (ECF No. 197, 49-50.)  Respondent states that because the word

"presume" does not appear in the instructions, the federal rule against using the word

"presume" in criminal jury instructions does not apply.  (ECF No. 218, 8.)

After reviewing the jury instructions as a whole, the Court finds these instructions

did not violate a constitutional right.  They did not create the presumption, as Keenan

suggests, mandatory or otherwise, that the jury could disregard Keenan's intent to commit

the crimes alleged.  For example, directly after the trial court's definition of aider and

abettor of which Keenan complains, the court further explained,

> As to an aider and abettor the mere fact a person is present when the
> criminal act is committed does not make him an aider and abettor unless he

134

does an overt act in the furtherance of the crime or crimes charged in the indictment.

. . .

. . . Overt act means any conduct when it is of such a character as to manifest a purpose on the part of the contractor that the crime charged be committed.

. . . A person acts purposefully when it is his *specific intention* to cause a certain result.

. . . To do an act is to do it *intentionally* and not accidentally.

(App. to Return of Writ, Trial Tr., vol. 8, 2628-29 (emphasis added).)

Accordingly, this claim fails.

### c.    failure to act instruction

Keenan also asserts that the trial court's instructions defining aggravated murder as "the failure to act" as well as "act" and including the significance of the use of a "deadly weapon" created "improper presumptions that had no statutory basis."  (ECF No. 197, 50-51.)  Respondent again counters that because the word "presume" does not appear in the instructions, the federal rule against using the word "presume" in criminal jury instructions does not apply.  (ECF No. 218, 8.)  The Court finds no infirmity in these instructions; this claim, too, is meritless.

## I.    *Fifteenth and Seventeenth Grounds for Relief:  Ineffective Assistance of Counsel*

Keenan's fifteenth and seventeenth grounds for relief state various instances in which his trial counsel violated his Sixth Amendment right to effective assistance of counsel.  He alleges that his counsel "engaged in ongoing collusion with the prosecution throughout the guilt phase of the trial."  (ECF No. 223, 93.)  Specifically, he claims that counsel:

1.    failed to object to numerous errors;

135

2.      failed to object to prosecutors' references to his first trial;

3.      failed to object to prosecutorial misconduct;

4.      failed to object to hearsay testimony of Detective Allen;

5.      failed to object to improper questioning of D'Ambrosio;

6.      allowed prosecutors to improperly impeach defense witnesses;

7.      failed to object to hearsay and conjecture from state witnesses;

8.      allowed prosecutors to destroy the credibility of and chastise defense witnesses;

9.      failed to advocate for Keenan;

10.     failed to present the alibi defense in proper order;

11.     conducted an improper closing argument;

12.     failed to object to erroneous jury instructions;

13.     failed to excuse a juror for cause; and

14.     failed to impeach state witnesses.

(ECF No. 197, 51-53.)  Keenan also contends that the court must "address the cumulative effect of counsel's performance" when assessing whether he was prejudiced by their omissions.  (ECF No. 223, 82.)  Respondent counters that Keenan has failed to meet his burden of establishing ineffective assistance of counsel by demonstrating either deficient performance or resulting prejudice; moreover, he has not applied the AEDPA standards governing habeas review of these claims.[36]  (ECF No. 218, 21-22.)

---

[36]      Respondent also argues that "the Court should view Keenan's [ineffective-assistance claims] with skepticism" because "Keenan makes no claim whatsoever his counsel were ineffective during the mitigation phase."  (ECF No. 218, 21.)  The Court does not agree. No legitimate inference can be drawn from the fact that Keenan's ineffective-assistance claims

### 1.  Procedural Posture

Keenan raised all but the last sub-claim, again in virtually identical form, to the Ohio Supreme Court on direct appeal.  (App. to Return of Writ, Direct Appeal, vol. 3, 99-109.)  Those claims (contained in his fifteenth ground for relief) are preserved for habeas review.  Keenan raised his final sub-claim (contained in his seventeenth ground for relief) on post-conviction appeal, but the court dismissed it on procedural grounds.  Keenan argues that this procedural default is excused under the actual innocence exception.  (ECF No. 223, 100.)  This Court already has addressed and rejected that argument.  *See supra* Part VII.C.  Keenan's sub-claim relating to his counsel's failure to impeach state witnesses, therefore, is procedurally defaulted.

### 2.  Merits

Nevertheless, the Court finds all of Keenan's ineffective-assistance claims meritless.  To succeed on a claim for ineffective assistance of counsel, a petitioner must satisfy the two-prong test announced in *Strickland v. Washington*, 466 U.S. 668 (1984).  First, the petitioner must demonstrate that counsel's errors were so egregious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id* at 687.  To determine if counsel's performance was "deficient" pursuant to *Strickland*, a reviewing court must find that the representation fell "below an objective standard of reasonableness."  *Id.* at 688.   A court considering an ineffective-assistance claim "must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance."  *Harrington v. Richter*, 131 S. Ct. 770, 787 (2011)

are limited to the guilt phase of his trial.

137

(quoting *Strickland*, 466 U.S. at 689).

Second, the petitioner must demonstrate that he or she was prejudiced by counsel's errors.  To do this, a petitioner "must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Harrington,* 131 S. Ct. at 787 (quoting *Strickland*, 466 U.S. at 694).  "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Id*. (quoting *Strickland*, 466 U.S. at 693).  "Counsel's  errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Id*. (quoting *Strickland*, 466 U.S. at 687).

A reviewing court must strongly presume that counsel's conduct was reasonable and might be part of a trial strategy.  *Strickland*, 466 U.S. at 689.  "'Judicial scrutiny of a counsel's performance must be highly deferential' and . . . 'every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Bell v. Cone*, 535 U.S. 685, 698 (2002) (quoting *Strickland*, 466 U.S. at 689).  "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington*, 131 S. Ct. at 788 (quoting *Strickland*, 466 U.S. at 690).  If a petitioner fails to prove either deficiency or prejudice, then the ineffective-assistance-of-counsel claims must fail.  *Lundgren v. Mitchell*, 440 F.3d 754, 770 (6th Cir. 2006) (citing *Strickland*, 466 U.S. at 697).

Keenan argues that this Court should review *de novo* his ineffective-assistance claims that the Ohio Supreme Court adjudicated on the merits. (ECF No. 223, 82.) That is wrong. Under the AEDPA, a habeas court is limited to determining whether a state court decision regarding an ineffective-assistance claim was contrary to, or an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d)(1); *Mitchell v. Mason*, 325 F.3d 732, 737-38 (6th Cir. 2003) (holding ineffective assistance of counsel is mixed question of law and fact to which the unreasonable application prong of Section 2254(d)(1) applies). The Supreme Court recently observed that the standards imposed by *Strickland* and Section 2254(d) are both "highly deferential," so that in applying them together, "review is 'doubly' so." *Harrington*, 131 S. Ct. at 788. Therefore, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.*

The Ohio Supreme Court generally concluded, "Keenan's ineffective-assistance claims lack merit." *Id.* at 153. It reasoned, "Keenan barely tries even to show deficient performance or resulting prejudice; instead, he makes shotgun claims and accuses his trial counsel, wholly without evidence, of deliberately sabotaging his defense in collusion with the state." *Id.* This Court agrees. Keenan's vague and conclusory allegations do not begin to satisfy his burden under *Strickland* of showing either deficient performance or resulting prejudice from the references to his first trial. Nevertheless, the Court will address each of Keenan's ineffective-assistance claims individually.

### a. failure to object to numerous errors

Keenan states as his first sub-claim that his counsel failed to object to "scores of"

errors in a "well orchestrated and deliberate denial of the effective assistance of counsel."

(ECF No. 223, 83.)  Keenan fails, however, to identify specific instances in which his

counsel failed to object other than those that are the subject of other claims.  This sub-

claim, therefore, is too vague and lacks merit.  *See, e.g., United States v. Crosgrove,* 637

F.3d 646, 663 (6th Cir. 2011) ("Because there is no developed argumentation in these

claims, the panel declines to address [the defendant's] general assertions of misconduct in

witness questioning and closing statements.").

### b.      failure to object to prosecutors' references to first trial

Keenan argues that his counsel were ineffective for failing to object to "repeated

references" made to Keenan's first trial, despite the trial court's instructions to refer to the

trial as "prior litigation."  (ECF No. 223, 85.)  The Ohio Supreme Court did not directly

address this claim, as it did not address several of Keenan's ineffective-assistance claims.

The court did observe, however, as to Keenan's many claims that his counsel should have

objected to evidence and argument, that "many lawyers recognize the wisdom of keeping

objections to a minimum."  *Keenan*, 81 Ohio St. 3d at 152, 689 N.E.2d at 947.  This

observation comports with prevailing federal law.  The Sixth Circuit has explained:

> [I]n a trial of any size, numerous potentially objectionable events occur.
> "[T]he Constitution does not insure that defense counsel will recognize and
> raise every conceivable constitutional claim." *Engle v. Isacc,* 456 U.S. 107,
> 134, 102 S. Ct. 1558, 71 L.Ed.2d 783 (1982).  Moreover, experienced trial
> counsel learn that objections to each potentially objectionable event could
> actually act to their party's detriment.  Learned counsel therefore use
> objections in a tactical manner.  In light of this, any single failure to object
> usually cannot be said to have been error unless the evidence sought is so
> prejudicial to a client that failure to object essentially defaults the case to the
> state.  Otherwise, defense counsel must so consistently fail to use
> objections, despite numerous and clear reasons for doing so, that counsel's
> failure cannot reasonably have been said to have been part of a trial strategy

or tactical choice.

*Lundgren*, 440 F.3d at 774.

Thus, this sub-claim also fails.

### c.      failure to object to prosecutorial misconduct

Keenan next contends that his trial counsel were ineffective for "failing to object to prosecutorial misconduct."  (ECF No. 197, 52.)  Keenan does not identify the specific instances of misconduct about which he complains in his Petition, but the Court presumes from his Traverse that he is referring to the prosecutors' questioning of Espinoza and Rosell about letters Keenan had written to them.  (ECF No. 223, 86-88.)   Keenan asserts that "[d]efense counsel worked in collusion with the prosecutor inferring the letters were sinister in nature by implying that defendant would deny writing these letters," when Keenan himself "readily admitted writing them in his capacity as co-counsel . . . ."  (*Id*. at 86.)

The Ohio Supreme Court addressed this claim.  It observed that an objection to this questioning "would have had merit: under the Best Evidence Rule, Evid. R. 1002, the state should have introduced the actual letters, rather than proving their content by testimony." *Keenan*, 81 Ohio St. 3d at 152, 689 N.E.2d at 947.  The court reasoned, however, that defense counsel "may well have preferred *not* to force the state to comply with the Best Evidence Rule," since the letters themselves may have been more damaging than the testimony about them.  *Id*.  It found "neither deficient performance nor prejudice in defense counsel's decision."  *Id*.

This Court agrees that counsel's failure to object may have flowed from sound

141

strategic considerations.  Indeed, Keenan's counsel initially objected to the letters being

admitted.  When the prosecutor replied that he was not offering the letters as state exhibits,

defense counsel responded, "We understand.  We don't mind."  When the court asked him

if he understood the letters were not being offered, defense counsel replied, "Thank you,

sir."  (App. to Return of Writ, Trial Tr., vol. 7, 1949-50.)

> Accordingly, this sub-claim, too, is meritless.

### d.     failure to object to hearsay testimony of Detective Allen

> For his next sub-claim, Keenan complains of his counsel's failure to object to

hearsay testimony of Detective Allen.  (ECF No. 223, 88.)  As noted above, this Court

agrees with the Ohio Supreme Court that it is objectively reasonable trial strategy to avoid

too many objections.  Moreover, Keenan again has failed to demonstrate precisely how

each omission on his counsel's part was deficient practice or how it prejudiced him.  This

sub-claim fails.

### e.     failure to object to improper questioning of D'Ambrosio

> Keenan further asserts that his counsel were ineffective when they did not object to

the prosecution's questioning of D'Ambrosio.  (ECF No. 223, 89.)  Keenan specifies three

questions that were "improper" but were not objected to:  whether D'Ambrosio thought

Detective Allen was lying; whether Keenan had cheated Lewis with a bad check; and

whether D'Ambrosio was on death row with Keenan. (*Id.*)  Even if the Court assumes these

questions were improper, Keenan again has not proven deficient performance or prejudice.

This sub-claim lacks merit.

### f.     allowing prosecutors to improperly impeach defense witnesses

For his next sub-claim, Keenan contends that his counsel permitted the prosecutor to "illegally" impeach defense witnesses Robert Doyle and Michelle Fertal by questioning them about prior convictions in violation of Ohio Evidence Rule 609(B), which permits impeachment by evidence of convictions if the conviction occurred less than ten years beforehand.  (ECF No. 223, 89-90.)  Keenan claims that he was prejudiced by this questioning because Doyle and Fertal were his "principal alibi witnesses," and therefore their credibility was key to his alibi defense.  (*Id.* at 90.)

Keenan's claim as to Fertal's testimony is false.  Keenan concedes that his counsel did in fact object to questions about her criminal record even though the trial court overruled the objection.  Furthermore, Fertal's conviction occurred only five years before her testimony, thereby falling within Rule 609's ten-year time limit.  (*Id.*)  As to Doyle's testimony, although the Ohio Supreme Court did not specifically address this claim, the court's general ruling concerning Keenan's ineffective-assistance claims about his counsel's failure to object applies and is objectively reasonable.  As the court stated, it is an accepted trial strategy to avoid too many objections, and, moreover, Keenan has failed to sufficiently demonstrate deficient performance or prejudice.

This sub-claim, therefore, fails.

### g. failure to object to hearsay and conjecture from state witnesses

Keenan next contends that his trial counsel provided  ineffective assistance when they permitted the prosecution to elicit hearsay and speculative testimony from witnesses.  (ECF No. 223, 90-93.)  Keenan identifies several examples of what he claims was impermissible hearsay and speculative testimony to which his counsel failed to object.  He

143

does not, however, explain how this testimony prejudiced him.  This sub-claim is meritless.

### h.   allowing prosecutors to destroy the credibility of and chastise defense witnesses

For this sub-claim, Keenan claims that his counsel were ineffective when they colluded with prosecutors to destroy the credibility of Michelle Fertal by implying that Keenan had threatened her into testifying and by "chastising" his mother and thereby preventing her from fully testifying.  (*Id*. at 93.)  These claims also are false.  Keenan's counsel did not imply anything about Keenan during the questioning of Fertal at issue.  Rather, he was asking Fertal about her husband, who had threatened her about visiting him in jail.  (App. to Return of Writ, Trial Tr., vol. 8, 2341.)  Additionally, counsel did not chastise Keenan's mother; he politely asked her to limit her testimony to answering his questions.  (*Id*. at 2397.)  This sub-claim is meritless.

### i.   failure to advocate for Keenan

In Keenan's next sub-claim, he contends that his trial counsel were ineffective for "fail[ing] to advocate" for him.  (ECF No. 197, 52.)  Keenan does not identify the specific instances of this failure to advocate about which he complains in his Petition, but the Court presumes from his Traverse that he is referring to his counsel's "refusal to object to improper methods used by the prosecutor" in questioning Espinoza, as well as counsel's "gross incompetence" in conducting direct and cross-examinations.  (ECF No. 223, 93-95.)  As to the failure to object, this claim fails for the reason stated above.  As to counsel's general performance during direct and cross-examination, the claim is too vague to merit relief.  This sub-claim is meritless.

**j.      failure to present the alibi defense in proper order**

Keenan next complains that counsel were ineffective when they "deliberately destroyed [his] alibi defense by intentionlly [*sic*] altering the order of [his] alibi witnesses in taking the stand."  (ECF No. 223, 95.)  Keenan claims that the alibi witnesses should have testified in an order that would have presented his alibi chronologically.  He states that the fact that his counsel did not call the witnesses in that order "can only be construed as deliberate obstruction of justice in order to prevent the members of the jury from being able to follow the time line and chain of events as they occurred."  (*Id*.)  Moreover, Keenan contends that counsel conducted "no meaningful trial preparation whatsoever," including failing to interview most defense witnesses or any of the State's witnesses, and conducting no discovery.  (*Id*. at 96.)

Again, the Ohio Supreme Court did specifically not address this claim.  Nevertheless, this Court finds it meritless.  The order of witnesses falls within the type of "sound trial strategy" for which attorneys are given wide latitude.  *Pinholster*, 131 S. Ct. at 1404.  Keenan's more serious charge concerning counsel's lack of preparation is not supported by any evidence, and also fails.

**k.      conducting an improper closing argument**

Keenan argues in this sub-claim that his counsel mishandled closing argument by "insult[ing] the jury and inflam[ing] them against defendant."  (ECF No. 223, 96-97.)  Specifically, he complains that counsel suggested a "homosexual love triangle" between Klann, Lewis and Espinoza; misstated the alternative sentence to death; and criticized Keenan's statement to the jury as a "long-winded non-stop run-on."  (*Id*.)

145

The Ohio Supreme Court addressed Keenan's claim regarding the suggestion of a homosexual relationship between Klann, Lewis and Espinoza.  It stated, "We agree that there was no evidence of such a relationship, but Keenan's claim that this argument 'insult[ed]' the jurors is sheer speculation, insufficient to show prejudice."  *Keenan*, 81 Ohio St. 3d at 152, 689 N.E.2d at 947.  This ruling is neither contrary to, nor an unreasonable application of, *Strickland*.  As to the other allegedly improper statements, Keenan also provides no evidence of prejudice other than speculation.

Accordingly, this sub-claim fails.

### l.      failure to object to erroneous jury instructions

As this Court found no merit in Keenan's underlying claims regarding these jury instructions, *see supra* Part VII.H, Keenan cannot show prejudice, and his claim of ineffective assistance of counsel based on this ground must fail.  Moreover, the Ohio Supreme Court reasonably rejected Keenan's ineffective-assistance claim based on counsel's failure to object to jury instructions on the ground that "many lawyers recognize the wisdom of keeping objections to a minimum."  *Keenan*, 81 Ohio St. 3d at 152, 689 N.E.2d at 947.

### m.      failure to excuse a juror for cause

In Keenan's Traverse, he adds that his counsel were ineffective because they "passed juror Barbara Ford for cause even thought [*sic*] she was so in favor of the death penalty that she should have been excused for cause."  (ECF No. 223, 97.)   Keenan cites only to portions of Juror Ford's voir dire that demonstrate her views on the death penalty.  (*Id.*)

146

As the Ohio Supreme Court ruled, this contention "is simply false."  *Keenan*, 81 Ohio St. 3d at 153, 689 N.E.2d at 947.  Although Keenan's counsel originally passed for cause on Juror Ford at the conclusion of her voir dire, they immediately changed tact and moved to dismiss her for cause.  The trial court overruled the motion.  (App. to Return of Writ, Trial Tr., vol. 4, 567-68.)  The Court is mystified as to why Keenan would pursue a claim in this habeas action that the Ohio Supreme Court correctly ruled, and the record clearly reflects, is wholly without merit.

### n.    failure to impeach state witnesses

Keenan argues that his counsel rendered ineffective assistance by failing to impeach the State's witnesses.  (ECF No. 197, 53.)  He provides a detailed comparison of several witnesses' testimony at his first and second trials and D'Ambrosio's trial.  (ECF No. 223, 101-17.)  In particular, he claims that Espinoza varied his testimony "several hundred times," and as the prosecution's key witness, his credibility and veracity were of "utmost importance."  His counsel, however, "chose not to even attempt to impeach Espinoza" with his prior inconsistent statements at trial.  (*Id.* at 101-02.)

Keenan cites *United States v. Cronic*, 466 U.S. 648, 659 (1984), in which the Supreme Court stated, "[I]f counsel entirely fails to subject the prosecutor's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable."  Here, the Court agrees that the State's witnesses, particularly Espinoza, testified inconsistently on numerous points, both minor and material.  *See, e.g., supra* nn. 22-24 and 32, and accompanying text.  Nevertheless, the Court does not find that Keenan's counsel failed to subject the State's

147

case to "meaningful adversarial testing."  Defense counsel thoroughly cross-examined all prosecution witnesses.  With regard to Espinoza in particular, defense counsel vigorously attacked both the substance of his testimony and his credibility.  Counsel swiftly and thoroughly grilled Espinoza on every aspect of his version of the events, highlighting many weaknesses in his story.  He also assailed Espinoza's character with questions about his problems with employment, relationships and his dishonorable discharge from the army; his alcohol and drug use; and perhaps most significantly, his deal with the State to provide testimony in exchange for a reduced charge and sentence.  In doing so, he did, in fact, impeach Espinoza with prior testimony numerous times.  (*See, e.g.*, App. to Return of Writ, Trial Tr., vol. 6, 1411-12, 1429, 1457, 1473-74, 1516, 1532, and 1632.)  But counsel may have decided as part of a reasonable trial strategy that impeaching Espinoza with prior testimony even more often would disrupt the flow of the examination, emphasize the fact that Keenan had been tried before, further confuse the jury with minor facts, and risk leading the jury to sympathize with a witness who has testified in multiple proceedings about events that occurred more than six years before.

Moreover, Keenan does not show that further impeachment of the witnesses would have affected the outcome of the trial.  Keenan provides an exhaustive list of inconsistencies, but he does not identify which ones are material, or which statements were true or false.  Keenan has not met *Strickland*'s prejudice requirement.  *See Campbell v. United States*, 364 F.3d 727, 735 (6th Cir. 2004) (holding that counsel's performance in failing to impeach coconspirator with minor inconsistencies in coconspirator's prior trial testimony was not deficient, but was reasonable trial strategy).

148

Accordingly, this sub-claim lacks merit.

### 3. Conclusion

Keenan contends that the court must "address the cumulative effect of counsel's performance when assessing whether Mr. Keenan was prejudice [*sic*] by counsel's omissions."  (ECF No. 223, 82.)  Because Keenan has failed to show that his counsel was actually deficient or that he was actually prejudiced in any meaningful way, however, he cannot show that the cumulative effect of these alleged deficiencies amounted to ineffective assistance of counsel.  *Campbell*, 364 F.3d at 736 (6th Cir. 2004) (the accumulation of non-errors cannot establish constitutionally ineffective assistance of counsel).

Ultimately, there is a strong presumption that counsel's performance lies within a wide range of reasonable professional conduct.  *Strickland*, 466 U.S. at 689.  This Court's review of Keenan's trial counsel's performance is highly deferential.  *Id.*  Keenan has not overcome the presumption that counsel's decisions were grounded in reasonable trial strategy.  Accordingly, Keenan's ineffective-assistance-of-counsel claims are denied.

### J.   *Twenty-Second Ground for Relief:  Jury Charge*

For his twenty-second ground for relief, Keenan asserts that the trial court improperly refused his request for an instruction on murder as a lesser included offense of aggravated murder under Count One, resulting in the jury not being required to make a specific finding of guilt or to unanimously agree as to which theory he had been found guilty.  (ECF No. 197, 60-61; ECF No. 223, 171-73.)

Count One of Keenan's indictment charged aggravated murder with "prior

149

calculation and design" under Ohio Rev. Code § 2903.01(A).  Count Two charged

aggravated murder for "felony murder" under Ohio Rev. Code § 2903.01(B).  Keenan

argued to the trial court that the jury should have been instructed on the lesser offense of

straight murder because there was conflicting evidence regarding whether the murder was

committed with prior design or whether it was a spur-of-the-moment act, in which case it

would constitute either murder or manslaughter.  (App. to Return of Writ, Trial Tr., vol. 8,

2480-83.)  The State argued that if the jury believed Espinoza's testimony, then there

would be no possibility for any finding other than prior calculation and design.  The court

agreed with the State and ruled,

> [T]here is no evidence to support a charge down on this case, that, in fact, it
> appears to the Court that all the charges in the indictment and also, with the
> alibi filed, that the findings by the jury will relate to a finding of guilty or
> not guilty as to all of those counts, and there is no evidence in the record
> indicating or justifying the Court charging on a lesser included charge of
> murder.

(*Id*. at 2482.)

### 1.    Procedural Posture

Keenan raised this claim on direct appeal to the Ohio Supreme Court, which

adjudicated and dismissed it on the merits.  *Keenan*, 81 Ohio St. 3d at 139-40, 689 N.E.2d

at 939.  It is therefore preserved for federal habeas review.

### 2.    Merits

The Ohio Supreme Court denied this claim on direct appeal on purely state-law

grounds.  *Keenan*, 81 Ohio St. 3d at 1139-40, 689 N.E.2d at 939.  It held that under Ohio

law, because Keenan presented an alibi defense, "Keenan was entitled to a murder

instruction only if the jury, viewing the evidence in the light most favorable to the defense,

could have had a reasonable doubt as to prior calculation and design, but yet could have found that Keenan purposely killed Klann." *Id*.  It then found that "[n]either Keenan nor the state presented any evidence negating prior calculation and design.  Thus, the jury was never presented with a reasonable view of the evidence on which it could have convicted Keenan of murder." *Id*. at 140.  A murder instruction, it concluded, would have been an "improper invitation to the jury to reach a compromise verdict that could not possibly be sustained by the adduced facts." *Id*. (internal quotation marks and citation omitted).

Keenan claims that the Ohio court's ruling is "contrary to the record and to the clearly established law."  (ECF No. 197, 46.)  Respondent argues that the Ohio Supreme Court's ruling is correct.  She also maintains that by asserting this claim, Keenan "should be seen by this Court as confessing to his participation in the crime," since in contrast to his alibi defense and claim of actual innocence, "Keenan does not challenge identity of the perpetrator; i.e. himself," in this claim.  (ECF No. 218, 8.)

In *Beck v. Alabama*, 447 U.S. 625, 627 (1980), the Supreme Court held that an Alabama statute that prohibited lesser included offense instructions in capital cases was unconstitutional, because a jury must be permitted to consider a verdict of guilt of a noncapital offense "in every case" in which "the evidence would have supported such a verdict."

The Court further explained its reasoning in *Beck* in a later decision, *Hopper v. Evans*, 456 U.S. 605 (1982).  It stated:

> The *Beck* opinion considered the alternatives open to a jury which is [precluded by state law from convicting] a defendant of a lesser included offense when there was evidence which, if believed, could reasonably have led to a verdict of guilt of a lesser offense.  In such a situation, we concluded,

> a jury might convict a defendant of a capital offense because it found that the
> defendant was guilty of a serious crime.  Or a jury might acquit because it
> does not think the crime warrants death, even it if concludes that the
> defendant is guilty of a lesser offense.  While in some cases a defendant
> might profit from the preclusion clause, we concluded that "in every case [it]
> [introduces] a level of uncertainty and unreliability into the fact finding
> process that cannot be tolerated in a capital case."

*Hopper*, 456 U.S. at 610.  The *Hopper* Court clarified that "due process requires that a

lesser included offense instruction be given *only* when the evidence warrants such an

instruction." *Id*.  Thus, "[t]he federal rule is that a lesser included offense instruction should

be given 'if the evidence would permit a jury rationally to find [a defendant] guilty of the

lesser offense and acquit him of the greater.'" *Id*. at 612 (quoting *Keeble v. United States*,

412 U.S. 205 (1973)).

The Supreme Court emphasized again in the case *Schad v. Arizona*, 501 U.S. 624

(1991), that the concern *Beck* addressed was juries being presented with an "all-or-nothing

choice between the offense of conviction (capital murder) and innocence." *Id*. at 646-47.

The Court determined that in that case this concern was not present because the jury was

given a "third option," second-degree murder. *Id*. at 647-48.  The *Schad* Court also held

that the trial court's second-degree murder instruction, rather than the defendant's requested

robbery instruction, did not "diminish the reliability of the jury's capital murder verdict."

*Id*. at 647.  The Court explained that to accept the defendant's argument, it "would have to

assume that a jury unconvinced that petitioner was guilty of either capital or second-degree

murder, but loath to acquit him completely (because it was convinced he was guilty of

robbery), might choose capital murder rather than second-degree murder as its means of

keeping him off the streets." *Id*.  Finally, although the *Schad* Court clarified that *Beck*

152

would not "be satisfied by instructing the jury on just any lesser included offense, even one without any support in the evidence," it opined that the second-degree murder instruction was "adequate to indicate that the verdict of capital murder represented no impermissible choice" because "petitioner concede[d] that the evidence would have supported a second-degree murder conviction." *Id.* at 648.

This Court finds that  it is possible under Section 2254(d)(1) for a fairminded jurist to believe that the Ohio Supreme Court's rationale comports with the holdings of *Beck* and its progeny.  Those cases, like the Ohio cases the court cited, require an instruction for a lesser included offense only where the evidence permits the jury to rationally find him guilty of such an offense.  Here, because Keenan offered an alibi defense, the jury was faced with the task of accepting the evidence of the State or that of Keenan.  If it rejected Keenan's alibi, and accepted the State's theory of the crime as offered by Espinoza, the jury could not rationally find him guilty of murder since the State's evidence did not support a spur-of-the-moment killing.  The Court finds that the evidence adduced at trial could not have reasonably supported both an acquittal on aggravated murder and a conviction on the charge of murder.

For these reasons, the Ohio Supreme Court's conclusion that the trial court did not err in denying Keenan's request for an instruction on the lesser included offense of murder was neither contrary to, nor an unreasonable application of, established United States Supreme Court law, and Keenan is not entitled to relief.

## VIII.   Certificate of Appealability Analysis

This Court must now determine whether to grant a Certificate of Appealability

("COA") for any of Keenan's grounds for relief.  The Sixth Circuit has determined that

neither a blanket grant nor a blanket denial of a COA is an appropriate means by which to

conclude a capital habeas case as it "undermine[s] the gate keeping function of certificates

of appealability, which ideally should separate the constitutional claims that merit the close

attention of counsel and this court from those claims that have little or no viability."

*Porterfield v. Bell*, 258 F.3d 484, 487 (6th Cir. 2001); *see also Murphy v. Ohio*, 263 F.3d 466

(6th Cir. 2001) (remanding motion for certificate of appealability for district court's analysis

of claims).  Thus, in concluding this Opinion, this Court now must consider whether to grant

a COA as to any of the claims Keenan presented in his Petition pursuant to 28 U.S.C. §

2253.

> That statute states in relevant part:
>
> (c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal
> may not be taken to the court of appeals from --
>
> > (A) the final order in a habeas corpus proceeding in which the detention
> > complained of arises out of process issued by a State court . . .
>
> (2) A certificate of appealability may issue under paragraph (12) only if the applicant
> has made a substantial showing of the denial of a constitutional right.

28 U.S.C. § 2253.  This language is identical to the requirements set forth in the pre-

AEDPA statutes, requiring the habeas petitioner to obtain a Certificate of Probable Cause.

The sole difference between the pre- and post-AEDPA statutes is that the petitioner must

now demonstrate he was denied a *constitutional* right, rather than the federal right that was

required prior to AEDPA's enactment.

The United States Supreme Court interpreted the significance of the revision

between the pre- and post-AEDPA versions of that statute in *Slack v. McDaniel*, 529 U.S.

154

473 (2000).  In that case, the Court held that Section 2253 was a codification of the standard

it set forth in *Barefoot v. Estelle*, 463 U.S. 880 (1983), but for the substitution of the word

"constitutional" for "federal" in the statute.  *Id.* at 483.  Thus, the Court determined,

> [t]o obtain a COA under § 2253(c), a habeas prisoner must make a
> substantial showing of the denial of a constitutional right, a demonstration
> that, under *Barefoot*, includes showing that reasonable jurists could debate
> whether (or, for that matter, agree that) the petition should have been
> resolved in a different manner or that the issues presented were "adequate to
> deserve encouragement to proceed further."

*Id.* at 483-04 (quoting *Barefoot*, 463 U.S. at 893 n.4).

The Court went on to distinguish the analysis a habeas court must perform

depending upon its finding concerning the defaulted status of the claim.  If the claim is not

procedurally defaulted, then a habeas court need only determine whether reasonable jurists

would find the district court's decision "debatable or wrong."  *Id.* at 484.  A more

complicated analysis is required, however, when assessing whether to grant a COA for a

claim the district court has determined is procedurally defaulted.  In those instances, the

Court opined, a COA should only issue if "jurists of reason would find it debatable whether

the petition states a valid claim of the denial of a constitutional right and that jurists of

reason would find it debatable whether the district court was correct in its procedural

ruling."  *Id.* (emphasis added).

After taking the above standards into consideration, the Court finds that only one

issue merits further review.  The Court finds that Keenan's sixteenth ground for relief

(gateway actual innocence) merits issuance of a COA.  While the Court found that Keenan's

alibis for both of the nights that the murder may have occurred have significant weaknesses,

and therefore he has failed to meet the extremely high standard to satisfy this claim,

155

reasonable jurists could differ on this point.  And if Keenan were to prevail on this claim, the procedural posture of several of his claims may be affected.  Thus, the Court's resolution of this claim is debatable.

The Court will not issue a COA for grounds for relief 1 (counsel of choice); 3 (indictment/date of offense); 5 (trial court error/hearsay testimony), sub-claim 1; 7 (judicial bias), partially; 8 (prosecutorial misconduct), sub-claim 9 (first trial references); 10 (trial court error/reference to Keenan imprisonment); 11 (trial court error/shackled witness); 12 (jury instruction/conspiracy); 15 (ineffective assistance of counsel); 18 (prosecutorial misconduct/false testimony); 20 (prosecutorial misconduct/expert testimony); and 22 (jury charge/lesser included offense).  No jurist of reason would debate the Court's conclusions regarding these claims.

No COA will issue for grounds for relief 2 (trial court error/full participation); 4 (complete transcript); 5 (trial court error/hearsay testimony), except sub-claim 1; 6 (trial court error/expert testimony); 7 (judicial bias), partially; 8 (prosecutorial misconduct), sub-claims 1-8; 9 (indictment/date of offense);13 (jury instruction/aiding and abetting); 14 (jury instruction/failure to act); and 17 (ineffective assistance of counsel/inconsistent testimony). These claims are unequivocally procedurally defaulted.

## IX.    Conclusion

This Court finds that all but two of the grounds raised by Keenan in his Petition for Writ of Habeas Corpus are not well taken on the merits or are procedurally barred, or both. The Court does find meritorious, however, Keenan's nineteenth and twenty-first grounds for relief, in which he challenges the constitutionality of the trial court's imposition of his

conviction for aggravated murder.  Specifically, the Court finds that Keenan was denied the right to due process pursuant to the Fourteenth Amendment as interpreted in *Brady v. Maryland*, 373 U.S. 83 (1963), which forbids the prosecution from suppressing material information that is favorable to an accused.

Accordingly, the Court grants Keenan's Petition and issues a Writ of Habeas Corpus as follows.  Respondent shall either: (1) set aside Keenan's conviction for aggravated murder and death sentence attendant thereto; or (2) conduct another trial within 180 days from the effective date of this Order.  On this Court's own motion, execution of this Order and, hence, its effective date, is stayed pending appeal by the parties.

The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this decision could be taken in good faith as to ground for relief 16, and the Court issues a certificate of appealability pursuant to 28 U.S.C. § 2253(c) and Federal Rule of Appellate Procedure 22(b) as to that claim only.  As to all remaining claims, the Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this decision could not be taken in good faith, and that there is no basis upon which to issue a certificate of appealability.  28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

IT IS SO ORDERED.

s/ *David A. Katz*
U. S. DISTRICT JUDGE

April 24, 2012

157